UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
                   v.             )     No. 03 CR 779
                                  )
LAURENCE W. CAPRIOTTI,            )     Judge James B. Moran
JACK L. HARGROVE,                 )
MICHEL D. THYFAULT,               )
JAMES R. WALLWIN and              )
GEORGE J. STIMAC                  )

**FILED**
DEC 2 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## NOTICE OF FILING

TO:     See Attached Service List.

PLEASE TAKE NOTICE that on Tuesday, December 2, 2003, the undersigned filed with the Clerk of this Court,

## GOVERNMENT'S CONSOLIDATED RESPONSE
## TO DEFENDANTS' PRETRIAL MOTIONS

service of which is being made upon you.

*Robert W. Kent, Jr./pmz*
ROBERT W. KENT, JR.
Assistant United States Attorney
219 S. Dearborn, 5th Floor
Chicago, IL 60604
(312) 886-4185

STATE OF ILLINOIS     )
                      ) SS
COUNTY OF COOK        )

Peggy M. Zabinski, being duly sworn on oath, deposes and says that she is employed in the Office of the United States Attorney for the Northern District of Illinois; and that on the 2nd day of December, 2003, she caused a copy of **Government's Consolidated Response To Defendants' Pretrial Motions** to be mailed to the individuals(s) named above.

*Peggy M. Zabinski*

SUBSCRIBED and SWORN to before me
this 2nd day of December, 2003

*Carol L. Blue*

N O T A R Y   P U B L I C

"OFFICIAL SEAL"
Carol L. Blue
Notary Public, State of Illinois
My Commission Exp. 06/24/2006

<u>SERVICE LIST - 03 CR 779</u>

## <u>ATTORNEYS FOR JACK L. HARGROVE</u>

Edward Genson
Genson & Gillespie
53 W. Jackson Blvd.
Suite 500
Chicago, IL 60604
312-726-9015

Marc W. Martin
Genson & Gillespie
53 W. Jackson Blvd.
Suite 1420
Chicago, IL 60604
312-408-1111

## <u>ATTORNEY FOR LAWRENCE CAPRIOTTI</u>

Theodore T. Poulos
Cotsirilos, Tighe & Streicker, Ltd.
33 N. Dearborn Street
Suite 600
Chicago, IL 60602
312-263-0345

## <u>ATTORNEYS FOR MICHEL D. THYFAULT</u>

Aldo E. Botti
Peter M. DeLongis
Thomas E. Haught
Botti, Marinaccio & DeLongis, Ltd.
720 Enterprise Drive
Oak Brook, IL 60523
630-573-8585

## <u>ATTORNEY FOR JAMES R. WALLWIN AND GEORGE J. STIMAC</u>

Shelly B. Kulwin
161 N. Clark Street
Suite 2500
Chicago, IL 60601
312-641-0300

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 03 CR 779 |
| | ) | |
| LAURENCE W. CAPRIOTTI, | ) | |
| JACK L. HARGROVE, | ) | |
| MICHEL D. THYFAULT, | ) | Judge James B. Moran |
| JAMES R. WALLWIN and | ) | |
| GEORGE J. STIMAC | ) | |

FILED

DEC X 2 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## GOVERNMENT'S CONSOLIDATED RESPONSE
## TO DEFENDANTS' PRETRIAL MOTIONS

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, hereby responds to the pretrial motions filed by

defendants Laurence W. Capriotti, Jack L. Hargrove and Michel D. Thyfault.[1]

## I      SUMMARY OF THE INDICTMENT

The indictment contains seventeen counts and a forfeiture allegation. Counts One through

Seven charge Capriotti, Hargrove and Thyfault each with several counts of mail and wire fraud

affecting financial institutions, in violation of 18 U.S.C. §§ 1341 and 1343. Count Eight charges the

same three defendants with conspiracy to commit mail fraud and wire fraud affecting financial

---

[1]      Defendants James R. Wallwin and George J. Stimac have not filed any pretrial
motions. This response does not address Hargrove's motion for early return of trial subpoenas or
Hargrove's motion to suppress evidence. The Court granted the former at the status hearing on
November 18, 2003. As for the latter, in response to the government's request for additional time
to investigate, the Court at the status hearing granted the government an indefinite amount of time
to respond. The government notes that the minute order issued by the Court relating to the status
hearing did not state that the government's response to Hargrove's motion to suppress evidence was
continued indefinitely. The government respectfully requests that the Court issue a minute order to
make that fact clear.

institutions, in violation of 18 U.S.C. § 371. The object of the conspiracy is the scheme to defraud described in Count One. Counts Nine, Ten and Eleven charge Hargrove with making a false statement on his income tax return, in violation of 26 U.S.C. § 7206(1). Count Twelve charges Hargrove with tax evasion, in violation of 26 U.S.C. § 7201. Counts Thirteen, Fifteen and Sixteen charge Capriotti with making a false statement on his income tax return, in violation of 26 U.S.C. § 7206(1). Count Fourteen charges Capriotti with tax evasion, in violation of 26 U.S.C. § 7201. Count Seventeen charges Wallwin and Stimac with insurance fraud, in violation of 18 U.S.C. § 1033.

### A. **Background**

The defendants and other relevant individuals are as follows:

**Laurence W. Capriotti**, a lawyer, was an owner, president and a director of Intercounty Title Company of Illinois (Intercounty-Illinois) and ITI Enterprises, Inc., and a director of Independent Trust Corporation (Intrust).

**Jack L. Hargrove**, a real estate developer, was an owner and chairman of the board of directors of Intercounty-Illinois, ITI Enterprises and Intrust.

**Michel D. Thyfault**, a certified public accountant, was chief financial officer of Intercounty-Illinois from 1989 to late 1995, chief financial officer of ITI Enterprises from late 1995 to November 1996, and a director of Intrust from December 1990 to December 1994.

**James R. Wallwin** was treasurer of Intercounty-Illinois from 1989 to late 1995, and from late 1995 to October 1996 was treasurer of ITI Enterprises.

**George J. Stimac**, a certified public accountant, was assistant controller of Intercounty-Illinois from 1986 to 1992, was controller from 1992 to late 1995, and was controller of ITI Enterprises from late 1995 to February 1997.

**Allan Hurwick**, a certified public accountant who passed away in March 2002, was chief financial officer of ITI Enterprises from January 1997 until 2000.

2

A person referred to herein as **Individual A** was an officer and director of Intercounty-Illinois, a director of Intrust, and an owner, officer and director of Intercounty Title Company, and Indiana corporation (Intercounty-Indiana) and Intercounty National Title Insurance Company (INTIC).

According to the indictment, Intercounty-Illinois, which had its primary office at 120 Madison St. in Chicago, was a title insurance agent for a Texas-based title insurance company named Stewart Title Guaranty Company. Intercounty-Illinois's relationship with Stewart lasted until about December 1995, when Intercounty-Illinois essentially ceased operations. From 1984 until April 1991, Intercounty-Illinois was owned approximately 40 percent by Capriotti, 40 percent by Hargrove, and 20 percent by Stewart. After April 1991, Capriotti and Hargrove each owned approximately 50 percent.

As a title insurance agent for Stewart, Intercounty-Illinois sold title insurance policies that were issued by Stewart to customers in the Chicago area and also acted as an escrow agent for the collection and disbursement of funds relating to the purchase, sale and construction of real estate. All of the funds that Intercounty-Illinois received as escrow agent were deposited and commingled in a few escrow accounts that it controlled, first at LaSalle National Bank until about September 1999, and later at Harris Bank and Trust. On a monthly basis, Intercounty-Illinois engaged in thousands of escrow account transactions involving the receipt and disbursement of millions of dollars belonging to its customers, who directed the transactions. Due to the volume of business, there was a substantial float in the escrow accounts, meaning that on any particular day, the total amount of title insurance customer funds that were deposited into the escrow accounts substantially exceeded the total amount of funds paid out. An escrow agreement between Stewart and

3

Intercounty-Illinois provided that Intercounty-Illinois agreed to keep the escrow funds safe and separate and to disburse the funds only for purposes authorized by the title insurance customers.

After late 1995, as Intercounty-Illinois became inactive, Intercounty-Illinois and Stewart were replaced by a set of new companies that provided the same services through a different corporate organization; these included: Intercounty-Indiana, Intercounty National Title Insurance Company (INTIC), and ITI Enterprises, which Capriotti and Hargrove each half-owned. Fidelity National Title Insurance Company of New York acted as reinsurer for most of the insurance underwritten by INTIC. ITI Enterprises controlled the escrow accounts.

Intrust, located in Lombard from 1989 until 1992, and later in Orland Park, served as a trustee for various types of trust accounts, including individual retirement accounts and employee benefit plans. In November 1989, Madison Avenue Investments, Inc., which was owned by Hargrove, purchased a controlling interest in the stock of Intrust, and Intercounty-Illinois purchased a minority interest. In approximately December 1990, Madison Avenue Investments, Inc. purchased the Intrust stock owned by Intercounty-Illinois and became the sole shareholder of Intrust.

In early December 1990, Intrust entered into an escrow agreement with Intercounty providing that Intercounty would serve as a vehicle for the daily investment of the cash in Intrust's trust accounts. Under the agreement, only Intrust was authorized to withdraw its funds from the escrow account. In reality, though, Intercounty controlled the funds and Intrust lacked the ability to remove money from the account directly. Between December 1990 and April 1999, Intrust channeled more than $50 million to the Intercounty-Illinois and Intercounty-Indiana escrow accounts. With interest, the Intrust funds should have grown to more than $68 million. Although Intrust was regulated by

4

the Illinois Office of Banks and Real Estate, none of the trust funds that Intrust deposited with Intercounty were insured.

From 1987 onward, Intercounty-Illinois was insolvent as a result of a price war in the Chicago title insurance market in the late 1980s, coupled with losses in excess of $10 million from bad investments in junk bonds with funds from a so-called "mortgage defeasance program." In 1987, Intercounty-Illinois lost more than $6 million and the deficit exceeded $20 million annually in the years after 1990.

### B.    Alleged Offenses

The indictment alleges that, beginning no later than 1988 and continuing until February 2000, Capriotti and Hargrove, assisted by Thyfault, Wallwin, Stimac, Hurwick and others, stole more than $80 million from the escrow accounts that were managed by Intercounty-Illinois and ITI Enterprises.

As part of the scheme, Capriotti, Hargrove, Thyfault and Hurwick allegedly fraudulently caused Intrust to tender more than $50 million in trust holder funds to Intercounty-Illinois and ITI Enterprises. Rather than keeping the Intrust funds in the escrow accounts as required, the defendants caused the Intrust funds to be spent as part of their ongoing scheme to deplete the escrow accounts. By infusing the Intrust funds into the escrow accounts and taking advantage of the natural float in the escrow accounts, the defendants were able to steal millions of dollars, use Intrust money and new title customer money to pay off old title customers, and continue the scheme for more than a decade. In the end, Intrust and its trust holders lost all of the more than $50 million that had been tendered, plus the more than $18 million in interest that they thought was accruing. Fidelity, which was insuring the escrow accounts when the scheme came to a close in early 2000, ultimately suffered the

remainder of the loss by paying more than $30 million to the title insurance customers who had deposited funds into the escrow accounts but had not yet withdrawn them.

The indictment alleges that the defendants engaged in various acts to conceal the scheme from Stewart, certain Intercounty-Illinois employees, Intrust's president, Intrust's auditors, state regulators and others.

Of the more $80 million that defendants stole, they plowed back approximately $70 million into their title insurance companies and other businesses. This was accomplished by:

- withdrawing more than $1 million in the late 1980s and using the funds to benefit Intercounty-Illinois and finance the acquisition of a commercial office building in Chicago;

- withdrawing more than $15 million starting in 1989 and using the funds to purchase certificates of deposit in the name of Intercounty-Illinois at various Chicago area financial institutions. Capriotti and Hargrove converted many of the CDs to their own use, and in some cases pledged the CDs as collateral for personal loans. Some of the loan proceeds were deposited into Intercounty-Illinois's operating accounts and were booked as loans to Intercounty from Capjac Investments Group, Inc., which was owned by Capriotti and Hargrove;

- withdrawing millions of dollars from the escrow accounts and disbursing the funds to Capjac, which Capriotti and Hargrove converted to their own use. Between 1991 and 1994, they caused more than $3 million to be disbursed to Capjac, and then caused a substantial portion to be transferred to Intercounty-Illinois's operating accounts; and

- starting in 1994, transferring more than $45 million – on an almost monthly basis for six years – from the escrow accounts to the operating accounts of Intercounty-Illinois and ITI Enterprises.

The indictment also alleges, as part of the fraud scheme, that from 1994 onward, Capriotti and Hargrove stalled, obstructed and made false statements and promises to the Office of Banks and Real Estate and Intrust's president. From 1994-96, OBRE issued reports noting the amount of money that Intrust had transferred to the escrow account and criticizing the commingling of funds.

6

In response to critical reports in 1997-98, the defendants provided OBRE with allegedly fraudulent escrow account statements purporting to show that the primary Intrust escrow account at LaSalle Bank contained in the vicinity or more than $53 million or $54 million, when, in fact, the account contained only $45,949.

As the fraud scheme neared its end-stage in early April 1999, LaSalle Bank advised Capriotti and Hargrove that the primary title insurance company escrow account was overdrawn by several million dollars, and that they needed to deposit funds into the account. Capriotti told the bank that Intercounty had $13 million in CDs and substantial funds in another bank account, when in fact, the indictment alleges, the CDs did not exist and the other account contained less than $2,500. Instead, according to the indictment, Capriotti and Hargrove obtained $9.2 million from Intrust by falsely telling Intrust's president that the funds were needed to boost Capriotti and Hargrove's account balances at LaSalle Bank so that the bank would charge them lower interest on a loan and falsely promising that the funds would be returned to Intrust by April 30. Capriotti and Hargrove used this $9.2 million to cure the overdraft problem and did not return any money to Intrust. A short time later, LaSalle Bank asked Capriotti and Hargrove to take their banking business elsewhere.

The defendants established a new primary escrow account at Harris Bank. By January 2000, that escrow account was substantially overdrawn, the indictment alleges, adding that, on January 5, Capriotti and Hargrove again attempted to obtain another $13 million from Intrust by again falsely stating to Intrust's president that the money was needed to reduce Capriotti and Hargrove's interest rate on a loan. This time, Intrust's president refused their request, according to the indictment, and the scheme ended the following month.

The four tax counts against Hargrove allege that he filed false federal income tax returns for 1996, 1997 and 1998, and that he evaded his tax obligation for 1999 by failing to file a return or pay any income tax for that year. In 1996 alone, he allegedly failed to report and pay taxes on more than $2 million in taxable income.

The four tax counts against Capriotti allege that he filed false federal income tax returns for 1996, 1999 and 2000, and that he evaded his tax obligation for 1998, when he reported that adjusted gross income was a loss of ($460,970), and he paid the alternative minimum tax of $2,212. In fact, his total income was approximately $732,133 greater than that and he owed more than $30,000 in additional taxes.

## II    MOTIONS TO ADOPT AND FOR LEAVE TO FILE ADDITIONAL MOTIONS

Thyfault moves to adopt the motions filed by his co-defendants, stating only that he adopts those motions "that are applicable" to him. Capriotti has filed a general motion to adopt Hargrove's motions, without any limit, explanation, or specification. The government objects to these motions to adopt. Courts in this circuit have repeatedly admonished that it is not the obligation of the court to sift through the various co-defendants' motions and determine which, if any, may have applicability to a given defendant. United States v. Sims, 808 F. Supp. 596, 602 (N.D. Ill. 1992) (noting that "barebones motions to adopt are routinely denied"); United States v. Milete, 1995 WL 702627 (N.D.Ill. 1995); United States v. Damico, 1995 WL 221883 (N.D. Ill. 1995); United States v. Messino, 855 F. Supp. 955, 971 (N.D. Ill. 1994). The barebones motions to adopt filed by Thyfault and Capriotti should be denied.

Hargrove has filed a motion for leave to file additional pretrial motions if he deems it to be "necessary" based on the review of documents done after the due date for motions. This Court,

pursuant to Rule 12(c) of the Federal Rules of Criminal Procedure, has established a schedule for the filing of pretrial motions. Hargrove has filed a large number of such motions. The government suggests that this Court should evaluate the propriety of any subsequent defense motions on a case-by-case basis. Rule 12(f) of the Federal Rule of Criminal Procedure provides in part that "the court for cause shown may grant relief" from failure to raise an objection "at the time set by the court." Hargrove should be required to seek leave to file additional motions at such time as he determines that additional motions are necessary. Only at that time will the Court be in a position to determine, for example, whether Hargrove has shown good cause for the late filing of a particular motion or whether the late filing of a motion will unduly prejudice the government. See Sims, 808 F. Supp. at 617. For the foregoing reasons, Hargrove's motion should be denied.

## III    SCHEDULING MOTIONS

Hargrove and Thyfault have filed several motions seeking to set schedules for various pretrial disclosures and filings. The government agrees that the Court should set such schedules. The government contends, however, that the motions filed by defendants, for the most part, should be denied, because their proposed schedules are unworkable and do not contain corresponding defense disclosure obligations.

### A.    Santiago Proffer

The government, in its discovery letter, proposed to file its Santiago proffer thirty days before trial. Hargrove has filed a motion suggesting that it be filed ninety days before trial. The government respectfully requests that the Court enter an order requiring the Santiago trial to be filed

9

four weeks before trial.[2] Based on the government's "open file" policy with respect to documents, and the generous pretrial disclosures proposed below, this schedule will give the defendants adequate time to prepare. In addition, based on experience, counsel for the government knows that the detailed witness preparation that is done to prepare for trial inevitably leads to the discovery of additional evidence, including additional co-conspirator statements. Thus, any earlier due date will work a severe hardship on the government. The government also requests that the Court order the defendants to file any objection to the Santiago proffer fourteen days before trial.

## B.    Rule 404(b) Evidence

The government, in its discovery letter, proposed to give notice of any proposed Rule 404(b) evidence thirty days before trial. Hargrove has filed a motion suggesting that notice be given ninety days before trial. The government respectfully requests that the Court enter an order requiring such notice be given eight weeks before trial. Twice the normal thirty days notice is more than adequate here. Contrary to the claims of the defendants, this is not a "highly complex and involved case." The factual background of the case may be somewhat complicated, but the essence of defendants' crime is simple -- the indictment charges that defendants stole from Intercounty's escrow accounts money that belonged to other people.

The government also requests that the Court require the defendants to file any objection to the government's Rule 404(b) notice four weeks before trial.

---

[2]    Given the existence of weekends, a schedule that speaks of things to be filed "weeks before trial" works better than one that speaks of "days before trial."

## C.        Jencks Act Material

Hargrove moves the Court to order the government to produce its "18 U.S.C. § 3500 material" ninety days before trial. Such material need not be provided until after the witness in question testifies at trial. 18 U.S.C. § 3500. In view of the desirability of avoiding delays in the trial due to the timing of such disclosures, the government proposes to disclose all witness statements and interview summaries eight weeks before trial. This is more than adequate for defendants' trial preparation. Given that the government has agreed to make such disclosure, the government respectfully requests that the Court order the defendants to disclose all interview summaries of all of their potential witnesses two weeks before trial.

## D.        Brady/Giglio Material

Hargrove moves the Court to order the government to produce all "Brady/Giglio" material ninety days before trial. In its discovery letter, the government disclosed all of the Brady material of which it is aware. The government agreed to produce any additional Brady material that it receives promptly upon its receipt. As for Giglio material, the government proposes to provide all such material eight weeks before trial. Such disclosure is more than adequate, given the trial experience of defense counsel.

## E.        Expert Witness Materials

Hargrove and Thyfault move for pretrial production of government expert witness materials pursuant to Rule 16(a)(1)(E). The government has no objection to this request, and in turn requests that defendants make corresponding disclosures regarding their expert witnesses, pursuant to Rule 16(b)(1)(C). The government proposes that it make its disclosures eight weeks before trial, that the defendants make their disclosures six weeks before trial, and that any motions objecting to any

proposed expert testimony be filed four weeks before trial, with responses to any such motions due fourteen days before trial.

**F.    Charts, Summaries and Calculations**

Hargrove moves for entry of an order directing the government to produce final versions of all summary charts sixty days before trial. This deadline places unreasonable demands on the government. The government agrees to produce its summary charts six weeks before trial, provided that all defendants produce all of their summary charts two weeks before trial and all defense objections to the government's charts are filed four weeks before trial. In addition, it simply is not realistic to expect that all of the charts will be in final form at the time of their initial disclosure. The government will endeavor to keep all modifications to its summaries to a minimum, and suggests that the Court resolve any objections to any revisions.

**G.    Trial Exhibits**

Hargrove moves for entry of an order directing the government to identify its trial exhibits sixty days before trial. Again, this deadline places unreasonable demands on the government. The government agrees to identify its trial exhibits four weeks before trial, provided that the defense identifies its trial exhibits (both cross examination and defense case-in-chief) two weeks before trial, and files any objections to any government exhibits fourteen days before trial. Given the realities of trial, there inevitably will be additional exhibits used by each party, and again the government suggests that the Court resolve any disputes about notice involving exhibits.

**H.    Witness List**

Hargrove and Thyfault move for entry of an order directing the government to provide a witness list. The government objects to this motion.

It is clear that production of a witness list is not required by Local Criminal Rule 16.1, Rule 16 of the Federal Rules of Criminal Procedure, or the Constitution, and is not favored:

> [T]he Constitution does not require that a defendant in a noncapital case be provided with a list of all prospective government witness. Nor does Rule 16 entitle a defendant to this information. In fact, Congress rejected a proposal that would have required the government and the defendant to exchange the names and addresses of their witnesses three days before trial. The conference committee expressed concern that such a requirement would discourage witnesses from testifying and would lead to "improper contact directed at influencing their testimony...."

United States v. Napue, 834 F.2d 1311, 1317 (7th Cir. 1987). Simply stated, "[t]he government is not required to provide a defendant with a list of all prospective government witnesses." United States v. Braxton, 877 F.2d 556, 560 (7th Cir. 1989)(citing United States v. Napue, 834 F.2d 1311, 1317 (7th Cir. 1987)). See also, Weatherford v. Bursey, 429 U.S. 545, 559-560, 97 S.Ct. 837, 846 (1977)(no constitutional right to disclosure of witnesses); United States v. Moore, 936 F.2d 1508, 1514-15 (affirming district court's decision not to compel disclosure of government witnesses) (7th Cir. 1991); United States v. Kimberlin, 805 F.2d 210, 233 (7th Cir. 1986), cert. denied, 483 U.S. 1023 (1987); United States v. Sims, 808 F.Supp. 607, 612-13 (N.D. Ill. 1992) (Alesia, J.) (denying defendant's motion for list of government witnesses); United States v. DeJohnette, 752 F.Supp. 849 (N.D.Ill. 1990) (Bua, J.) (same). United States v. Balogun, 971 F. Supp. 1215, 1233 (N.D. Ill. 1997) ("government is not required to provide a defendant with a list of prospective government witnesses"). This policy exists because the effective administration of criminal justice may be impaired due to the potential discouragement of witnesses and improper contacts directed at influencing their testimony. See United States v. Bouye, 688 F.2d 471, 473-74 (7th Cir. 1982).

Given all the pretrial disclosures agreed to by the government, counsel for defendants can effectively prepare for trial and identify the government's potential witnesses. Accordingly,

defendant's motion should be denied. As a matter of courtesy, however, the government will provide

defendants with a list of the government's prospective trial witnesses at a reasonable time shortly

before trial, provided that the defendants agree to do the same when it comes time for their case-in-

chief.

## IV    DISCOVERY MOTIONS

### A.    Grand Jury Material

Thyfault moves for entry of an order directing the government to produce to him, or to submit

to the Court for in camera inspection, the recorded testimony of all grand jury witnesses, the minutes

of testimony taken before the grand jury, the record of votes cast by members of the grand jury, and

all extension and sealing orders submitted to the grand jury. This motion should be denied.

Grand jury materials have been afforded great protection against random discovery by

criminal defendants. Rule 6(e) of the Federal Rules of Criminal Procedure controls the disclosure

of grand jury materials. United States v. Peters, 791 F.2d 1270, 1283 (7th Cir.), cert. denied, sub

nom Odoner v. U.S., 479 U.S. 847 (1986). To obtain disclosure the requesting party must show a

"particularized need" for the grand jury materials. United States v. Sells Engineering, Inc., 463 U.S.

418, 443 (1983). This rule maintains the long-standing policy that "maintains the secrecy of the

grand jury proceedings in the federal courts." United States v. Proctor & Gamble Co., 356 U.S. 677,

681 (1958). Without such a policy, "[g]rand jurors would not act with that independence required

of an accusatory and inquisitional body . . . [and] testimony would be parsimonious . . . ." Pittsburgh

Plate Glass Co. v. United States, 360 U.S. 395, 400 (1959). In recognition of the importance of the

ends served by the policy of grand jury secrecy, the Supreme Court has concluded that "[t]he burden

. . . is on the defense to show that 'a particularized need' exists . . . [for grand jury information] which

outweighs the policy of secrecy." Id. The burden is a "heavy one to overcome." Douglas Oil Co. of Cal. v. Petrol Stops Northwest, 441 U.S. 211, 222 (1974). Moreover, there is a strong presumption of regularity of proceedings before the grand jury. United States v. Duncan, 598 F.2d 839, 867 (2nd Cir.), cert. denied, 444 U.S. 871 (1979). Unsupported speculation is not enough to overcome the requirement of particularized need or the presumption of regularity. United States v. Edelson, 581 F.2d 1290, 1291 (7th Cir.), cert. denied, 440 U.S. 908 (1970); see United States v. DeTar, 832 F.2d 1110, 1113 (9th Cir. 1987) (Defendant's speculative claims, without more, regarding matters occurring before the grand jury do not justify release of grand jury materials).

In his motion, Thyfault makes several arguments, none of which have merit. First, Thyfault claims that disclosure "is the only means by which [he] can determine whether he should file a motion to dismiss the indictment for grand jury abuse or violations of Rule 6(e)." Memorandum at 2. This is precisely the sort of speculation that the courts have held to be insufficient. Second, Thyfault asserts that disclosure is necessary "because there has been an incredibly long passage of time between the events alleged and the return of the indictment (Allegations against Defendant Thyfault stem from the early and mid ninety's)." Id. Defendant does not explain why this fact is relevant. Given that the government is proposing to produce all grand jury testimony of all prospective witnesses eight weeks, the length of time between Thyfault's alleged criminal acts and the date of the indictment appears insignificant. Third, Thyfault asserts, "upon information and belief, the evidence presented to the grand jury consisted mostly of uncorroborated testimony of government witnesses and unnecessary and unreliable hearsay was presented to the grand jury." Id. at 2-3. Again, this type of speculation is not enough to overcome the policy of grand jury secrecy and the presumption of regularity of grand jury proceedings. Finally, Thyfault claims that, because

he "was under the employ of the corporate entities for only a portion of the time during which the alleged fraud occurred," id. at 3, all of the requested grand jury materials constitute Brady material. This argument makes no sense. The government has stated that it is well aware of its Brady obligations and will honor them.

Accordingly, Thyfault's motion for release of grand jury material should be denied.

### B. Brady/Giglio Material

Thyfault moves for entry of an order directing the immediate disclosure of all exculpatory evidence and all evidence that constitutes impeachment of any government witness, all of which fall under the rubric of Brady and Giglio material. The government acknowledges its obligations under both Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). At this time, the government is not aware of any evidence which would fall within the purview of Brady, other than that disclosed in its initial discovery letter. In addition, the government will honor its obligation under Giglio to provide the defendants with any documents reflecting any agreement it has with witnesses at the defendant's trial or any evidence bearing on any witness' credibility. Specifically, the government proposes to provide all impeachment/Giglio evidence to the defendants no later than eight weeks prior to the trial in this case. As such, Thyfault's motion should be denied as moot.[3]

---

[3]     The government's acknowledgement of its obligations under Brady and Giglio should not be interpreted as a stipulation to provide all of the materials requested in Thyfault's motion for exculpatory evidence. Rather, the government will abide by the law in this Circuit and will provide the defendants with all materials to which they are entitled. For example, there is no basis to require the government to produce the names, addresses and interview summaries of persons the government has interviewed and does not intend to call as witnesses at trial, unless those witnesses provided information that is either exculpatory or impeaching of another government witness. United States v. Coffey, 1993 WL 424239 (N.D.Ill. 1993); United States v. Villareal, 752 F. Supp. 851, 853 (N.D.Ill. 1991); United States v. Pace, 1988 WL 40922 (N.D.Ill. 1988); United States v. Savides, 661

## C.    Electronic Devices

Thyfault moves for entry of an order permitting him to inspect, audit and copy the recordings of any electronic devices used in the investigation of this case, other than those provided by the government in its initial discovery letters. There are no such recordings. The only recordings that are relevant to this case are the recordings created by Intrust's automatic call taping system. The government has produced to the defendants copies of all of the recordings in its possession. If the government obtains any other such recordings of the defendants or their alleged co-schemers, it will produce them at that time. Accordingly, Thyfault's motion should be denied as moot.

## D.    Rule 16 Discovery

Thyfault moves for entry of an order require the government to make the disclosures required by Rule 16. The government has already done so in its initial discovery letters, except for expert witness disclosures, which are discussed above. More specifically, the government has already produced all of Thyfault's written, recorded and oral statements, his criminal record to the extent it exists, the results of all scientific tests and analyses (there are none at this time), and a fourteen page document inventory that sets forth the source and general description of all of the documents in the possession of the government, all of which are available for Thyfault to review.

In addition to requesting the Rule 16 materials that the government has already provided, Thyfault also seeks materials that are clearly not covered by the rule. For example, Thyfault seeks: (1) statements of non-witnesses; (2) statements of co-defendants or unindicted co-conspirators; (3) a witness list; (4) the names of all persons "who in any way have knowledge of defendant, or the facts alleged in the indictment;" (5) "copies and the distribution list of any news or press release or

F. Supp. 1024, 1026 (N.D.Ill. 1987), aff'd, 898 F.2d 1218 (7th Cir. 1990).

photographs prepared by" the government; and (6) all grand jury exhibits. Motion at 2-3. All of these disclosures are covered by other rules and are addressed above. Therefore, Thyfault's motion pursuant to Rule 16 should be denied.

**E.**   **Sentencing Information**

Thyfault moves for entry of an order directing the government to disclose its analysis of the Sentencing Guidelines as they apply to Thyfault. This motion should be denied.

This issue was squarely addressed in United States v. Knell, 771 F.Supp. 230 (N.D.Ill. 1991). In Knell, the defendant filed a motion to compel production of the government's position on the application of the Sentencing Guidelines. In denying defendant's motion, the district court ruled that such information was protected from disclosure by Rule 16(a)(2) of the Federal Rules of Criminal Procedure which precludes the disclosure of the government's work product. Specifically, the court reasoned as follows:

> [t]he government's assessment of the appropriate way to calculate Defendant's range of sentencing is a matter of legal conclusion and strategy. The court cannot require the government to disclose its thought processes or legal theories, whether or not they have been reduced yet to written form.

Id. at 231. See also Balogun, 971 F. Supp. at 1234-35 ("[T]here is simply no authority for the court to order the government to produce . . . sentencing information as part of pre-trial discovery.").

As a practical matter, much of the information sought by Thyfault is disclosed during plea negotiations. If Thyfault is interested in finding out the government's proposed calculations, he can enter into good faith plea negotiations with the government. Counsel for the government is willing to discuss with defense counsel what the government currently believes the applicable guideline range to be. However, the government cannot be bound to that current estimate because it is nothing more than an estimate; additional information may become available to the government in the future.

In sum, the law is clear that disclosure of the information requested by Thyfault is not required. Accordingly, his motion should be denied.

## V    MOTIONS ADDRESSING THE ADEQUACY OF THE INDICTMENT

### A.    Bills of Particulars

Hargrove and Thyfault both move for a bill of particulars. Neither motion has merit.

#### 1.    Legal Standards Governing Bills of Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure authorizes a bill of particulars only where the indictment fails to sufficiently apprise the defendant of the offense with which he is charged. Such a bill is not necessary when the indictment "sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial." United States v. Kendall, 665 F.2d 126, 134 (7th Cir. 1981); United States v. Canino, 949 F.2d 928, 949 (7th Cir. 1991).

An indictment satisfies this standard if it sets forth the elements of each offense charged, cites the statutes that are violated, and the time and place of the defendant's conduct that allegedly violated the statute. United States v. Roya, 574 F.2d 386, 391 (7th Cir. 1978); United States v. Russo, 1988 WL 58594, at *1 (N.D.Ill. 1988). This is true because a defendant has only a constitutional right to know the offenses with which he is charged, not "the details of how it will be proved." Kendall, 665 F.2d at 135; United States v. Richardson, 130 F.3d 765, 776 (7th Cir. 1997); United States v. Balogun, 971 F. Supp. 1215, 1227 (N.D.Ill. 1997). Thus, a bill of particulars may not be used to obtain evidentiary details about the government's case. Russo, supra. See also United States v. Glecier, 923 F.2d 496, 501 (7th Cir.1991).

In considering whether a bill of particulars is required to inform the defendant of the nature of the charges, the Court should consider the clarity of the indictment, along with the degree of discovery available to the defense absent such a bill. Roya, 574 F.2d at 391; United States v. Coffey, 1993 WL 424239, at *10 (N.D.Ill. 1993)(citations omitted). In this case, the defendants are charged in a 51-page indictment which supplies innumerable details about the nature of the charges and what constitutes the offending conduct. The government also has disclosed all known Brady material, has made available all of the documents obtained during the course of the investigation, and has provided defendants with a detailed fourteen page inventory that sets forth the source and general description of the documents. Furthermore, the government has: (1) agreed to provide all Jencks Act materials, Giglio materials, expert witness materials, and Rule 404(b) evidence eight weeks before trial; (2) agreed to provide all summary charts six weeks before trial; (3) agreed to file a Santiago proffer and identify all of its trial exhibits four weeks before trial; and (4) agreed to provide a witness list in advance of trial. This extraordinary degree of discovery renders a bill of particulars unnecessary, especially considering that all of the defendants have been involved in related civil case discovery since 2000. Canino, 949 F.2d at 949; Glecier, 923 F.2d at 502.

### 2. Hargrove's Motion for a Bill of Particulars

Hargrove seeks a bill of particulars describing various evidentiary details as to how the government will prove its case against him. As discussed above, the law in this Circuit precludes such requests. For example, Hargrove's request for elaboration on how he personally participated in the various acts of the scheme, such as his request for all acts of concealment and a catalog of all false statements that he personally made to the OBRE, is precisely the sort of demand for evidentiary detail that exceeds the proper scope of a bill of particulars. Alex, 791 F. Supp. at 728; Russo, 1988

WL 58594. See also Balogun, 971 F. Supp. at 1229 (denying defendants' requests to be apprised of each occasion when they personally committed an act in furtherance of the charged conspiracy); United States v. Messino, 855 F. Supp. 955, 962-63 (N.D.Ill. 1994) (same). This is especially true in conspiracy cases, where each member of the conspiracy is liable for the acts of his co-conspirators. United States v. Atkins, 661 F. Supp. 491, 497 (S.D.N.Y. 1987). The government is not required to supply its evidence in advance of trial, and Hargrove may not seek to limit the government's evidence at trial through an inappropriate bill of particulars. Id. Moreover, and most significantly, much of the information that Hargrove seeks to further flesh out the details of the scheme and his contributions thereto are available in the indictment and the extensive discovery that has been and will be afforded to defendants before trial.

In sum, in light of the detail available from the lengthy indictment and the extensive discovery made available to the defendants before trial, a bill of particulars is not required to apprise Hargrove of the nature of the charges against him, and his motion should be denied.

### 3. Thyfault's Motion for a Bill of Particulars

Thyfault seeks a bill of particulars stating: (1) the name and address of all informers and all persons relied on by the government for information relating to the counts in which Thyfault is charged; (2) the name and address of all witnesses whom the government intends to call at trial; (3) certain Giglio information relating to the government's witnesses; (4) the names of all unnamed co-conspirators; and (5) all overt acts not set forth in the indictment, indicating which overt acts Thyfault is alleged to have committed.

All of these requests are clearly inappropriate. As set forth above, a defendant may not use a bill of particulars as a subterfuge for obtaining the details of how the government will prove its

case. Kendall, 665 F.2d at 135; Richardson, 130 F.3d at 776; Balogun, 971 F. Supp. at 1227. This principle applies equally to Thyfault's request for the names of all co-conspirators. See, e.g., United States v. Kramer, 711 F.2d 789, 796 (7th Cir. 1983); Kendall, 665 F.2d at 134; Balogun, 971 F. Supp. at 1229. Similarly, Thyfault's request for elaboration on how he personally participated in the various acts of the conspiracy is precisely the sort of demand for evidentiary detail that exceeds the proper scope of a bill of particulars. Alex, 791 F. Supp. at 728; Russo, 1988 WL 58594; see also Balogun, 971 F. Supp. at 1229 (denying defendants' requests to be apprised of each occasion when they personally committed an act in furtherance of the charged conspiracy); United States v. Messino, 855 F. Supp. 955, 962-63 (N.D.Ill. 1994) (same). Accordingly, Thyfault's motion for a bill of particulars should be denied.

**B.    Surplusage**

Hargrove and Thyfault move to strike certain language in the indictment as surplusage. These motions are without merit.

Motions to strike surplusage are rarely granted because they are subject to an exacting standard: the defendant must show that "the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial." United States v. Infelise, 1991 WL 159126, *3 (N.D.Ill. 1991) (emphasis added), quoting United States v. Chaverra-Cardona, 667 F. Supp. 609, 611 (N.D.Ill. 1987). See also United States v. Colon, 1998 WL 214714, *4 (N.D.Ill. 1998); United States v. Stoecker, 920 F. Supp. 876, 887 (N.D.Ill. 1996); United States v. Andrews, 749 F. Supp. 1517, 1518-19 (N.D.Ill. 1990); United States v. Richter, 610 F. Supp. 480, 496 (N.D.Ill. 1985). Accord United States v. Awan, 966 F.2d 1415, 1426 (11th Cir. 1992); United States v. Collins, 920 F.2d

619, 631 (10th Cir. 1990); United States v. Terrigno, 838 F.2d 371, 373 (9th Cir. 1988); United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996).

If the government intends to prove a matter at trial and it is relevant to the overall scheme charged in the indictment, the indictment may properly include these matters, even if they are not "essential elements" of the crime charged. United States v. Giampa, 904 F. Supp. 235, 271 (D.N.J. 1995); United States v. Hill, 799 F. Supp. 86, 89 (D.Kan. 1992); United States v. Rastelli, 653 F. Supp. 1034, 1055 (E.D.N.Y. 1986); United States v. Persico, 621 F. Supp. 842, 860 (S.D.N.Y. 1985); United States v. Wecker, 620 F. Supp. 1002, 1006 (D.Del. 1985); United States v. Castellano, 610 F. Supp. 1359, 1428 (S.D.N.Y. 1985). Similarly,

> if language in the indictment is information that government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be, provided, it is legally relevant.

United States v. Climatemp, 482 F. Supp. 376, 391 (N.D.Ill. 1979), aff'd, 705 F.2d 461 (7th Cir.), cert. denied sub nom., Fackter v. United States, 462 U.S. 1134 (1983); United States v. Stoecker, 920 F. Supp. at 887; United States v. Infelise, at *4; United States v. Lov-it Creamery,Inc. 704 F. Supp. 1532, 1551 (E.D.Wis. 1989); United States v. Richter, 610 F. Supp. at 496. United States v. Lavin, 504 F. Supp. 1356, 1362 (N.D.Ill. 1981). See also United States v. Sawyer, 878 F. Supp. 279, 294 (D. Mass. 1995) ("The determinative question in a motion to strike surplusage is not the prejudice, but the relevance of the allegation to the crime charged"), aff'd, 85 F.3d 713 (1996); United States v. Jackson, 850 F. Supp. 1481, 1506 (D.Kan. 1994); United States v. Hill, 799 F. Supp. 86, 88-89 (D.Kan. 1992).

Hargrove moves to strike the word "shell" from paragraph 1.m. of the indictment. That paragraph states:

> Capjac Investments Group, Inc. and Capjac Investments Ltd. (together referred to as "Capjac") were shell companies controlled by CAPRIOTTI and HARGROVE. CAPRIOTTI and HARGROVE used Capjac's bank accounts to receive funds from various ventures, both legal and illegal, and then spent those funds as they saw fit. Individual A, who was vice president of Capjac, signed most of the checks by which funds were disbursed from Capjac's checking accounts.

Hargrove contends that the word "shell" is argumentative, prejudicial, and nonessential. This argument fails to recognize the governing principle that if evidence of the allegation is admissible and relevant to the charge, it cannot be struck as surplusage, regardless of whether it is essential or prejudicial to a defendant. Webster's Dictionary states that one of the definitions of "shell" is "a casing without substance, as in 'mere effigies and shells of men,' quoting Thomas Carlyle." Webster's Ninth New Collegiate Dictionary (1983). The allegation that Capjac was a corporation "without substance" is extremely relevant to this case, because, according to the indictment, Hargrove and his co-schemers caused millions of dollars to be wrongfully diverted from the escrow accounts to Capjac, and then spent it on their own use. Indictment, ¶ 9.d. The fact that defendants used a shell company to launder their ill-gotten gains is relevant to proving their intent to defraud. The prejudice to the defendants, if any, comes from the fact that the evidence will show that Capjac was indeed a shell company, as defined by the dictionary, not from the fact that the indictment used that word in describing Capjac. Under these circumstances, Hargrove's motion should be denied.

Thyfault moves to strike one phrase as "irrelevant and prejudicial" and several phrases as "unnecessary and prejudicial." These contentions are without merit because all of the phrases allege relevant information that the government will prove at trial. Thyfault also seeks to use his motion to strike surplusage as a vehicle for attempting to redraft the indictment to conform to his understanding of what the evidence will be. This is improper, and his motion should be denied.

24

First, Thyfault seeks to redraft the indictment's description of his status as a Certified Public Accountant. The indictment, at ¶ 1.c., says that he "was" a CPA. He wants the indictment to say that he "is" a CPA. This argument fails to apprehend that paragraph 1 describes facts that are "material herein," meaning that they are material to the offenses charged in the indictment, the last of which ended in February 2000. Under these circumstances, the past tense is the only tense that is appropriate.

Second, Thyfault seeks to strike the allegations, at ¶ 1.n., that Intercounty-Illinois lost money because of the collapse of the junk bond market, and that these losses created a "huge" financial problem for Intercounty-Illinois. This evidence is extremely relevant. The indictment charges that that these investment losses and other problems caused Intercounty-Illinois to become insolvent as of 1987, and that the charged scheme in part was designed to keep Intercounty-Illinois and its successors afloat for the next thirteen years. Indictment, ¶¶ 1.u. and 3. Thyfault also quibbles with the use of the phrase "other problems" in this context. This argument fails because the jury must understand the reasons for the insolvency in order to understand the context of defendants' offenses.

Third, Thyfault seeks to strike the indictment's general description of a fiduciary duty at ¶ 1.t. as legally inaccurate. The indictment alleges that defendants caused several different types of fiduciary duties to be violated. Indictment, ¶ 1.t. Each such duty will be defined in the jury instructions. The indictment contains an accurate statement of the fiduciary duty that is at the heart of the case, and at the heart of the allegations against Thyfault. Intercounty-Illinois, of which Thyfault was chief financial officer, was the escrow agent for Intrust, and held millions of dollars of trust holder funds pursuant to an escrow agreement that required them to keep the funds in the escrow account unless Intrust directed them to be moved. Indictment, ¶¶ 1.p and 1.q. This

relationship made Intercounty-Illinois a trustee of both Intrust and Intrust's trust holders. Stark v. Chicago Title & Trust Co., 316 Ill. App. 353, 45 N.E.2d 81, 84 (1st Dist. 1942). "Trustees are held to a high standard of conduct and must exercise the highest degree of fidelity and the utmost good faith in the administration of the trust. The trustee's primary responsibility is to the beneficiary. Especially when their individual interests are concerned, trustees' actions are governed by rules which exact of them the utmost good faith, honesty, integrity, faithfulness and fair dealing." Jefferson Nat'l Bank v. Central Nat'l Bank, 700 F. 2d 1143, 1152 (7th Cir. 1983). Thus, the indictment's description of fiduciary duty is appropriate and should not be stricken.

Thyfault seeks to strike the words "dire" and "substantial" from the indictment's description of Intercounty-Illinois's financial situation. Indictment, ¶ 1.t. These adjectives are relevant because the depth of the problem helps explain why the defendants engaged in the charged offenses.

Thyfault seeks to replace the word "plowed" with the word "placed" in the sentence: "The defendants plowed more than $70 million of the stolen funds back into their title insurance business." Indictment, ¶ 3. There is no basis for this request. The fact that the defendants used their ill-gotten gains to support the ongoing operations of their company is relevant. The dictionary states that the term "plow back" means "to reinvest." Webster's Ninth New Collegiate Dictionary (1983). Thyfault's motion should be denied.

The remainder of Thyfault's motion seeks to redraft the indictment by deleting certain allegations that "others," in addition to the named defendants, engaged in various acts, and by deleting the word "defendant" in certain places and replacing it with the name of the defendant to which, in Thyfault's mind, the allegation refers. The first category of objections should be denied because, in each instance, it is relevant, and the government intends to prove, that "others" were

26

involved. As for the second category, there is no basis for Thyfault's attempt to "clarify" the indictment. Thyfault has cited no case to support his requests. The allegations are clear enough, and any ambiguity will be resolved at trial. Thyfault's motion should be denied.

### C.      Section 1346

Hargrove moves to dismiss or strike the counts that charge mail fraud, wire fraud and conspiracy to commit mail and wire fraud to the extent that they rely on Section 1346, which provides that a "'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Section 1346 became effective in November 1988, and was enacted as a response to McNally v. United States, 483 U.S. 350 (1987). Hargrove contends that Section 1346 is void for vagueness, and that a corporation cannot be a victim because the term "another" in the statute is not defined. Neither argument has merit.

When there is a vagueness challenge to a statute that does not involve First Amendment freedoms, the statute must be evaluated on an "as applied" basis. Maynard v. Cartwright, 486 U.S. 356, 361 (1988); United States v. Rybicki, 287 F.3d 257, 263 (2d Cir. 2002). "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of ordinary notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." United States v. Hausmann, 345 F.3d 952, 958 (7th Cir. 2003), quoting City of Chicago v. Morales, 527 U.S. 41, 56 (1999).

The Supreme Court addressed the "fair warning" requirement in United States v. Lanier, 520 U.S. 259 (1997). The principle animating the requirement "is that no man shall be held responsible for conduct which he could not reasonably understand to be proscribed." Id. at 265, quoting Bouie

v. City of Columbia, 378 U.S. 347, 351 (1964). "[T]he touchstone [of the fair warning requirement] is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267. Constructions of a statute announced by the Supreme Court or lower courts can give citizens fair warning, even if the cases are not "fundamentally similar." Id. at 269-71.

Every court to consider the issue has held that, as a result of Congress' passage of Section 1346, all potential defendants "had notice that Congress had repudiated the Supreme Court's interpretation in McNally. Congress, in other words, announced that it wanted the courts to enforce the honest-services doctrine developed in the years leading up to McNally." United States v. Brumley, 116 F.3d 728, 733 (5th Cir. 1997); see also United States v. Bryan, 58 F.3d 933, 941-42 (4th Cir. 1995); United States v. Waymer, 55 F.3d 564, 568-69 (11th Cir. 1995). Therefore, for purposes of analyzing the "fair warning" requirement as to the defendants in this case, they are deemed to be aware of all of the pre-McNally case law on the issue, as well as all interpretations of Section 1346 that were issued prior to the termination of their mail fraud scheme in or about February 2000.

The statutory term of which Hargrove claims lack of notice is "honest services." The "honest services" scheme to defraud in this case charges that Hargrove was an owner and director of the Intercounty entities that served as agents to the title insurance customers, Stewart, Intrust and the Intrust trust holders, and that Hargrove caused the Intercounty entities to violate their fiduciary duties to their principals for his own gain, by stealing money that the Intercounty entities were supposed to hold on behalf of their principals.

Prior to McNally, the courts held that private fiduciaries committed "honest services" mail fraud by engaging in a wide variety of fraudulent misconduct. See McNally, 483 U.S. at 363

28

(Stevens, J., dissenting) (collecting cases). One category of "honest services" prosecutions involved situations in which a private fiduciary violated his duty to provide honest services to his principal for his own financial gain. See United States v. George, 477 F.2d 508, 512-15 (7th Cir. 1973); United States v. Bryza, 522 F.2d 414, 422 (7th Cir. 1975). The courts continued to enunciate these principles in post-McNally cases. See United States v. Bloom, 149 F.3d 649, 655-56 (7th Cir. 1998).

Under the standard set forth in Lanier, the private fiduciary abuse cases described above provided "fair warning" to Hargrove that embezzling funds that his companies were holding for the benefit of others was honest services mail fraud. He can hardly claim to the contrary. There are numerous cases holding that Section 1346 was not unconstitutionally vague as applied to private fiduciaries who abuse their positions of trust for personal gain. See United States v. Frost, 125 F.3d 370, 371 (6th Cir. 1997) (collecting cases).

In fact, Hargrove does not really explain his position at all. He does not cite any case to support the proposition that the term "honest services" as used in Section 1346 is unconstitutionally vague as applied to him, nor does he argue that he did not know that what he is alleged to have done was not honest services mail fraud. Moreover, his primary legal argument – that "[b]ecause federal criminal offenses are solely creatures of statute, the constitutionally required fair warning must come from the legislature, and not the courts" – is simply wrong. Motion at 2. The cases that Hargrove cites for this proposition do not deal with the constitutional "fair warning" issue – they merely hold that it is Congress, and not the courts, that define the elements of federal criminal offenses. See, e.g., Staples v. United States, 511 U.S. 600, 604-05 (1994). As set forth above, whether a defendant received "fair warning" requires an analysis of both the statute and the case law. Lanier, 520 U.S. at 265-71; Kolender v. Lawson, 461 U.S. 352, 355-56 (1983); Bouie, 378 U.S. at 357-59. .

Hargrove's argument that corporations cannot be the victims of a Section 1346 violation is equally weak. Hargrove cites to the dissent in Brumley, which proposed an analysis of the word "another" in Section 1346 that has never been adopted by any court in the country. But even the Brumley dissent does not help Hargrove. According to the Brumley dissent, the word "another" includes corporations and other non-individual entities just like the ones charged in the indictment here. Brumley, 116 F.3d at 741. This makes sense, since defendants have been convicted of committing honest services mail fraud against corporations since the concept has existed. See George, 477 F.2d at 1215. Counsel for Hargrove has made this argument regarding the word "another" in previous cases in this district. It has always been rejected. See Unites States v. Warner, 2003 WL 22697289, *13 (N.D. Ill. 2003); United States v. Fawell, 2003 WL 21544239, *4 (N.D. Ill. 2003); United States v. Farley, 1997 WL 695680, *3 (N.D. Ill. 1997). This Court should join its colleagues by denying Hargrove's motion.

## VI    MOTIONS BASED ON BRUTON

Hargrove moves for the entry of an order precluding the admission at trial of out-of-court statements made by his co-defendants, or for severance. This motion is based on Hargrove's fear that evidence will be offered against him in violation of Bruton v. United States, 391 U.S. 123 (1968). Hargrove notes that the government has produced proffer-protected statements of co-defendants Capriotti and Thyfault, and unprotected statements of Thyfault, all of which mention Hargrove. Hargrove is correct in asserting that any such statements, if admitted, will have to be scrutinized to determine that they comply with Bruton and its progeny.

As to the unprotected statements of co-defendants that the government intends to admit at trial, the government proposes that it disclose all such statements eight weeks before trial, and that

30

the defendants file any objections four weeks before trial. As for the proffer-protected statements, it is impossible for the government to identify before trial the statements that it would seek to admit at trial because their admissibility necessarily depends on events that occur at trial. The government respectfully submits that defendant's fears of that happening, as it did in <u>Krilich</u>, are exaggerated. In any event, the Court can address that issue if and when it arises, and can take whatever steps are necessary to ensure that the protections of <u>Bruton</u> and its progeny are enforced. Thus, Hargrove's motion should be denied as premature.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____

ROBERT W. KENT, JR.
Assistant United States Attorney
219 South Dearborn Street
Room 500
Chicago, Illinois 60604
(312) 886-4185