UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DOCKETED
OCT 1 5 2004

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 03 CR 779 |
| | ) | |
| | ) | Judge James B. Moran |
| LAURENCE W. CAPRIOTTI, | ) | |
| JACK L. HARGROVE, | ) | |
| MICHEL D. THYFAULT, | ) | |
| JAMES R. WALLWIN and | ) | |
| GEORGE J. STIMAC | ) | |

/FILED

OCT 1 4 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## NOTICE OF FILING

TO:  Edward M. Genson          Jeffrey B. Steinback         Paull A. Wagner
     Genson & Gillespie        Genson & Gillespie           321 S. Plymouth Court
     53 W. Jackson Blvd        53 W. Jackson Blvd.          Suite 1500
     Suite 1420                Suite 1420                   Chicago, Illinois 60604
     Chicago, Illinois 60604   Chicago, Illinois 60604

     PLEASE TAKE NOTICE that on October 14, 2004, the undersigned filed with the Clerk of this
Court,

### GOVERNMENT'S CORRECTED PROFFER
### AND MOTION REGARDING NON-CHARGED ACTS

service of which is being made upon you by hand delivery.

                         *Robert W. Kent, Jr./PMZ*
                         ROBERT W. KENT, JR.
                         Assistant United States Attorney
                         219 S. Dearborn, 5th Floor
                         Chicago, IL 60604
                         (312) 886-4185

STATE OF ILLINOIS  )
                   ) SS
COUNTY OF COOK     )

     Peggy M. Zabinski, being duly sworn on oath, deposes and says that she is employed in the Office
of the United States Attorney for the Northern District of Illinois; and that on the 14th day of October, 2004,
she caused a copy of **Government's Corrected Proffer And Motion Regarding Non-Charged Acts** to
be hand delivered to the individuals(s) named above.

                         *Peggy M. Zabinski*
                         SUBSCRIBED and SWORN to before me
                         this 14th day of October, 2004

"OFFICIAL SEAL"
Carol L. Blue
Notary Public, State of Illinois
My Commission Exp. 06/24/2006

                         *Carol L. Blue*
                         N O T A R Y   P U B L I C

*101*

DOCKETED

OCT 1 5 2004

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 03 CR 779 |
| | ) | |
| LAURENCE W. CAPRIOTTI, | ) | |
| JACK L. HARGROVE, | ) | |
| MICHEL D. THYFAULT, | ) | Judge James B. Moran |
| JAMES R. WALLWIN and | ) | |
| GEORGE J. STIMAC | ) | |

**FILED**

OCT 1 4 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## GOVERNMENT'S CORRECTED PROFFER
## AND MOTION REGARDING NON-CHARGED ACTS

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, the United States Attorney for the Northern District of Illinois, Eastern Division, hereby submits this written proffer of evidence and memorandum as to the admissibility of acts not charged in this case, and moves in limine for their admission at trial. Most of the proffered evidence is admissible because it is "intricately related" to the charged fraud offenses. All of the proffered evidence is admissible pursuant to Fed. R. Evid. 404(b) to prove the defendants' state of mind.

Defendants Jack L. Hargrove and Laurence W. Capriotti are both charged with engaging in an extensive fraud that lasted from approximately 1988 through 2000. Hargrove also is charged with tax violations for the calendar years 1996, 1997, 1998, and 1999, which allege that he failed to report all income on his individual tax returns for 1996 through 1998, and that he engaged in tax evasion regarding tax year 1999. The indictment further charges that Capriotti failed to report all income on his tax returns for 1996, 1999 and 2000, and that he engaged in tax evasion regarding tax year 1998.

The government seeks to offer the individual tax returns of Hargrove for calendar years 1991 through 1995, and the corporate tax returns for his company Jack L. Hargrove Builders, Inc.

*101*

("Hargrove Builders") for calendar years 1994 and 1995, together with evidence showing that Hargrove failed to disclose all relevant income on such tax returns in 1991, and 1993-1995. The government further seeks to offer the individual income tax returns of Capriotti for calendar years 1991 and 1993-1995, together with evidence that he failed to disclose all of his income on those returns. The government also seeks to offer evidence showing that Hargrove failed to file tax returns for calendar years 1997 through 2000 for six condominium development corporations that he owned and controlled.

All of the above evidence, except for the evidence relating to Hargrove's six condominium development corporations for years 1997 through 2000, is admissible because it is "intricately related" to the charged fraud offenses. The evidence shows that Hargrove and Capriotti concealed income that they obtained from the fraud scheme charged in the indictment and tends to prove that they intended to commit the charged fraud offenses.

All of the proffered evidence also is admissible pursuant to Rule 404(b) to show the defendants' intent, plan, knowledge, and absence of mistake or accident concerning the charged conduct – both the fraud charges and the alleged tax violations.

## I.    Summary of the Indictment

The indictment contains seventeen counts--including four tax counts against each of Hargrove and Capriotti--and a forfeiture allegation. Counts One through Seven charge Hargrove, Capriotti, and Michel D. Thyfault each with several counts of mail and wire fraud affecting financial institutions, in violation of 18 U.S.C. §§ 1341 and 1343. Count Eight charges the same three defendants with conspiracy to commit mail fraud and wire fraud affecting financial institutions, in

violation of 18 U.S.C. § 371. The object of the conspiracy is the scheme to defraud described in Count One.

Counts Nine, Ten and Eleven charge Hargrove with making a false statement on his income tax returns for calendar years 1996, 1997, and 1998, in violation of 26 U.S.C. § 7206(1). Count Twelve charges Hargrove with tax evasion for calendar year 1999, in violation of 26 U.S.C. § 7201.

Counts Thirteen, Fifteen and Sixteen charge Capriotti with making a false statement on his income tax returns for calendar years 1996, 1999 and 2000, in violation of 26 U.S.C. § 7206(1). Count Fourteen charges Capriotti with tax evasion for calendar year 1998, in violation of 26 U.S.C. § 7201. Count Seventeen charges Wallwin and Stimac with insurance fraud, in violation of 18 U.S.C. § 1033.

### A.   **Background**

The defendants and other relevant individuals are as follows:

**Laurence W. Capriotti**, a lawyer, was an owner, president and a director of Intercounty Title Company of Illinois, Inc. (Intercounty-Illinois) and ITI Enterprises, Inc., and a director of Independent Trust Corporation (Intrust).

**Jack L. Hargrove**, a real estate developer, was an owner and chairman of the board of directors of Intercounty-Illinois, ITI Enterprises and Intrust.

**Michel D. Thyfault**, a certified public accountant, was chief financial officer of Intercounty-Illinois from 1989 to late 1995, chief financial officer of ITI Enterprises from late 1995 to November 1996, and a director of Intrust from December 1990 to December 1994.

**James R. Wallwin** was treasurer of Intercounty-Illinois from 1989 to late 1995, and from late 1995 to October 1996 was treasurer of ITI Enterprises.

**George J. Stimac**, a certified public accountant, was assistant controller of Intercounty-Illinois from 1986 to 1992, was controller from 1992 to late 1995, and was controller of ITI Enterprises from late 1995 to February 1997.

3

**Allan Hurwick,** a certified public accountant who passed away in March 2002, was chief financial officer of ITI Enterprises from January 1997 until 2000.

A person referred to herein as **Individual A** was an officer and director of Intercounty-Illinois, a director of Intrust, and an owner, officer and director of Intercounty Title Company, and Indiana corporation (Intercounty-Indiana) and Intercounty National Title Insurance Company (INTIC).

According to the indictment, Intercounty-Illinois, which had its primary office at 120 Madison St. in Chicago, was a title insurance agent for a Texas-based title insurance company named Stewart Title Guaranty Company. Intercounty-Illinois's relationship with Stewart lasted until about December 1995, when Intercounty-Illinois essentially ceased operations. From 1984 until April 1991, Intercounty-Illinois was owned approximately 40 percent by Capriotti, 40 percent by Hargrove, and 20 percent by Stewart. After April 1991, Capriotti and Hargrove each owned approximately 50 percent.

As a title insurance agent for Stewart, Intercounty-Illinois sold title insurance policies that were issued by Stewart to customers in the Chicago area and also acted as an escrow agent for the collection and disbursement of funds relating to the purchase, sale and construction of real estate. All of the funds that Intercounty-Illinois received as escrow agent were deposited and commingled in a few escrow accounts that it controlled, first at LaSalle National Bank until about September 1999, and later at Harris Bank and Trust. On a monthly basis, Intercounty-Illinois engaged in thousands of escrow account transactions involving the receipt and disbursement of millions of dollars belonging to its customers, who directed the transactions. Due to the volume of business, there was a substantial float in the escrow accounts, meaning that on any particular day, the total amount of title insurance customer funds that were deposited into the escrow accounts substantially exceeded the total amount of funds paid out. An escrow agreement between Stewart and

4

Intercounty-Illinois provided that Intercounty-Illinois agreed to keep the escrow funds safe and separate and to disburse the funds only for purposes authorized by the title insurance customers.

After late 1995, as Intercounty-Illinois became inactive, Intercounty-Illinois and Stewart were replaced by a set of new companies that provided the same services through a different corporate organization; these included: Intercounty-Indiana, Intercounty National Title Insurance Company (INTIC), and ITI Enterprises, which Capriotti and Hargrove each half-owned. Fidelity National Title Insurance Company of New York acted as reinsurer for most of the insurance underwritten by INTIC. ITI Enterprises controlled the escrow accounts.

Intrust, located in Lombard from 1989 until 1992, and later in Orland Park, served as a trustee for various types of trust accounts, including individual retirement accounts and employee benefit plans. In November 1989, Madison Avenue Investments, Inc., which was owned by Hargrove, purchased a controlling interest in the stock of Intrust, and Intercounty-Illinois purchased a minority interest. In approximately December 1990, Madison Avenue Investments, Inc. purchased the Intrust stock owned by Intercounty-Illinois and became the sole shareholder of Intrust.

In early December 1990, Intrust entered into an escrow agreement with Intercounty providing that Intercounty would serve as a vehicle for the daily investment of the cash in Intrust's trust accounts. Under the agreement, only Intrust was authorized to withdraw its funds from the escrow account. In reality, though, Intercounty controlled the funds and Intrust lacked the ability to remove money from the account directly. Between December 1990 and April 1999, Intrust channeled more than $50 million to the Intercounty-Illinois and Intercounty-Indiana escrow accounts. With interest, the Intrust funds should have grown to more than $68 million. Although Intrust was regulated by

the Illinois Office of Banks and Real Estate, none of the trust funds that Intrust deposited with Intercounty were insured.

From 1987 onward, Intercounty-Illinois was insolvent as a result of a price war in the Chicago title insurance market in the late 1980s, coupled with losses in excess of $10 million from bad investments in junk bonds with funds from a so-called "mortgage defeasance program." In 1987, Intercounty-Illinois lost more than $6 million and the deficit exceeded $20 million annually in the years after 1990.

### B.    Alleged Offenses

The indictment alleges that, beginning no later than 1988 and continuing until February 2000, Capriotti and Hargrove, assisted by Thyfault, Wallwin, Stimac, Hurwick and others, stole more than $80 million from the escrow accounts that were managed by Intercounty-Illinois and ITI Enterprises.

As part of the scheme, Capriotti, Hargrove, Thyfault and Hurwick allegedly fraudulently caused Intrust to tender more than $50 million in trust holder funds to Intercounty-Illinois and ITI Enterprises. Rather than keeping the Intrust funds in the escrow accounts as required, the defendants caused the Intrust funds to be spent as part of their ongoing scheme to deplete the escrow accounts. By infusing the Intrust funds into the escrow accounts and taking advantage of the natural float in the escrow accounts, the defendants were able to steal millions of dollars, use Intrust money and new title customer money to pay off old title customers, and continue the scheme for more than a decade. In the end, Intrust and its trust holders lost all of the more than $50 million that had been tendered, plus the more than $18 million in interest that they thought was accruing. Fidelity, which was insuring the escrow accounts when the scheme came to a close in early 2000, ultimately suffered the

remainder of the loss by paying more than $30 million to the title insurance customers who had deposited funds into the escrow accounts but had not yet withdrawn them.

The indictment alleges that the defendants engaged in various acts to conceal the scheme from Stewart, certain Intercounty-Illinois employees, Intrust's president, Intrust's auditors, state regulators and others.

Of the more than $80 million that defendants stole, they plowed back approximately $70 million into their title insurance companies and other businesses. This was accomplished by:

- withdrawing more than $1 million in the late 1980s and using the funds to benefit Intercounty-Illinois and finance the acquisition of a commercial office building in Chicago;

- withdrawing more than $15 million starting in 1989 and using the funds to purchase certificates of deposit in the name of Intercounty-Illinois at various Chicago area financial institutions. Capriotti and Hargrove converted many of the CDs to their own use, and in some cases pledged the CDs as collateral for personal loans. Some of the loan proceeds were deposited into Intercounty-Illinois's operating accounts and were booked as loans to Intercounty from Capjac Investments Group, Inc., which was owned by Capriotti and Hargrove;

- withdrawing millions of dollars from the escrow accounts and disbursing the funds to Capjac, which Capriotti and Hargrove converted to their own use. Between 1991 and 1994, they caused more than $3 million to be disbursed to Capjac, and then caused a substantial portion to be transferred to Intercounty-Illinois's operating accounts; and

- starting in 1994, transferring more than $45 million – on an almost monthly basis for six years – from the escrow accounts to the operating accounts of Intercounty-Illinois and ITI Enterprises.

The indictment also alleges, as part of the fraud scheme, that from 1994 onward, Capriotti and Hargrove stalled, obstructed and made false statements and promises to the Office of Banks and Real Estate and Intrust's president. From 1994-96, OBRE issued reports noting the amount of money that Intrust had transferred to the escrow account and criticizing the commingling of funds.

In response to critical reports in 1997-98, the defendants provided OBRE with allegedly fraudulent escrow account statements purporting to show that the primary Intrust escrow account at LaSalle Bank contained in the vicinity or more than $53 million or $54 million, when, in fact, the account contained only $45,949.

As the fraud scheme neared its end-stage in early April 1999, LaSalle Bank advised Capriotti and Hargrove that the primary title insurance company escrow account was overdrawn by several million dollars, and that they needed to deposit funds into the account. Capriotti told the bank that Intercounty had $13 million in CDs and substantial funds in another bank account, when in fact, the indictment alleges, the CDs did not exist and the other account contained less than $2,500. Instead, according to the indictment, Capriotti and Hargrove obtained $9.2 million from Intrust by falsely telling Intrust's president that the funds were needed to boost Capriotti and Hargrove's account balances at LaSalle Bank so that the bank would charge them lower interest on a loan and falsely promising that the funds would be returned to Intrust by April 30. Capriotti and Hargrove used this $9.2 million to cure the overdraft problem and did not return any money to Intrust. A short time later, LaSalle Bank asked Capriotti and Hargrove to take their banking business elsewhere.

The defendants established a new primary escrow account at Harris Bank. By January 2000, that escrow account was substantially overdrawn, the indictment alleges, adding that, on January 5, Capriotti and Hargrove again attempted to obtain another $13 million from Intrust by again falsely stating to Intrust's president that the money was needed to reduce Capriotti and Hargrove's interest rate on a loan. This time, Intrust's president refused their request, according to the indictment, and the scheme ended the following month.

The four tax counts against Hargrove allege that he filed false federal income tax returns for 1996, 1997 and 1998, and that he evaded his tax obligation for 1999 by failing to file a return or pay any income tax for that year. In 1996 alone, he allegedly failed to report and pay taxes on more than $2 million in taxable income. Among other things, the indictment alleges that he failed to report income that was generated by Capjac's payment of his personal expenses with escrow funds, and by his use of certificates of deposit purchased with escrow funds to pay off personal loans at banks.

The four tax counts against Capriotti allege that he filed false federal income tax returns for 1996, 1999 and 2000, and that he evaded his tax obligation for 1998, when he reported that adjusted gross income was a loss of ($460,970), and he paid the alternative minimum tax of $2,212. In fact, his total income was approximately $732,133 greater than that and he owed more than $30,000 in additional taxes. As with Hargrove, the indictment alleges that, among other things, Capriotti failed to report income that was generated by Capjac's payment of his personal expenses with escrow funds, and by his use of certificates of deposit purchased with escrow funds to pay off personal loans at banks.

## II.    Legal Standards

The charges in this case require the government to prove a specific mental state – an intent to defraud and willfulness with respect to the tax charges. In such circumstances, the Seventh Circuit has held that the failure to report income associated with a fraud is direct circumstantial evidence of the fraud itself. See, e.g., United States v. Ryan, 213 F.3d 347, 350-51 (7th Cir. 2000); see also United States v. Kalita, 712 F.2d 1122, 1130 (7th Cir. 1983) (holding that failure to file tax returns is admissible on issue of willfulness in a tax case).

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).

The Seventh Circuit recognized that in <u>Huddleston v. United States</u>, 485 U.S. 681, 686-90 (1988), the Supreme Court stated a "rationale of general admissibility" with respect to 404(b) evidence. <u>United States v. Jackson</u>, 886 F.2d 838, 848 (7th Cir. 1989). <u>See also</u> <u>United States v. Manso Porte</u>, 867 F.2d 422, 425 (7th Cir. 1989) (noting that "the emphasis in <u>Huddleston</u> is on admissibility"). Indeed, the Seventh Circuit has found that Rule 404(b) is intended "to be construed as a rule of 'inclusion,' and not 'exclusion,'" <u>United States v. Jordan</u>, 722 F.2d 353, 356 (7th Cir. 1983), and that it prohibits the admission of evidence regarding other actions of a defendant "only when they have no relevance other than to show . . . criminal predisposition . . . ." <u>United States v. York</u>, 933 F.2d 1343, 1349 (7th Cir.), <u>cert. denied</u>, 112 S. Ct. 321 (1991) (admitting evidence of uncharged murder to prove intent in prosecution for attempt to defraud insurance company by means of arson and murder).

The Seventh Circuit has established a four-part test for determining whether evidence is admissible under Rule 404(b). <u>United States v. Bursey</u>, 85 F.3d 293, 297 (7th Cir. 1996). First, the evidence must be directed toward establishing a matter in issue other than the defendant's propensity to commit the act charged. Second, the other act must be similar enough and close enough in time to be relevant to the matter in issue. Third, the evidence must be such that the jury could find by a preponderance of the evidence that the defendant committed the similar act. Finally, the proponent of the evidence must show that the probative value of the evidence is not substantially outweighed by any unfair prejudicial effect. <u>Id.</u>

The government may introduce Rule 404(b) evidence in its case-in-chief if it is relevant to rebut a reasonably anticipated defense, such as lack of knowledge or intent. United States v. Juarez, 561 F.2d 65, 73 (7th Cir. 1977); United States v. Lewis, 759 F.2d 1316, 1349 n. 14 (8th Cir.), cert. denied, 474 U.S. 994 (1985); United States v. Mergist, 738 F.2d 645, 650 (5th Cir. 1984). In addition, when proffered Rule 404(b) evidence is relevant to the issue of intent, such evidence is admissible in the government's case-in-chief whenever the indictment charges a specific intent crime; that is, intent is automatically an issue in such cases. United States v. Manganellis, 864 F.2d 528, 532-39 (7th Cir. 1988); United States v. Harbour, 809 F.2d 384, 387 (7th Cir. 1988). As the Seventh Circuit has stated, "[c]ourts routinely admit evidence of prior . . . frauds to prove a present intent to defraud . . . ." York, 933 F.2d at 1350. In tax prosecutions, the Seventh Circuit has, on several occasions, approved the admissibility of uncharged tax misconduct to prove the defendant's "wilfulness" in committing the tax crimes charged in the indictment. United States v. Zizzo, 120 F.3d 1338, 1355 (7th Cir. 1997); United States v. Kalita, 712 F.2d 1122, 1130-31 (7th Cir. 1983); United States v. Serlin, 707 F.2d 953, 959 (7th Cir. 1983).

In addition, evidence of uncharged acts or events is admissible if it is "intricately connected" to the charged offenses. United States v. Roberts, 933 F.2d 517, 520 (7th Cir. 1991). "Under the 'intricately related' doctrine, evidence of uncharged criminal activity is admissible even if it does not satisfy the requirements of Fed. R. Evid. 404(b), if that evidence is intricately related to the facts of the case before the court." United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995); United States v. Hargrove, 929 F.2d 316, 320 (7th Cir. 1991). Under the "intricately related" doctrine evidence of other acts is admissible if it "arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged

offense, or it is necessary to complete the story of the crime [on] trial." Roberts, 933 F.2d at 520 (citation omitted). Put another way, the evidence is admissible if it is "so blended or connected" that "it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime," Ramirez, 45 F.3d at 1102, or if "its absence would create a 'chronological or conceptual void' in the story of the crime." United States v. Hattaway, 740 F.2d 1419, 1424-25 (7th Cir. 1984) (citation omitted); see also United States v. Pulido, 69 F.3d 192, 201-02 (7th Cir. 1995).

In United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000), the Seventh Circuit approved the admission at trial, under the "intricately related" doctrine, of evidence that the defendant failed to report on his tax return his proceeds from the charged fraud scheme. The Court found that the defendant's failure to report his illegal income tended to prove an element of the charged fraud, namely intent to defraud. Id. The Court approved the analysis of the trial court: "The judge found that the evidence of his failure to report the kickbacks in his tax returns 'is evidence of a cover-up, attempted cover-up, which has generally been held to be admissible as far as casting some reflection on how the defendant evaluated his own conduct." Id.

Evidence admitted under Rule 404(b) and the "intricately related" doctrine must satisfy the requirements of Rule 403, which requires that the probative value of the evidence cannot be substantially outweighed by unfair prejudice. Fed. R. Evid. 403. The Advisory Committee Notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id., Notes of Advisory Committee on Proposed Rules. The Seventh Circuit has observed that all evidence that rebuts a defense is prejudicial to the defendant, but that does not mean that it is unfairly prejudicial under Rule 403. See United States v. Hargrove, 929 F.2d 316, 320 (7th Cir. 1991). In addition, courts routinely give

limiting instructions to the jury about any Rule 404(b) evidence, which mitigates any unfair prejudice that might occur. See United States v. Macey, 8 F.3d 462, 467 (7th Cir. 1993).

The Seventh Circuit will overturn a district court's decision to admit evidence only upon a showing that the court committed "a clear abuse of discretion." United States v. Levy, 955 F.2d 1098, 1100 (7th Cir. 1992). "Such an abuse occurs only where no reasonable person could take the view adopted by the district court." United States v. Van Wyhe, 965 F.2d 528, 533 (7th Cir. 1992).

## III.  Proposed Extrinsic Act Evidence

The government seeks to offer three categories of extrinsic act evidence at trial. First, the government seeks to offer the individual tax returns of Hargrove and Capriotti for calendar years 1991 and 1993 through 1995, together with evidence showing that they failed to disclose all of their income on said tax returns. Second, the government seeks to offer the corporate tax returns for Hargrove's "S" corporation, Jack L. Hargrove Builders, Inc. ("Hargrove Builders"), for calendar years 1994 and 1995, together with evidence showing that income to Hargrove Builders in those years was not reported on Hargrove Builders's tax returns, or on Hargrove's individual tax returns. Third, the government seeks to offer evidence showing that Hargrove failed to file tax returns for calendar years 1997 through 2000 for six condominium development corporations that he owned and controlled.

### A.  Hargrove's and Capriotti's Individual Tax Returns - 1991 through 1995

Hargrove and Capriotti filed individual tax returns for calendar years 1991 through 1995. During that time period, they each had income from: (1) a shell company that disbursed funds for their benefit; and (2) certificates of deposit purchased with Intercounty escrow funds that were converted to their personal use. Hargrove also had income from the sale of a golf course. Hargrove

and Capriotti failed to report this income on their tax returns for calendar years 1991, 1993, 1994, and 1995.

## 1. Unreported Income from Capjac - 1994 and 1995

Hargrove and Capriotti, as the owners of Intercounty-Illinois and ITI Enterprises, controlled certain escrow accounts. Hargrove, Capriotti, and another individual caused escrow funds to be transferred to the checking account of a company known as Capjac Investments Group, Inc. and Capjac Investments Ltd. (together referred to as "Capjac"), which were shell companies controlled by Hargrove and Capriotti.

In 1994 and 1995, checks were drawn on the Capjac checking account to the benefit of Hargrove and Capriotti as follows: (1) approximately $215,000 was paid to three banks to service three personal loans to Hargrove and Capriotti jointly (approx. $120,000 in 1994 and approx. $95,000 in 1995); and (2) approximately $295,000 was deposited into Capriotti's personal bank account and converted to his own use (approx. $80,000 in 1994 and approx. $315,000 in 1995). All of this money was taxable income to Hargrove and Capriotti, and none of it was reported on their income tax returns.

## 2. Unreported Income from Ruffled Feathers - 1995

Hargrove had gross income in 1995 as a result of a transaction involving the the sale of Ruffled Feathers Golf Course in excess of $1 million. Following the sale of the golf course, the entity that owned the course issued a check in the amount of $1,087,480 to Hargrove, which was deposited into Hargrove's personal bank account and converted to his own use. At the same time, a loan from Hargrove to the entity in excess of $800,000 stopped appearing on the entity's financial books. If this loan was legitimate and was paid off with the $1,087,480 payment, then Hargrove had

14

income of approximately $200,000. If the loan was not legitimate or was paid off by other means, then Hargrove's income was greater. In any event, Hargrove did not report any of this money as income on his 1995 individual income tax return.

### 3. **Certificates of Deposit - 1991, 1993, 1995**

Starting in or about 1989, Hargrove, Capriotti, Thyfault and others withdrew money from the Intercounty escrow accounts, and used those funds to purchase certificates of deposit at various financial institutions in the Chicago area. Hargrove and Capriotti subsequently converted certain of these certificates of deposit to their own use, thus generating taxable income to Hargrove and Capriotti in calendar years 1991, 1993, and 1995. Hargrove and Capriotti failed to report that income on their individual income tax returns as required.

In March 1991, Hargrove and Capriotti caused Intercounty-Illinois to purchase a certificate of deposit in the amount of $900,000 at the First National Bank of LaGrange. This certificate of deposit was purchased with escrow funds. Hargrove and Capriotti caused this certificate of deposit to be pledged as collateral on a personal loan to them by the First National Bank of LaGrange in the same amount as the certificate of deposit. In December 1991, Hargrove and Capriotti paid off this loan by causing the First National Bank of LaGrange to close out the certificate of deposit and to apply the proceeds against the outstanding personal loan. The use of the certificate of deposit to pay off this personal loan generated taxable income to Hargrove and Capriotti in the amount of approximately $450,000 each, which was not reported on their tax returns for that year.

The same thing happened in 1993, based on a certificate of deposit that was originally purchased in 1990. Specifically, in 1990, Hargrove and Capriotti caused Intercounty-Illinois to purchase a certificate of deposit in the amount of $900,000 at the Standard Bank and Trust. This

certificate of deposit was purchased with escrow funds. Hargrove and Capriotti caused this certificate of deposit to be pledged as collateral on a personal loan to them by the Standard Bank and Trust in the same amount as the certificate of deposit. In June 1993, Hargrove and Capriotti paid off this loan by causing the Standard Bank and Trust to close out the certificate of deposit and to apply the proceeds against the outstanding personal loan. The use of the certificate of deposit to pay off this personal loan generated taxable income to Hargrove and Capriotti in the amount of approximately $450,000 each, which they failed to report on their 1993 tax returns.

In 1995, Hargrove and Capriotti failed to report income that they received as a result of converting four certificates of deposit for their own benefit. In 1990, Hargrove and Capriotti caused Intercounty-Illinois to purchase four certificates of deposit in the amounts of: (1) $500,000 at Capitol Bank of Westmont; (2) $800,000 at Capitol Bank of Westmont; (3) $1,000,000 at the Howard Savings Bank; and (4) $1,000,000 at the Howard Savings Bank. These certificates of deposit were purchased with escrow funds. Hargrove and Capriotti caused these certificates of deposit to be pledged as collateral for personal loans issued to them by the banks in the same amounts as the certificates of deposit. In 1995, Hargrove and Capriotti paid off these personal loans by causing the banks to close out the certificates of deposit and to apply the proceeds against the outstanding personal loans. The use of the certificates of deposit to pay off personal loans generated taxable income to Hargrove and Capriotti in the amount of approximately $1,650,000 each, which was not reported on their individual tax returns for 1995.

**B. Hargrove Builders' Income - 1994 and 1995**

16

Hargrove Builders, an "S" corporation owned by Hargrove, received taxable income from Capjac during 1994 and 1995. Hargrove did not report that income on the corporate returns for Hargrove Builders or on his individual returns for 1994 and 1995.

In 1994, checks were drawn on the Capjac checking account that were paid directly to Hargrove's business, Hargrove Builders. Those checks totaled approximately $90,000. In 1994 and 1995, checks were also drawn on the Capjac checking account that were tendered as payment for the debts of Hargrove Builders, namely monies paid to three mortgage holders. Those checks totaled approximately $67,000 in 1994 and $170,000 in 1995.

All of these funds ($90,000, $67,000, and $170,000) constituted taxable income to Hargrove Builders which should have been reported on Hargrove Builders' corporate tax returns. Those funds were not reported. These funds also should have been reported on Hargrove's individual tax returns, because the taxable income of that "S" corporation should have flowed through to Hargrove. That income was not reported on Hargrove individual returns.

## C. Condominium Development Corporations - 1997 through 2000

Hargrove owned and controlled at least six condominium development corporations, which owned apartment complexes that Hargrove caused to be converted into condominiums. Those condominiums were sold after the apartments were rehabbed and converted. Each of those condominiums projects had gross profits, before expenses, which would have required those entities to file a corporate income tax return. In total, those six condominium projects had unreported gross profits in excess of $10 million, before expenses. None of those six condominiums filed tax returns following the earning of gross profits between 1997 and 2000[1].

---

[1] The government will offer certified copies of IRS records that show a lack of filing for these entities. The government will also offer evidence showing Hargrove's ownership of these

## IV. Argument

The unreported income to Hargrove and Capriotti and the unreported income to Hargrove Builders is admissible because it is "intricately related" to the charged fraud offenses. In addition, this evidence, plus the failure of Hargrove's condominium conversion corporations to file tax returns, also is admissible under Rule 404(b) to show defendants' plan, intent, knowledge, and absence of mistake or accident as to the charged fraud and tax offenses.

### A. Most of the Proffered Evidence is "Intricately Related" to the Charged Offenses

The evidence concerning Hargrove's and Capriotti's individual returns, as well as the evidence relating to Hargrove Builders' returns, is admissible because it is "intricately related" to the charged fraud offenses.

In the instant case, Hargrove and Capriotti failed to report income that they received as part of the fraud charged in Counts One through Eight of the indictment. Hargrove and Capriotti attempted to conceal the fraud by not reporting the receipt of that income on their tax returns or on his company's corporate returns. Their failure to report those funds as income tends to prove an element of the charged fraud, namely, it provides evidence of intent. See Ryan, 213 F.3d at 350-51 (defendant's failure to report fraud scheme income on his tax return was "intricately related" to the charged fraud offenses because it showed defendant's intent to defraud). The fact that they concealed money that they obtained as a result of the fraud scheme shows that they viewed their conduct as being illegal, and rebuts a defense that they were unaware that any fraud was occurring.

More specifically, the fact that Hargrove and Capriotti failed to report any of the hundreds of thousands of dollars in income that they received through Capjac – substantially all of which were

---

condominiums and the entities' gross profits.

fraud proceeds – is strong proof that they knew they were stealing escrow funds and intended to defraud the owners of those funds. The fact that Hargrove failed to report his income from the sale of Ruffled Feathers is strong proof that he knew that Ruffled Feathers was funded with millions of dollars that was stolen from the escrow account. Finally, the fact that Hargrove and Capriotti failed to report income generated by their conversion of escrow-funded certificates of deposit shows that they knew they were stealing and that they intended to defraud their victims. The government anticipates that Hargrove and Capriotti will argue that they thought that the certificates of deposit were purchased with Intercounty-Illinois corporate funds, not escrow money. The fact that they concealed their conversion of these certificates of deposit by failing to report the conversions on their tax returns tends to rebut this "mistake" defense.

In addition, this evidence is admissible because, without it, the jury will be left with a chronological and conceptual void. The evidence at trial of the charged fraud scheme will show that Hargrove and Capriotti received substantial income from the fraud scheme from 1991 to 2000. Almost none of this income was reported on their tax returns. As part of its proof on the charged tax counts, which focus on 1996 to 2000, the government will be showing that Hargrove and Capriotti received but did not report income from Capjac, and that they converted, but did not report on their tax returns, escrow-funded certificates of deposit. The same thing happened from 1991 to 1995. If the government is not allowed to adduce evidence from this earlier time period, the jury will be left to wonder whether Hargrove and Capriotti actually reported the earlier income, which might lead them to unjustifiedly question the evidence of intent on both the fraud counts and the tax counts that are charged in the indictment. The Court should eliminate this potential void in the evidence by allowing the government to present the proffered evidence.

19

## B. The Proffered Evidence is Admissible under Rule 404(b)

All of the proffered evidence – the unreported income to Hargrove and Capriotti, the unreported income to Hargrove Builders, and the failure of Hargrove's condominium conversion corporations to file tax returns – also satisfies the four requirements for admissibility under Rule 404(b). The proffered evidence in the instant case would not be offered to prove propensity. Rather, the evidence would be offered to show Hargrove's and Capriotti's mental state vis-a-vis the charged fraud and tax offenses – their intent to defraud, their wilfulness as to the tax charges, their lack of mistake or error in taking escrow funds and omitting income form their tax returns, and their plan to defraud the their victims. See York, 933 F.2d at 1349 (uncharged frauds admissible to prove intent to defraud); Zizzo, 120 F.3d at 1355 (uncharged tax misconduct admissible to prove wilfulness); Kalita, 712 F.2d at 1130-31 (same); Serlin, 707 F.2d at 959 (same).

The proffered evidence also satisfies the requirement for Rule 404(b) that the prior crime be close enough in time to be relevant. *See, e.g., United States v. Kreiser*, 15 F.3d 635, 640 (7th Cir.1994) (finding seven year time gap to be close enough to allow admission under Rule 404(b)); *see also United States v. Wimberly*, 60 F.3d 281, 285 (7th Cir.1995)(finding 13 year time gap close enough where prior evidence was almost identical to current charged crime). In this instance, the proffered evidence pertains to 1991 through 1995 for Hargrove and Capriotti, 1994 and 1995 for Hargrove Builders, and 1997 through 2000 for the six condominium conversion corporations. The indictment alleges that the overarching fraud scheme lasted from approximately 1988 through 2000. The proffered evidence falls within that scope of time. The tax violations charged in the indictment pertain to calendar years 1996 through 2000. The proffered evidence falls within five years of those charges.

In addition to being close in time, the proffered evidence also is similar in nature to the charged offenses. The charged tax offenses allege that Hargrove and Capriotti failed to report income that was derived, at least in part, from escrow-funded Capjac payments and the conversion of escrow-funded certificates of deposit. Indictment, Counts 9-14. The proffered extrinsic act evidence is exactly the same. In addition, the indictment charges that Hargrove failed to report income generated by one of his real estate development corporations, Beacon Cove Condominium Corporation. Indictment, Counts 11-12. The proffered extrinsic act evidence relating to Ruffled Feathers and the condominium conversion corporations from 1997-2000 again is almost identical. Thus, the Rule 404(b) similarity requirement is satisfied.

Much of the evidence that will be offered, such as the conversion of certificates of deposit and payments being made by Capjac, will be offered as part of the evidence concerning the charged fraud scheme. An IRS Revenue Agent will testify concerning the charged tax counts, and will also testify concerning the other acts evidence. The government will offer tax records from the IRS and from the defendants' accountants. The evidence will be based in large part on documents that show that the defendants had income that they failed to report to the IRS. Thus the evidence will be sufficient to support a jury finding that the defendants committed the similar act.

Finally, the probative value of all of the evidence is not substantially outweighed by its prejudicial effect. None of the uncharged conduct is inflammatory. Any danger regarding the jury's improper use of the evidence can by minimized by appropriate limiting instructions. *See United States v. Wright*, 943 F.2d 748, 752 (7th Cir. 1991); *United States v. Penson*, 896 F.2d 1087, 1093 (7th Cir. 1990).

## Conclusion

The government respectfully requests that the Court admit the above-proffered evidence – other than that relating to Hargrove's corporations from 1997-2000 – as being "intricately related" to the charged fraud offenses. Alternatively, the government requests that the Court admit all of the proffered evidence under Rule 404(b).

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____
ROBERT W. KENT, JR.
Assistant United States Attorney
219 South Dearborn Street
Room 500
Chicago, Illinois 60604
(312) 886-4185