UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**DOCKETED**

NOV 0 4 2004

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 03 CR 779 |
| v. | ) | |
| | ) | Judge James B. Moran |
| LAURENCE W. CAPRIOTTI, | ) | |
| JACK L. HARGROVE, | ) | |
| MICHEL D. THYFAULT, | ) | |
| JAMES R. WALLWIN and | ) | |
| GEORGE J. STIMAC | ) | |

**FILED**

OCT 2 8 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

NOTICE OF MOTION

TO:
| | | |
|---|---|---|
| Edward M. Genson | Jeffrey B. Steinback | Paul A. Wagner |
| Genson & Gillespie | Genson & Gillespie | 321 S. Plymouth Court |
| 53 W. Jackson Blvd. | 53 W. Jackson Blvd. | Suite 1500 |
| Suite 1420 | Suite 1420 | Chicago, IL 60604 |
| Chicago, IL 60604 | Chicago, IL 60604 | |

PLEASE TAKE NOTICE that on November 3, 2004, at 9:15 a.m. or as soon thereafter as counsel may be heard, I will appear before United States District Court Judge James B. Moran, in the courtroom usually occupied by him (Courtroom 1843) in the Everett McKinley Dirksen Building, 219 S. Dearborn, Chicago, Illinois, or before such other who may be sitting in his place instead, and then and there present:

**GOVERNMENT'S MOTION FOR LEAVE TO FILE GOVERNMENT'S CORRECTED EVIDENTIARY PROFFER SUPPORTING THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS**

**GOVERNMENT'S CORRECTED EVIDENTIARY PROFFER SUPPORTING THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS**

in the above-captioned case, at which time and place you may appear if you see fit.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY: *Robert W. Kent, Jr.*

ROBERT W. KENT, JR.
Assistant United States Attorney

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 03 CR 779 |
| | ) | |
| LAURENCE W. CAPRIOTTI, | ) | **DOCKETED** |
| JACK L. HARGROVE, | ) | **NOV 0 4 2004** |
| MICHEL D. THYFAULT, | ) | Judge James B. Moran |
| JAMES R. WALLWIN and | ) | **FILED** |
| GEORGE J. STIMAC | ) | **OCT 2 8 2004** |

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## GOVERNMENT'S CORRECTED EVIDENTIARY PROFFER
## SUPPORTING THE ADMISSIBILITY OF COCONSPIRATOR STATEMENTS

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, respectfully submits this proffer, pursuant to Federal

Rule of Evidence 801(d)(2)(E) and United States v. Santiago, 582 F.2d 1128 (7th Cir. 1987), of the

government's evidence supporting the admission of coconspirators' statements at trial. This proffer

sets forth the evidence relating to the conspiracy charged in Count Eight of the indictment, which

charges that defendants Laurence Capriotti, Jack Hargrove and Michel Thyfault conspired together

and with others to commit offenses against the United States, namely mail fraud affecting financial

institutions, and wire fraud affecting financial institutions.

The Federal Rules of Evidence provide that a "statement" is not hearsay if it "is offered

against a party" and is "a statement by a coconspirator of a party during the course and in furtherance

of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Below are summaries of the case law interpreting

this rule, the background of the conspiracy charged in Count Eight, the evidence of the conspiracy

and its participants, and the evidence showing that the proffered coconspirator statements were made

during and in furtherance of the conspiracy.

# I.  Governing Law

## A.  General Principles

Federal Rule of Evidence ("Rule") 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  The admission of a coconspirator statement against a defendant is proper where the government establishes, by a preponderance of evidence, that: (1) a conspiracy existed; (2) the defendant and the person making the cited statement were members of that particular conspiracy; and (3) that the statement was made during the course and in furtherance of the conspiracy.  See Bourjaily v. United States, 483 U.S. 171, 175 (1987); United States v. Westmoreland, 312 F.3d 302, 309 (7th Cir. 2002); United States v. Santiago, 582 F.2d at 1130-31.

In this Circuit, the preferred way for the government to make its preliminary "coconspirator-statement" factual showings is by the filing of a pretrial written proffer of the government's evidence.[1]  See United States v. Centracchio, 265 F.3d 518, 522 n. 1(7th Cir. 2001); United States v. Haynie, 179 F.3d 1048, 1050 (7th Cir. 1999).

In determining whether a coconspirator statement is admissible pursuant to Rule 801(d)(2)(E), the court should examine the coconspirator statement itself to decide whether a conspiracy existed and whether the defendant participated in it.  "Bootstrapping" in this fashion is expressly permitted: the statement of a coconspirator may be the predicate for its own admissibility.  Bourjaily v. United States, 107 S.Ct. at 2781-82.  See also  United States v. Zambrana, 841 F.2d

---

[1]    This Court has substantial discretion in the manner in which it decides to evaluate the admissibility of coconspirator statements.  Although the pre-trial proffer is the customary procedure, the Court may admit coconspirator statements subject to the government's eventual proof by preponderance of the evidence of the elements required under Fed. R. Evid. 801(d)(2)(E).  See United States v. Doerr, 886 F.2d 944, 967 (7th Cir. 1989).

1320, 1344-45 (7th Cir. 1988) (discussing how overall context of coconspirator statements is what makes the statements very reliable as evidence of a defendant's role in a conspiracy). The evidence used in showing a conspiracy and a given defendant's participation in that conspiracy may be either direct or circumstantial. United States v. Irorere, 228 F.3d 816, 823 (7th Cir. 2000); United States v. Redwine, 715 F.2d 315, 319 (7th Cir. 1983).

Admissions by a defendant are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule. See United States v. Shoffner, 826 F.2d 619, 626-7 and n.10 (7th Cir.). Of course, a defendant's own admissions are obviously and powerfully relevant to establish the factual predicates for the admission of coconspirator statements against him. See United States v. Potts, 840 F.2d 368, 371-72 (7th Cir. 1987); United States v. Alexander, 741 F.2d 962, 966 (7th Cir. 1984), overruled on other grounds, United States v. Ginsburg, 773 F.2d 798, 802 (7th Cir. 1985).

Further, certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries to be made as to the existence of a conspiracy and a defendant's membership in it. For instance, a defendant joins a conspiracy if he agrees with a conspirator to participate in the project or enterprise that is the object of a scheme involving others and knowingly acts in furtherance of that object; it is immaterial whether the defendant knows, has met with, or has agreed with every coconspirator. United States v. Boucher, 796 F.2d 972, 975 (7th Cir. 1986); United States v. Balistrieri, 779 F.2d 1191, 1225 (7th Cir. 1985). Similarly, the government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. United States v. Liefer, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); United States v. Towers, 775 F.2d 184, 189 (7th Cir. 1985). A defendant may be found guilty even if he joined or

terminated his relationship with core conspirators at different times.[2] United States v. Ramirez, 796 F.2d 212, 215 (7th Cir. 1986); United States v. Noble, 754 F.2d 1324, 1329 (7th Cir. 1985). Even after a conspirator has concluded his active participation in the activities of the conspiracy, the statements of coconspirators will be admitted against him, unless he affirmatively establishes that he has withdrawn from the scheme. United States v. Feldman, 825 F.2d 124, 129 (7th Cir. 1987). To withdraw from a conspiracy, a conspirator must take steps to disavow or defeat the purpose of the conspiracy, either by communicating the fact of his withdrawal to his coconspirators or by informing the authorities of the conspiracy. United States v. Wilson, 134 F.3d 855, 863 (7th Cir. 1998); United States v. Andrus, 775 F.2d 825, 850 (7th Cir. 1985).

## B.    The "In Furtherance" Requirement

To establish that a statement was made "in furtherance" of the conspiracy, the government need only show "some reasonable basis" upon which to conclude that the statement furthered the conspiracy. United States v. Zizzo, 120 F.3d 1338, 1352 (7th Cir. 1997); United States v. Stephens, 46 F.3d 587, 597 (7th Cir. 1995); Shofner, 826 F.2d at 628.   Furthermore, the government has a "relatively low burden of proof on this issue." Shofner, 826 F.2d at 628 (collecting cases).   Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the conspiracy in order to be admissible under the coconspirator exception.   United States v. Singleton, 125 F.3d 1097, 1107 (7th Cir. 1997);   United States v.

---

[2]    A defendant, even if not an "agreeing" member of the conspiracy, may also be found guilty of conspiracy if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy. United States v. Kasvin, 757 F.2d 887, 889-891 (7th Cir.); United States v. Galiffa, 734 F.2d 306, 309-11 (7th Cir. 1984).   There is no requirement that the indictment charge the defendant with aiding and abetting the conspiracy. Kasvin, 757 F.2d at 890.

4

Powers, 75 F.3d 335, 340 (7th Cir. 1996); United States v. Stephenson, 53 F.3d 836, 845 (7th Cir.1995). Thus, updates on a conspiracy's progress, Potts, 840 F.2d at 371, and conversations concerning planning or review of coconspirators' exploits, United States v. Molt, 772 F.2d 366, 368-69 (7th Cir. 1985), are statements in "furtherance."

As discussed below, the Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement.

### 1.    Statements Made to Execute the Conspiracy

Statements made by conspirators to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. United States v. Cox, 923 F.2d 519, 527 (7th Cir. 1991). In the instant case, for example, statements made by the conspirators and their agents[3] to move money in and out of the escrow accounts were plainly made "in furtherance" of the conspiracy charged in Count Eight of the indictment.

Statements such as these, which are "intended to promote the conspiratorial objectives," are readily admitted pursuant to Rule 801(d)(2)(E). See, e.g., United States v. Sinclair, 109 F.3d 1527, 1534 (10th Cir. 1997); United States v. Shores, 33 F.3d 438, 444 (4th Cir. 1994); United States v. DeLuna, 763 F.2d 897, 909 (8th Cir. 1985); United States v. Layton, 720 F.2d 548, 556 (9th Cir. 1983); United States v. Hamilton, 689 F.2d 1262, 1270 (6th Cir. 1982). Statements which prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. United States v. Monus, 128 F. 2d 376, 392 (6th Cir. 1997); United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991). See also United States v. Smith, 833 F.2d 213, 219 (10th Cir. 1987) (sole purpose of conversation from coconspirator's perspective was to

---

[3]    See infra at pages 10-11 for a discussion concerning statements made by agents of the defendants.

promote conspiracy's unlawful objectives; coconspirator's responses to individual's questions were designed to whet individual's interest in acquiring stolen property). Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's assistance is determined by an examination of the context in which it is made. Garlington v. O'Leary, 879 F.2d 277, 284 (7th Cir. 1989).

### 2.    Statements Regarding the Conspiracy's Activities.

Statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because conspirators make such statements to guide each other toward achievement of the objectives of the conspiracy. United States v. Ashman, 979 F.2d 469, 489 (7th Cir. 1992). Similarly, statements that are part of the information flow between conspirators made in order to help each conspirator perform his role are "in furtherance" of the conspiracy, United States v. Godinez, 110 F.3d at 454; United States v. Herrero, 893 F.2d 1512, 1527-28 (7th Cir. 1990); Garlington v. O'Leary, 879 F.2d at 283-84; United States v. Van Daal Wyk, 840 F.2d 494, 499 (7th Cir. 1988). Statements to assure that a coconspirator can be trusted to perform his role also satisfy the "in furtherance" requirement. United States v. Buishas, 791 F.2d 1310, 1315 (7th Cir. 1986); United States v. Romo, 914 F.2d 889, 897 (7th Cir. 1990); United States v. Martinez de Ortiz, 907 F.2d 629, 635-36 (7th Cir. 1990).

### 3.    Statements to Recruit Conspirators

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy. United States v. Godinez, 110 F.3d at 454;   Shoffner, 826 F.2d at 628. "Conversations made by conspirators to prospective coconspirators for membership purposes are acts in furtherance of the conspiracy." United States v. Dorn, 561 F.2d 1252, 1256-57 (7th Cir. 1977).

See also Herrero, 893 F.2d at 1528; United States v. Doerr, 886 F.2d at 951; Garlington, 879 F.2d at 283.

### 4. Statements Regarding the Activities of Other Conspirators Designed to Inform or Reassure the Listener.

Statements made by conspirators to other individuals who participate in, or interact with, the conspiracy contribute to the conspiracy. In United States v. Van Daal Wyk, 840 F.2d 494 (7th Cir. 1988), the government sought to admit statements made by a drug wholesaler to one of his couriers concerning the defendant. The pertinent statements identified the defendant as a dealer of the wholesaler who owed the wholesaler money for cocaine. In addition, the wholesaler had instructed his courier not to deliver any additional quantities of cocaine to the defendant. These statements were held to be in furtherance of the conspiracy and admissible.

The Seventh Circuit has also found that "[s]tatements made to keep coconspirators informed about the progress of the conspiracy, to recruit others, or to control damage to the conspiracy are made in furtherance of the conspiracy." Stephenson, 53 F.3d at 845; United States v. Curtis, 37 F.3d 301, 307 (7th Cir. 1994).

As the Seventh Circuit held in United States v. Pallais, 921 F.2d 684, 688 (7th Cir. 1990):

> [t]he exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a coconspirator by an informative nickname. . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

The same logic dictates that discussions concerning a conspiracy's successes are admissible as statements in furtherance of the conspiracy. See id.; Van Daal Wyk, 840 F.2d at 499 ("statements

7

were not made in superfluous causerie; they were part of the information flow between conspirators intended to help each perform his role").

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. A coconspirator's statement describing a defendant's past drug deals furthered the conspiracy by reassuring the listener that the defendant would be a reliable source. United States v. Sophie, 900 F.2d 1064, 1073 (7th Cir. 1990). Likewise, statements made to reassure and calm the listener may further the conspiracy as well. Garlington, 879 F.2d at 284 (upholding admission of coconspirator's statement to defendant in a murder conspiracy "We're going to take care of him" reasoning that the statement encouraged the defendant to perform his task in the conspiracy). In United States v. Molinaro, 877 F.2d 1341, 1343-44 (7th Cir. 1989), the defendant sought to preclude the admission of statements between conspirators in which they were complaining about a third conspirator's handling of the delivery and payment for narcotics. The defendant argued that these statements were mere idle chatter and not in furtherance of the conspiracy. The Seventh Circuit rejected the defense's position, finding that the statements were made to iron out disputed details of the conspiracy and to control the damage apparently done to the conspiracy by the third conspirator.

### 5. Statements Relating to the Progress and Past Accomplishments of the Conspiracy.

Statements made by conspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy. Potts, 840 F.2d at 371, Molt, 772 F.2d at 368-69. Similarly, statements regarding a conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy. United States v. Doyle, 771 F.2d 250, 256 (7th Cir. 1985).

### 6. Statements to Conceal the Criminal Objectives of the Conspiracy.

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where, as here, ongoing concealment is one of its purposes. United States v. Gajo, 290 F.3d 922, 928-29 (7th Cir. 2002); United States v. Kaden, 819 F.2d 813, 820 (7th Cir. 1987); Xheka, 704 F.2d at 985-86; United States v. Mackey, 571 F.2d 376, 383 (7th Cir. 1978). "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." United States v. Troop, 890 F.2d 1393, 1404 (7th Cir. 1989). Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy. See Van Daal Wyk, 840 F.2d at 499. The use of violence and threats to intimidate the members of a conspiracy and to protect its secrecy are also relevant to and in furtherance of the ongoing conspiracy. United States v. Markowski, 772 F.2d 358, 366 (7th Cir. 1985).

### C. Statements Admissible Without Regard To The Coconspirator Rule.

As discussed above, statements that a defendant personally makes are admissible against him as admissions of a party-opponent pursuant to Rule 801(d)(2)(A) without reference to the coconspirator statement rule. See Shoffner, 826 F.2d at 626-627 and n.10. Statements that a conspirator does not make personally, but which he impliedly or expressly authorizes an agent to make in the context of an existing agency relationship are admissible pursuant to Rule 801(d)(2)(D). United States v. Feldman, 825 F.2d 124, 128 (7th Cir. 1987); see also United States v. Gibson, 690 F.2d 697, 701 (9th Cir. 1982); United States v. Krohn, 573 F.2d 1382, 1386 (10th Cir. 1978); United State v. AMREP Corp., 560 F.2d 539, 545 (2d Cir. 1977). An agent-principal relationship exists when the agent acts on behalf of the principal and subject to his or her control and if the agent

consents to so act. United States v. Feldman, 825 F.2d at 129, quoting Southern Pac. Transp. Co. V.
Continental Shippers Ass'n, 642 F.2d 236, 238 (8th Cir. 1981).

The coconspirator statement rule is not implicated where the relevant verbal declaration is not
a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification; an
example would be a declaration that is simply an order or a suggestion. See United States v. Tuchow,
768 F.2d 855, 868 n.18 (7th Cir. 1985). Equally importantly, the coconspirator statement rule is not
implicated if a statement is not offered in evidence to prove the truth of the matter asserted and thus
does not constitute "hearsay" as defined by Rule 801(c). United States v. Feldman, 825 F.2d at 127.
Accordingly, statements by alleged coconspirators may be admitted against a defendant, without
establishing the Bourjaily factual predicates, but with corresponding limiting instructions, where such
statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope
of the charged conspiracy. Gajo, 290 F.3d at 929-30; United States v. Herrera-Medina, 853 F.2d 564,
565-566 (7th Cir. 1988); Van Daal Wyk, 840 F.2d at 497-498; Tuchow, 768 F.2d at 867-869; United
States v. Magnus, 743 F.2d 517, 521-523 (7th Cir. 1984).

**D.**      **The Absence of Confrontation Issues with Coconspirator Statements**

No separate Sixth Amendment confrontation issues are posed by the use of a non-testifying
coconspirator's statements which are offered for their truth against the defendant. This is because the
requirements for admission under Rule 801(d)(2)(E) are identical to "the requirements of the
Confrontation Clause." Bourjaily, 483 U.S. at 182. Thus, there are no "constitutional problems" once
Rule 801(d)(2)(E)'s requirements have been met. Id.; United States v. Ceballos, 302 F.3d 679, 689
n. 2 (7th Cir. 2002); United States v. Singleton, 125 F.3d at 1107-08. See also Idaho v. Wright, 497
U.S. 805, 814 (1990) (Confrontation Clause is not violated where hearsay statement falls within a

firmly rooted hearsay exception).    As a result, in considering the  admissibility of proffered

coconspirator statements, the trial court does not consider whether or not the coconspirator-declarant

is "unavailable" or whether there is independent evidence to establish the "reliability" of the proffered

statements. Inadi, 475 U.S. at 400; Bourjaily, 483 U.S. at 183-84.

## II.    Background Of The Conspiracy

### The Individuals

The defendants and other relevant individuals are as follows:

**Laurence W. Capriotti,** a lawyer, was an owner, president and a director of Intercounty Title Company of Illinois, Inc. (Intercounty-Illinois) and ITI Enterprises, Inc., and a director of Independent Trust Corporation (Intrust).

**Jack L. Hargrove,** a real estate developer, was an owner and chairman of the board of directors of Intercounty-Illinois, ITI Enterprises and Intrust.

**Michel D. Thyfault,** a certified public accountant, was chief financial officer of Intercounty-Illinois from 1989 to late 1995, chief financial officer of ITI Enterprises from late 1995 to November 1996, and a director of Intrust from December 1990 to December 1994.

**James R. Wallwin** was treasurer of Intercounty-Illinois from 1989 to late 1995, and from late 1995 to October 1996 was treasurer of ITI Enterprises.

**George J. Stimac,** a certified public accountant, was assistant controller of Intercounty-Illinois from 1986 to 1992, was controller from 1992 to late 1995, and was controller of ITI Enterprises from late 1995 to February 1997.

**Allan Hurwick,** a certified public accountant who passed away in March 2002, was chief financial officer of ITI Enterprises from January 1997 until 2000.

**Susan A. Peloza,** a person referred to in the indictment as **Individual A,** was an officer and director of Intercounty-Illinois, a director of Intrust, and an owner, officer and director of Intercounty Title Company, and Indiana corporation (Intercounty-Indiana) and Intercounty National Title Insurance Company (INTIC).

**Joseph Gerlach,** the Data Processing Manager at Intercounty-Illinois from 1985 to 1993.

11

## The Title Insurance Entities

Intercounty-Illinois, which had its primary office at 120 Madison St. in Chicago, was a title insurance agent for a Texas-based title insurance company named Stewart Title Guaranty Company. Intercounty-Illinois's relationship with Stewart lasted until about December 1995, when Intercounty-Illinois essentially ceased operations. From 1984 until April 1991, Intercounty-Illinois was owned approximately 40 percent by Capriotti, 40 percent by Hargrove, and 20 percent by Stewart. After April 1991, Capriotti and Hargrove each owned approximately 50 percent.

As a title insurance agent for Stewart, Intercounty-Illinois sold title insurance policies that were issued by Stewart to customers in the Chicago area and also acted as an escrow agent for the collection and disbursement of funds relating to the purchase, sale and construction of real estate. All of the funds that Intercounty-Illinois received as escrow agent were deposited and commingled in a few escrow accounts that it controlled, first at Exchange National Bank and American National Bank, then at LaSalle National Bank until about September 1999, and later at Harris Bank and Trust. On a monthly basis, Intercounty-Illinois engaged in thousands of escrow account transactions involving the receipt and disbursement of millions of dollars belonging to its customers, who directed the transactions. Due to the volume of business, there was a substantial float in the escrow accounts, meaning that on any particular day, the total amount of title insurance customer funds that were deposited into the escrow accounts substantially exceeded the total amount of funds paid out. An escrow agreement between Stewart and Intercounty-Illinois provided that Intercounty-Illinois agreed to keep the escrow funds safe and separate and to disburse the funds only for purposes authorized by the title insurance customers.

After late 1995, as Intercounty-Illinois became inactive, Intercounty-Illinois and Stewart were replaced by a set of new companies that provided the same services through a different corporate organization; these included: Intercounty-Indiana, Intercounty National Title Insurance Company (INTIC), and ITI Enterprises, which Capriotti and Hargrove each half-owned. Fidelity National Title Insurance Company of New York acted as reinsurer for most of the insurance underwritten by INTIC. ITI Enterprises controlled the escrow accounts.

## The Non-Title Insurance Entities

Capjac Investments Group, Inc. and Capjac Investments, Ltd. (together referred to as "Capjac") were shell companies controlled by Capriotti and Hargrove. They used Capjac's bank accounts to receive and spend funds, including, as explained below, funds that they stole from the escrow accounts.

In the 1980's, Intercounty-Illinois initiated what was known as a "mortgage defeasance program." This program was implemented through several wholly-owned subsidiaries, the last of which was called ITC Defeasance Company. At this time, many real estate properties were encumbered by mortgage loans that carried substantial prepayment penalties. The existence of these penalties deterred the sale and refinancing of such properties. The mortgage defeasance program facilitated such transactions by eliminating these penalties as a deterrent. In a defeasance transaction, the buyer's funds that normally went to pay off the existing mortgage were instead placed in escrow with an Intercounty-Illinois defeasance subsidiary. Although the existing mortgage continued to exist, Intercounty-Illinois issued title insurance to the buyer and its lender as if the existing mortgage had been paid off. The defeasance subsidiary took on the responsibility of paying off the existing mortgage. The plan was for the defeasance subsidiary to invest the funds provided by the buyer, and

13

to make enough money to service the existing mortgage and make a profit. The plan failed because Intercounty-Illinois chose to invest the funds in the junk bond market. By 1990, the junk bond market had collapsed, and the defeasance subsidiaries suffered investment losses in excess of $10 million. These investment losses made it impossible for the defeasance subsidiaries to honor their obligations to pay off the pre-existing mortgages in the defeasance transactions, and created a huge financial problem for Intercounty-Illinois.

### Independent Trust Corporation

Intrust, located in Lombard from 1989 until 1992, and later in Orland Park, served as a trustee for various types of trust accounts, including individual retirement accounts and employee benefit plans. In approximately November 1989, Madison Avenue Investments, Inc., which was wholly owned by Hargrove, purchased a controlling interest in the stock of Intrust, and Intercounty-Illinois purchased a minority interest. In approximately December 1990, Madison Avenue Investments, Inc. purchased the stock owned by Intercounty-Illinois and became the sole shareholder of Intrust. Hargrove was the chairman of the board of directors of Intrust and Capriotti was a director of Intrust throughout the relevant time period. Peloza was a director of Intrust from the 1980's until December 1994. Thyfault was a director of Intrust from December 1990 to December 1994.

On or about December 4, 1990, Intrust entered into an Escrow Agreement with Intercounty-Illinois. The stated purpose of the Escrow Agreement was to serve as an investment vehicle for the daily investment of the cash in Intrust's trust accounts. The Escrow Agreement called for Intrust to tender trust funds to Intercounty-Illinois, and for Intercounty-Illinois to deposit the funds in a specific account at LaSalle National Bank of Chicago, which in fact was one of the escrow accounts managed by Intercounty-Illinois in connection with its title insurance business. The Escrow Agreement

obligated Intercounty-Illinois to pay Intrust interest on the funds deposited and sweep fees based on the overnight investment of the funds in the account, which were to be used to purchase and sell short term U.S. Government Obligations each evening.

Under the stated terms of the Escrow Agreement, Intrust was the principal and Intercounty-Illinois was the escrow agent, and only Intrust was able to authorize withdrawals of Intrust funds from the account. In reality, Intercounty-Illinois controlled the funds in the account because the signators on the account were only Intercounty-Illinois employees; no Intrust employee was ever a signator. Thus, Intrust lacked the ability to remove money from the account directly, and could do so only if Intercounty-Illinois complied with its directive. In addition, LaSalle Bank would not disclose to Intrust the status of the escrow account because no Intrust employee was a signator. Thus, Intrust relied on Intercounty-Illinois and its successors for truthful information about the status of Intrust's funds in the escrow account.

Intrust was regulated by the Office of Banks and Real Estate of the State of Illinois and its predecessor ("OBRE"). In 1994, OBRE began to criticize the Escrow Agreement, the intermingling of Intrust and Intercounty-Illinois funds, and Intrust's lack of control over the funds in Intercounty-Illinois' escrow account. In response, in approximately January 1997, Intercounty-Indiana, the successor escrow agent to Intercounty-Illinois, established a separate escrow account at LaSalle Bank, which purported to hold all of the funds that Intrust had tendered to Intercounty-Illinois and Intercounty-Indiana under the Escrow Agreement and which purported to be governed by the terms of the Escrow Agreement ("the Intrust escrow account"). The signators on the Intrust escrow account were solely employees of ITI Enterprises, which managed Intercounty-Indiana's escrow accounts; no Intrust employee was ever a signator on this account. Thus, ITI Enterprises controlled the flow of

funds out of the account, and Intrust relied on ITI Enterprises for truthful information about the status of Intrust's funds in the account. After this separate escrow account was established, OBRE continued to press Hargrove and Capriotti, who were board members of both Intrust and ITI Enterprises, to give Intrust control over its money in the escrow account.

Between December 1990 and April 1999, Intrust tendered more than $50 million to Intercounty-Illinois and Intercounty-Indiana pursuant to the Escrow Agreement. With interest, the Intrust funds should have grown to more than $68 million. Although Intrust was regulated by OBRE, none of the funds that trust holders deposited with Intrust and Intrust tendered to Intercounty-Illinois and Intercounty-Indiana were insured. The funds that were tendered pursuant to the Escrow Agreement were described on Intrust trust holder account statements as funds invested in "Cash Account" or "Money Market Account."

## Financial Situation In The Late 1980's

A price war in the Chicago title insurance market, coupled with the defeasance program investment losses and other problems, rendered Intercounty-Illinois insolvent as of 1987. The consolidated balance sheets for Intercounty-Illinois showed a negative net worth from 1987 onward . In 1987, liabilities exceeded assets by more than $6 million. In 1988, the deficit exceeded $11 million. In 1989 and 1990, the deficit approached $20 million, and it exceeded $20 million in the following years. The last year that Intercounty-Illinois had an outside auditing firm perform an audit of the company was 1988, which audit report was issued on or about August 1, 1989. That audit report disclosed that in 1988 Intercounty-Illinois had lost more than $7 million.

In November 1989, Capriotti, Hargrove and Peloza attended an Intercounty-Illinois shareholder meeting with representatives of Stewart, which at that time was a minority shareholder.

16

At this meeting, the participants discussed Intercounty-Illinois' dire financial situation and the need for a substantial infusion of cash. Capriotti and Hargrove offered to provide funds to Intercounty-Illinois, but only if Stewart agreed to modify certain provisions in the master agreement between Intercounty-Illinois and Stewart that Capriotti and Hargrove deemed unfair. Stewart refused to agree to their demands, and the meeting ended at an impasse.

## III.    **Evidence Of The Conspiracy And Its Participants**

The government's evidence at trial will establish as follows. The members of the conspiracy charged in Count Eight included Capriotti, Hargrove, Thyfault, Wallwin, Stimac, Hurwick, Peloza and Gerlach.

### Summary

The conspiracy started no later than 1988 and continued until February 2000. During the charged time period, Capriotti and Hargrove, with the assistance of Thyfault, Wallwin, Stimac, Hurwick and Peloza, agreed to and did steal more than $80 million from the escrow accounts that were managed by Intercounty-Illinois and ITI Enterprises. As part of the conspiracy, Capriotti, Hargrove, Thyfault, Peloza and Hurwick fraudulently caused Intrust to tender more than $50 million in trust holder funds to Intercounty-Illinois and ITI Enterprises. Rather than keeping the Intrust funds in the escrow accounts as required, the conspirators caused the Intrust funds to be spent as part of their ongoing scheme to deplete the escrow accounts. By infusing the Intrust funds into the escrow accounts and taking advantage of the natural float in the escrow accounts, the conspirators were able to steal millions of dollars, use Intrust money and new title customer money to pay off old title customers, and continue the scheme for more than a decade. In the end, Intrust and its trust holders lost all of the more than $50 million that had been tendered, plus the more than $18 million in

interest that they thought was accruing. Fidelity, which was insuring the escrow accounts when the scheme came to a close in early 2000, ultimately suffered the remainder of the loss by paying more than $30 million to the title insurance customers who had deposited funds into the escrow accounts but had not yet withdrawn them.

Of the more than $80 million that the conspirators stole, they plowed back approximately $70 million into their title insurance companies and other businesses. This enabled otherwise insolvent conspirator-controlled entities to continue in business, which benefitted the conspirators in various ways, including millions of dollars in salaries and other employment related agreements (including a lucrative severance agreement for Thyfault), hundreds of thousands of dollars of personal credit card expenses being paid, and the ability to place family, friends and personal employees on the corporate payroll. In addition to the money that was plowed back into the title insurance businesses, Capriotti and Hargrove stole more than $10 million from the escrow accounts directly and converted it to their own use.

### Transfers of Funds from Escrow Accounts to the Title Insurance Entities

The conspirators propped up their insolvent title insurance entities by using escrow money to fund the operations of their companies. They employed several different methods, which included the following:

- In the late 1980's, Capriotti and Hargrove caused more than $1 million to be withdrawn from the escrow account and used it to: (1) make a loan to an Intercounty-Illinois customer; and (2) finance the acquisition of a commercial office building in Chicago.

- Starting in 1988 and continuing thereafter, Capriotti, Hargrove, Thyfault and Peloza directed Wallwin and Stimac to disburse more than $15 million in escrow funds for the purpose of purchasing certificates of deposit in the name of Intercounty-Illinois at various Chicago area financial institutions. Capriotti and Hargrove, with the assistance of Peloza, converted many of the CDs to

their own use, and in some cases pledged the CDs as collateral for personal loans to Capriotti and Hargrove. In order to induce the banks to make these loans, Capriotti, Hargrove and Peloza made false statements to the banks about their authorization to use these escrow-funded CDs as collateral for personal loans. Capriotti and Hargrove caused some of the loan proceeds to be deposited into Intercounty-Illinois's operating accounts. These transfers were booked as loans to Intercounty-Illinois from Capjac. Later on, Capriotti and Hargrove paid off some of the loans by causing the financial institutions to foreclose on the CDs that they had fraudulently pledged as collateral.

- Starting in 1989 and continuing throughout the 1990's, Capriotti, Hargrove and Peloza caused millions of dollars of escrow funds to be disbursed to Capjac. Between 1991 and 1994 alone, more than $3 million in escrow funds were disbursed to Capjac. In Intercounty-Illinois' escrow accounting system, these funds were accounted as disbursements from escrow file TI 4659, which was assigned to Hargrove. None of these disbursements was supported by a corresponding deposit of funds. The Intercounty-Illinois employees who handled this file during this time period will testify that they made these fraudulent disbursements at the direction of Hargrove and Peloza, and that Hargrove told one employee not to do anything with this file without first talking to him. The records show that a substantial portion of these funds were transferred from Capjac back to Intercounty-Illinois's operating accounts, and booked (on Intercounty-Illinois' records) as loans from Capjac to Intercounty-Illinois.

- Starting in 1994, Capriotti and Hargrove directed Thyfault, Wallwin and Stimac to transfer funds directly from the escrow account to Intercounty-Illinois' operating account. These transfers occurred almost monthly, and on several occasions more than once per month. By the time that Thyfault, Wallwin and Stimac left Intercounty-Illinois in late 1996, more than $15 million had been transferred directly from the escrow account to the operating account. By the time this practice ended in 2000, more than $45 million had been so transferred.

- Capriotti caused escrow funds to be disbursed for the purpose of paying the debts of their title insurance entities, including debts relating to the defeasance transactions. For example, in 1995, escrow funds totaling approximately $1.2 million were used to pay off a defeasance obligation relating to a property called Randall Plaza.

19

**Transfers of Funds from Escrow Accounts to Defendants and Their Businesses**

In addition to funding the operations of their insolvent title insurance entities, Capriotti, Hargrove and Peloza caused millions of dollars to be disbursed directly from the escrow accounts to bank accounts and businesses that they controlled, including:

- As set forth above, from 1989 throughout the 1990's, Capriotti, Hargrove and Peloza caused millions of dollars in escrow funds to be disbursed to Capjac. Some of this money was transferred to Intercounty-Illinois' operating accounts. A lot, however, was spent directly for the benefit of Capriotti and Hargrove, usually by means of checks signed by Peloza, including the following approximate amounts:

  1994 - $240,000 to make payments on personal loans to Capriotti and Hargrove
      $80,000 directly to Capriotti
      $90,000 directly to Jack L. Hargrove Builders, Inc. (owned by Hargrove)
      $67,000 to make payments on debts owed by Hargrove Builders

  1995 - $190,000 to make payments on personal loans to Capriotti and Hargrove
      $315,000 directly to Capriotti and $30,000 directly to Hargrove
      $170,000 to make payments on debts owed by Hargrove Builders

  1996 - $40,000 to make payments on personal loans to Capriotti and Hargrove
      $24,000 directly to Capriotti
      $127,000 to make payments on debts owed by Hargrove Builders

  1997 - $63,000 to make payments on debts owed by Hargrove and his companies

  1998 - $23,000 to make payments on debts owed by Hargrove and his companies

  1999 - $13,000 to make payments on debts owed by Hargrove and his companies.

- In late 1995 Hargrove caused approximately $970,000 that was owed to Intercounty-Illinois to be deposited into the escrow account (as opposed to the operating account, where it should have gone). Then, in 1995 and 1996 Hargrove caused approximately $970,000 in escrow funds to be transferred to the checking account of an entity he controlled called First Mortgage Corp. Hargrove then signed approximately $970,000 in checks drawn on the First Mortgage Corp. account made payable to himself, and caused them to be deposited into his personal checking account.

- In 1998, 1999 and 2000, Capriotti caused escrow funds to be transferred to his personal checking account in the approximate amounts of $450,000, $1.1 million and $36,000, respectively.

- Between 1990 and 1995, Capriotti and Hargrove caused escrow funds totaling approximately $9.9 million to be disbursed to pay for the development of a residential/golf course property that they owned in Lemont, Illinois, called Ruffled Feathers. These disbursements were not supported by any corresponding deposits. In 1995, Capriotti and Hargrove sold a part of Ruffled Feathers for approximately $9.3 million, of which approximately $3.5 million in net proceeds was paid to Capriotti and Hargrove. None of this money was returned to the Ruffled Feathers escrow files.

## Transfers of Funds from Intrust to the Escrow Accounts

As set forth above, the money that the conspirators stole from the escrow accounts came from title insurance customers and the Intrust trust holders. Below is the chronology of events that the government will present at trial regarding the transfer of more than $50 million in funds from Intrust to the escrow accounts controlled by Intercounty-Illinois and ITI Enterprises.

The Escrow Agreement between Intrust and Intercounty-Illinois was signed by Thyfault on behalf of Intercounty-Illinois on December 5, 1990. On that same date, Capriotti, Hargrove and Peloza, as directors of Intrust, directed Intrust's bank to wire transfer approximately $16,500,000 from Intrust's account to Intercounty-Illinois's escrow account at LaSalle Bank. In January 1991, Capriotti, Hargrove and Thyfault, as directors of Intrust, voted at a board of directors meeting to approve the Escrow Agreement and the transfers of money thereunder.

Between December 1990 and April 1999, Intrust transferred a net total of more than $50 million in Intrust trust holder funds to escrow accounts controlled by the defendants. Intrust and its trust holders understood and believed that, with interest, this $50 million grew to more than $68 million. Sometimes funds were transferred back to Intrust, but the net amount of funds transferred from Intrust to the escrow accounts grew over time. The Intrust employees understood that they were to transfer whatever excess cash that they had to the escrow accounts.

At the same time, as set forth above, the conspirators were fraudulently transferring funds out of the escrow accounts and converting them to their own use. By January 1994 and continuing thereafter, the net amount transferred by Intrust to the escrow accounts generally exceeded the total amount of money in the escrow accounts. By January 1995 and continuing thereafter, the net amount transferred by Intrust to the escrow accounts generally exceeded the sum of the escrow account balances plus the amount of escrow funds that had been used to purchase certificates of deposit, as reflected on the escrow account reconciliation. Below is a chart that illustrates the growing disparity between the funds transferred by Intrust to the escrow accounts and the funds available to honor those obligations:

| Period Ending | Balance in Escrow Accounts | Balance of Escrow Accounts Plus CDs | Balance of Intrust Deposits | Total Intrust $ Supposedly in Escrow Accts |
|---|---|---|---|---|
| 1/94 | $20,472,168 | $44,094,703 | $29,814,751 | $32,837,502 |
| 1/95 | 7,091,279 | 30,713,814 | 30,814,751 | 35,114,974 |
| 1/96 | 10,330,270 | 32,934,261 | 46,314,751 | 52,901,721 |
| 1/97 | 7,691,002 | 29,821,143 | 44,814,751 | 53,995,536 |
| 1/98 | 11,401,380 | 32,131,521 | 41,314,751 | 53,225,878 |

The disparity between the total amount of Intrust funds supposedly in the escrow accounts and the actual amount of funds available to honor those obligations was even greater than depicted above because: (1) throughout this time period, the escrow accounts also received from and owed millions of dollars to title insurance customers; and (2) many of the certificates of deposit referred to in the chart were cashed in but were kept on the escrow account reconciliation. In essence, almost from the

22

very beginning, the conspirators caused Intrust funds to be fraudulently transferred out of the escrow accounts in violation of the Escrow Agreement.

In December 1990, Thyfault created an Excel spreadsheet entitled "INTRUST - Interest and Fees Earned." This spreadsheet kept track of, among other things, the "book balance" and "invested balance" of the funds transferred from Intrust to the escrow accounts, plus the "interest credited" each day on these balances pursuant to the terms of the Escrow Agreement. Starting in December 1990 and continuing thereafter until November 1996, Thyfault caused this spreadsheet to be created and faxed to Intrust each month. After Thyfault left ITI Enterprises in November 1996, Hurwick took over responsibility for creating and faxing this spreadsheet each month. Intrust used these spreadsheets to calculate the total amount of trust holder funds in the escrow accounts controlled by defendants. In the context of the Escrow Agreement, these spreadsheets were false and fraudulent. As Thyfault and Hurwick (as well as Capriotti and Hargrove) well knew, the Intrust funds had been transferred out of the escrow accounts without Intrust's consent, in violation of the Escrow Agreement, and Intercounty-Illinois and ITI Enterprises were unable to pay Intrust what it was due, both of which facts were not disclosed to Intrust.

The Illinois Office of Banks and Real Estate ("OBRE") regulated Intrust. OBRE periodically reviewed Intrust's operations and issued reports that were directed to Intrust's board of directors for response. In or about March 1994, May 1995 and March 1996, OBRE issued Reports of Examination for Intrust that noted the amount of money that Intrust had sent to the escrow account, and observed that the commingling of trust holder funds and title customer funds was a breach of Intrust's fiduciary duty to its trust holders, and that Intrust, rather than receiving bank account statements, was forced to rely on spreadsheets provided by Intercounty for information about the status of the Intrust money.

The reports recommended that the Intrust funds be separated from the Intercounty-Illinois customer funds. Capriotti and Hargrove, who constituted two of Intrust's three-person board of directors, initially promised only to examine the issue and then, in response to the 1996 report, promised "to appropriately have this situation resolved to the satisfaction of the state auditors prior to the next annual audit by having the funds segregated in a separate account at LaSalle National Bank in the name of Independent Trust Corporation."

In January 1997, Capriotti purported to honor this promise by causing a new, non-interest bearing escrow account to be established at LaSalle Bank entitled "Intercounty Title Co. as escrowee for Independent Trust Corporation Trust Funds" (the "Intrust escrow account") and claiming to move all of the money owed to Intrust into the account, which should have been more than $53 million. Instead, the Intrust escrow account, for which the signatories were only ITI Enterprises employees, was funded with only $45,949. The remainder of the Intrust money either was already stolen or was kept in the title insurance escrow account to fund future thefts.

In connection with OBRE's 1997 examination of Intrust, OBRE received what purported to be an account statement that stated that, as of May 31, 1997, the Intrust escrow account at LaSalle Bank contained $54,894,943. In fact, the Intrust escrow account still contained only $45,949.[4] In a Report of Examination issued in September 1997, OBRE criticized Intrust's inability to control the funds in this account and the fact that it did not receive account statements, and stated that "this situation continues to present a serious lapse in internal control and appears to violate the basic trust

---

[4]     Wallwin will testify that, in 1996, he met with Capriotti and Hargrove, who inquired whether it would be possible to create bank account statements. Capriotti explained that Intrust's president needed a bank statement for the escrow account and that they wanted to get the president off their backs. Wallwin told Capriotti and Hargrove that he had no idea how to create or falsify bank account statements.

rule that the trustee take possession of and hold all trust property for the benefit of the beneficiaries." Capriotti and Hargrove, who constituted two of Intrust's three-person board of directors, did nothing to correct the situation.

In connection with OBRE's 1998 examination of Intrust, OBRE received what purported to be an account statement that stated that, as of August 31, 1998, the Intrust escrow account contained $54,840,446. In fact, the Intrust escrow account still contained only $45,949. In a Report of Examination issued in October 1998, OBRE criticized Intrust's inability to control the funds in this account and the fact that it did not receive account statements, and stated that "[m]anagement should ensure that only Trust Company personnel can direct and control the funds in this account and all statements relating to this account be sent to the Trust Company." Intrust's board of directors, which was controlled by Capriotti and Hargrove, responded by falsely promising that Capriotti "would take the necessary steps to appropriately have this situation resolved to the satisfaction of the state auditors prior to the next annual audit." In fact, nothing was done to correct the situation.

In April 1999, Capriotti, Hargrove and Hurwick fraudulently caused the last of the transfers from Intrust to the escrow accounts that they controlled. In early April 1999, LaSalle Bank advised Capriotti, Hargrove and Hurwick that the primary title company escrow account was overdrawn by millions of dollars and demanded that they deposit funds to eliminate the overdraft. Capriotti told LaSalle Bank that Intercounty had $13 million in certificates of deposit at other financial institutions, and that Intercounty had an account at First National Bank of Chicago ("First Chicago") that contained a substantial amount of money due to a mistaken overfunding of a real estate transaction.[5] Capriotti promised to send funds from the certificates of deposit and the First Chicago account to

_____

[5]     Although the escrow account at that time was managed by ITI Enterprises, LaSalle Bank, the conspirators and others referred to the controlling entity as "Intercounty."

25

LaSalle Bank to correct the overdraft. These representations were false – the certificates of deposit did not exist and the First Chicago account contained less than $2500.

On April 21, 1999, Capriotti asked the president of Intrust to wire transfer Intrust trust holder funds totaling $3.5 million to the Intrust escrow account at LaSalle Bank. At this time, the president of Intrust was reluctant to transfer any more trust holder money because of the pressure from OBRE on the issue. Capriotti overcame the president's reluctance by promising that the funds would be returned to Intrust by April 30, 1999. This promise was fraudulent because Capriotti knew that LaSalle Bank was going to keep these funds and that no other funds were available for return to Intrust. Capriotti told the president of Intrust that the funds were needed to increase Capriotti's and Hargrove's account balances at LaSalle Bank so that Capriotti and Hargrove would receive a lower interest rate on the renewal of an $18 million loan at LaSalle Bank. This representation was false because Capriotti knew that no such loan existed and that the funds were to be used to eliminate the overdraft in ITI Enterprise's main escrow account at LaSalle Bank. Based on these false promises and representations, Intrust's president caused $3.5 million to be wire transferred from Intrust's bank account at Cole Taylor Bank to the Intrust escrow account at LaSalle Bank in Chicago.

During a joint telephone conversation that occurred on April 23, 1999, Capriotti and Hargrove told the president of Intrust to wire an additional $5.7 million in trust holder funds to the Intrust escrow account at LaSalle Bank. The Intrust president was extremely reluctant. Capriotti repeated the false promise that the funds would be returned by April 30, 1999, and repeated the false representation that the funds were needed to help Capriotti and Hargrove obtain a lower interest rate on a loan at LaSalle Bank. Hargrove, who was the owner and chairman of Intrust, supported these lies by falsely promising that he would make sure that the money was returned to Intrust by April 30,

1999, and by repeatedly directing the Intrust president to send the money immediately. Based on these false promises and representations, Intrust's president caused $5.7 million to be wire transferred from Intrust's bank account at Cole Taylor Bank to the Intrust escrow account at LaSalle Bank in Chicago.

From the Intrust escrow account at LaSalle Bank, Capriotti and Hurwick caused the $9.2 million to be wire transferred to the Intercounty account at First Chicago. Then, the funds were transferred to Intercounty's main title insurance business escrow account back at LaSalle Bank. The money was transferred from LaSalle Bank to First Chicago and then back to LaSalle Bank in an effort to disguise the fact that the funds had come from Intrust. The infusion of $9.2 million into the main escrow account at LaSalle Bank alleviated the overdraft problem, but LaSalle Bank soon thereafter asked Capriotti and Hargrove to take their banking business elsewhere. In or about September 1999, ITI Enterprises established a new escrow account for the title insurance business at Harris Bank.

When the April 30, 1999 deadline passed and Intrust's president pressed for the return of the $9.2 million to Intrust, Capriotti and Hargrove repeatedly promised to take action to return the money. These promises were false – there was no money to be returned. Capriotti and Hargrove also promised that all of the funds due to Intrust would be placed in an escrow account that would be controlled by Intrust, as opposed to ITI Enterprises. These promises were false – there essentially was no money left, and defendants never intended to give Intrust control over this account.

In September 1999, the OBRE issued a Corrective Action Order that required that Intrust "terminate the escrow arrangement with Intercounty Title Company of Illinois, take control of the trust assets subject to that arrangement, and properly account for those trust assets on its trust accounting system and on its customers' account statements." During a meeting with the OBRE in

27

November 1999, Capriotti, in Hargrove's presence, falsely assured the regulators that the money was safe and that he would comply with the regulators' directives. Capriotti and Hargrove caused Intrust to do none of these things.

In November 1999, when additional funds were needed for operating expenses, Capriotti and Hargrove caused Intrust to loan $1.6 million in corporate funds to ITI Enterprises, knowing that Intrust had debts to its trust holders that it could not pay and that, but for this loan, these corporate funds would have been available for the trust holders. In response to the president of Intrust's statement that the corporate funds might be needed because of the escrow situation, Capriotti, in Hargrove's presence, falsely stated to Intrust's president that the escrow accounts were audited every year by the Illinois Department of Financial Institutions and by Fidelity, the re-insurer. The $1.6 million in loan proceeds were wire transferred to Harris Bank and deposited into ITI Enterprises' operating account.

On January 5, 2000, Capriotti asked the president of Intrust to wire transfer another $13 million in trust holder funds to the Intrust escrow account at LaSalle Bank. Capriotti stated that he and Hargrove needed the money to increase their account balances at LaSalle Bank, so that the bank would charge them a lower interest rate on a loan renewal. This representation was false – the money was needed to cure an overdraft in the title insurance escrow account at Harris Bank. Capriotti promised that the money would be returned promptly. The Intrust president was reluctant to comply with this request because of the pressure from OBRE on the issue. Capriotti stated that he would have Hargrove, who was the owner of Intrust, speak with the Intrust president.

Later that same day, Capriotti and Hargrove spoke with the Intrust president in an attempt to get him to transfer $13 million in trust holder funds to the Intrust escrow account at LaSalle Bank.

Capriotti repeated the lie – that the funds were needed to boost account balances at LaSalle Bank so that Capriotti and Hargrove could avoid an extra interest charge. Capriotti promised that the funds would be returned in forty-five to sixty days. Hargrove promised that he would stay on the situation and make sure that the money was repaid. The Intrust president was reluctant because of pressure from OBRE on the issue, the fact that April 1999 $9 million had not been returned, and his continuing inability to gain control over the funds that had been transferred over the years. Capriotti falsely stated that all of the Intrust money was in an account at ABN AMRO International, which Capriotti said was the parent of LaSalle Bank, that the paperwork for the transfer of control had been submitted to the bank, and that the delay was being caused by the bank's legal department. Hargrove repeatedly told the Intrust president to wire the money, and that he needed to either wire the money or resign. Notwithstanding all this pressure and these lies, the Intrust president refused to wire any more trust holder money to the Intrust escrow account at LaSalle Bank.

On January 24, 2000, Capriotti and Hargrove removed the president of Intrust from the position of chief executive officer of Intrust and installed Capriotti into that position.

On February 4, 2000, in response to a request by OBRE, Hurwick wrote and sent a letter to the president of Intrust stating that "Intercounty Title Company is holding $67,817,367.99 in funds belonging to Independent Trust Corporation as of December 31, 1999." In fact, at that time, there was still only $45,949 in the Intrust escrow account. The conspiracy ended later that month.

### Concealment

In addition to concealing the conspiracy from the president of Intrust, the conspirators also concealed it from others who attempted to monitor the escrow accounts, including Stewart. As set forth above, from 1984 through approximately 1995, Intercounty-Illinois was an agent of Stewart,

29

which issued the title insurance policies that Intercounty-Illinois delivered to its title insurance customers. The agreement between Stewart and Intercounty-Illinois allowed Stewart to audit the escrow accounts to make sure that Intercounty-Illinois was honoring its promise to disburse escrow funds only as directed by the depositors. Stewart conducted audits in 1990 and 1995. On both occasions, the conspirators falsified records to deceive Stewart about the hole in the escrow accounts.

Wallwin will testify that, in 1990, Capriotti and Hargrove told him to falsify records to conceal the fact that Capriotti and Hargrove had stolen escrow funds. Capriotti had an escrow file relating to the construction of his home, which had a negative position of approximately $365,000 (meaning that Capriotti had withdrawn $365,000 more than he had deposited). Hargrove's TI 4659 file had a negative position of approximately $675,000. Gerlach, who was Intercounty-Illinois' Data Processing Manager, will testify that Wallwin came to him and asked him to alter the records to conceal these entries from Stewart. Gerlach declined to do so, but did show Wallwin how to do it. With Gerlach's assistance, Wallwin created the falsified records.

Wallwin and Stimac will testify that, in connection with Stewart's 1995 audit, they met with Capriotti and Hargrove, who directed them to falsify the escrow accounting records to conceal the thefts from the escrow account and the fact that Intrust was sending millions of dollars over to the escrow account. Among others, Wallwin and Stimac deleted references to Hargrove's TI 4659 file, the Ruffled Feathers escrow files, and the escrow file created for Intrust, the transfers from the escrow account to the operating account, and the purchase of certain CD's with escrow funds. After Wallwin and Stimac completed their work, Hargrove told Stimac that "you guys must be magicians."

Capriotti and Hargrove also deceived Stewart in 1995 by means of what was known at Intercounty-Illinois as the "circle jerk." In 1995 Stewart agreed with Capriotti and Hargrove that they

would stop doing business with each other, and to unwind their affairs, entered into a Restructuring Agreement. Pursuant to the Restructuring Agreement, Capriotti and Hargrove agreed to replenish the escrow with the funds that Stewart knew was missing, which totaled approximately $5.8 million. Capriotti and Hargrove purported to do this by demonstrating that they had deposited the necessary sum into the escrow account. What Capriotti and Hargrove did not tell Stewart was that at least $1.4 million of the funds tendered had actually been removed from the escrow account during that same time period. The evidence at trial will show that, in 1995, approximately $1.4 million was disbursed from the escrow account to the checking account of First Mortgage Corp. During the same time period, Hargrove wrote checks on that account totaling approximately the same amount, and deposited them into his personal checking account. Then Hargrove wrote checks on his personal account in approximately the same amount and tendered those checks to the escrow account to honor the obligation to Stewart.

Capriotti, Hargrove, Thyfault and Wallwin also conspired to deceive David Smith, the Intercounty-Illinois employee who was in charge of managing the Ruffled Feathers escrow files. By February 1992, the Ruffled Feathers escrow files showed that Capriotti and Hargrove had withdrawn more than $4.3 million without any supporting deposits.[6] Wallwin will testify that, around this time, he attended a meeting with Capriotti, Hargrove and Thyfault. Thyfault had a computer printout that

---

[6] Intercounty-Illinois' escrow accounting system required that every disbursement entry be supported by a deposit entry. In connection with the Ruffled Feathers escrow files and other escrow files, Capriotti and Hargrove directed that disbursements be made without supporting deposits. In order to make these disbursements, Intercounty-Illinois employees had to input some sort of fictional receipt into the accounting system. The fictional receipt was called an "undep," which was short for "unreceived deposit" or "undeposited receipt." In reality, "undep" was accounting gibberish for a sum that the accounting personnel had never received and never expected to receive in the future. In February 1992, the Ruffled Feathers escrow file showed "undeps" totaling more than $4.3 million.

showed how far the Ruffled Feathers escrow files were in arrears. Capriotti explained that he was concerned about the number of people who knew the facts about the Ruffled Feathers escrow file and that he wanted to do something about it. Capriotti stated that Capjac checks would be issued to Intercounty and delivered to Wallwin, and directed Wallwin to show the checks to Smith, to tell him that they would be deposited, and then not to deposit them. Pursuant to this plan, Peloza signed and gave to Wallwin a Capjac check dated 2/28/92 and payable to Intercounty-Illinois in the amount of $2.8 million. As directed, Wallwin showed the check to Smith but failed to deposit it. Smith recorded the payment in his records – a payment that Capjac actually never made. Later, Wallwin repeated the ruse with a Capjac check dated 3/23/92 in the amount of $1.5 million. Wallwin's testimony will be corroborated by copies of the checks, which Wallwin saved, and Smith's recollection of the events.

The evidence at trial will further demonstrate that Hargrove and Capriotti made false and misleading statements to Intrust's auditors about the security and availability of the funds that Intrust transferred to the escrow accounts, for the purpose of concealing their thefts from the escrow accounts, and that Thyfault concealed from Intercounty-Illinois' tax return preparers the transfers from the escrow accounts to the operating accounts.

### III. Statements Made During And In Furtherance Of The Conspiracy

The foregoing establishes that defendants Capriotti, Hargrove, Thyfault, Wallwin and Stimac, as well as uncharged conspirators Peloza, Hurwick and Gerlach, were members of the conspiracy charged in Count Eight and that the conspiracy started no later than 1988 and continued until February 2000. The statements that the government proposes to offer as coconspirator statements are described by category below. Each category contains some examples of the statements offered, which are not

intended to be all encompassing but rather to explain the premise for the admission of the statements that fall into the category. All of the statements that the government will offer were made during the course of the conspiracy. The reasons why these statements were "in furtherance" of the conspiracy are set forth below.

## A. Statements Made To Execute The Conspiracy

The first category consists of written and oral statements made for the purpose of executing the conspiracy. This category includes several sub-categories: statements made to cause deposits into the escrow accounts, statements made to cause escrow funds to be disbursed for improper purposes, and statements made to keep track of the flow of funds. All of these statements were made in furtherance of the conspiracy because they advanced the objectives of the conspiracy. E.g., United States v. Cox, 923 F.2d at 527; United States v. Herrero, 893 F.2d at 1527-28.

### 1. Statements Made To Cause Deposits Into The Escrow Accounts

The first sub-category is statements made to cause deposits into the escrow accounts by title insurance customers and by Intrust. This category includes many false statements which are described above, such as the lies told by Capriotti and Hargrove in April 1999 and January 2000 to the president of Intrust. These statements are not even hearsay because they are not being offered for the truth of the matter asserted. E.g., United States v. Feldman, 825 F.2d at 128. This money flow, however, also was caused by the conspirators and their agents making many statements and doing many things that did not involve explicit false statements. For example, Intercounty-Illinois did not have to lie to the title insurance customers in order to induce them to tender their funds. The fraud on these victims was a fiduciary fraud – the conspirators' theft of funds that had been entrusted to them as escrow agents. Nor did the conspirators have to lie to Intrust in order to induce each of the transfers pursuant

to the Escrow Agreement. Again, the fraud on Intrust and the Intrust trust holders was largely a fiduciary fraud by the conspirators as escrow agents.

### 2. Statements Made To Cause Escrow Funds To Be Disbursed For Improper Purposes

The second sub-category of statements made to execute the conspiracy is statements made to cause escrow funds to be disbursed for improper purposes. Many of these statements were orders by the conspirators to their subordinates, which are not hearsay because they are not being offered to prove the truth of the matter asserted. Tuchow, 768 F.2d at 868 n.18. Many of the disbursements, however, did involve the conspirators and their agents making true statements. Because the whole purpose of the conspiracy was to convert the escrow funds to the benefit of the conspirators, statements made in the course of causing those disbursements to occur were in furtherance of the conspiracy.

Some of the statements that fall into this category are as follows:

-- Statements made for the purpose of causing disbursements of escrow funds in the late 1980's to help Intercounty-Illinois purchase real estate and to make loans to James Burke, an Intercounty-Illinois title insurance customer. These disbursements, which Stewart knew about and which were reflected on Intercounty-Illinois' financial statements, were called "file overdrafts."

-- Statements made in the course of purchasing CDs with escrow funds and then converting those CDs to the use of Capriotti and Hargrove. The conversion of these CDs each necessitated several steps that involved non-hearsay directives, non-hearsay false statements and co-conspirator statements. As to many of the CDs, the evidence will show that Capriotti, Hargrove, Peloza and/or Thyfault directed Wallwin to send escrow money to a bank for the purchase of a CD in the name of Intercounty-Illinois. Capriotti and Hargrove then applied for a loan from the bank to

themselves personally in the amount of the CD, to be secured by the CD. To obtain the loan, Capriotti, Hargrove and Peloza often made false statements regarding their authority to pledge the CD as collateral and the approval of Intercounty-Illinois' board of directors. Once the loan was obtained, Capriotti and Hargrove often caused the funds to be transferred to Intercounty-Illinois' operating account, which transfers were booked as loans from Capjac to Intercounty-Illinois. Later, Capriotti and Hargrove directed the bank to pay off the loan by foreclosing on the CD.

-- Statements made in the course of disbursing escrow funds through unfunded escrow files. As described above, in connection with TI 4659, the Ruffled Feathers escrow files, and other escrow files, Capriotti, Hargrove and Peloza directed that escrow funds be disbursed without supporting deposits. Most of these statements are not hearsay because they were orders, not declarations of fact.

-- Statements made for the purpose of transferring escrow funds directly to the operating account, and statements made to spend funds in the operating account for the benefit of the conspirators. Again, most of these statements are not hearsay because they were orders.

**B.   Statements Made To Conceal The Conspiracy**

The second general category is statements made by the conspirators and their agents to conceal the conspiracy. This category includes lulling statements made directly to the victims and statements made to others that were part of the coconspirators' efforts to conceal the conspiracy. The law is well-established that statements such as these, which serve to conceal the conspiracy, satisfy the "in furtherance" requirement. See, e.g., Kaden, 819 F.2d at 820; Xheka, 704 F.2d at 985-86; Mackey, 571 F.2d at 383.

Examples of statements made to conceal the conspiracy include:

    --      Statements to Stewart, David Smith, and the auditors for the purpose of concealing the extent of the deficit in the escrow accounts.

    --      Oral and written statements by Capriotti and Hargrove to Intrust's president and to OBRE about the escrow account.

    --      Oral and written statements by Thyfault to Intrust's president about the status of Intrust's funds in the escrow account. For example, in addition to tendering the fraudulent Excel spreadsheets, Thyfault made oral representations to Intrust's president that concealed the conspiracy by making it appear as if he were honoring his fiduciary obligations regarding the escrow account by disclosing certain inadvertent problems with the escrow account, while failing to disclose the massive thefts from the escrow account.

Many of these statements are not hearsay because they are not being offered for the truth of the matter asserted, but some of the representations involved true declarations of fact that are admissible under Rule 801(d)(2)(E).

## Conclusion

For all the foregoing reasons, the government respectfully requests that the Court allow the government to introduce the coconspirator statements identified herein pursuant to Fed. R. Evid. 801(d)(2)(E).

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____

ROBERT W. KENT, JR.
Assistant United States Attorney
219 South Dearborn Street
Room 500
Chicago, Illinois 60604
(312) 886-4185

STATE OF ILLINOIS        )
                         ) SS
COUNTY OF COOK           )


    Peggy M. Zabinski, being duly sworn on oath, deposes and says that she is employed in the Office of the United States Attorney for the Northern District of Illinois; and that on the 28th day of October, 2004, she caused a copy of:

**Government's Motion for Leave to File Government's Corrected**
**Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements**

and

**Government's Corrected Evidentiary Proffer Supporting the Admissibility**
**of Coconspirator Statements**

to be mailed to the following individuals:

| | | |
|---|---|---|
| Edward M. Genson | Jeffrey B. Steinback | Paul A. Wagner |
| Genson & Gillespie | Genson & Gillespie | 321 S. Plymouth Court |
| 53 W. Jackson Blvd. | 53 W. Jackson Blvd. | Suite 1500 |
| Suite 1420 | Suite 1420 | Chicago, IL 60604 |
| Chicago, IL 60604 | Chicago, IL 60604 | |

*Peggy M. Zabinski*

SUBSCRIBED and SWORN to before me
this 28th day of October, 2004

*Cheryl M. Guest*
N O T A R Y   P U B L I C


"OFFICIAL SEAL"
Cheryl M. Guest
Notary Public, State of Illinois
My Commission Exp. 07/31/2005