**DOCKETED**

NOV 0 5 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE MORAN

MAGISTRATE JUDGE ASHMAN

UNITED STATES OF AMERICA **FILED**

v.

NOV - 4 2004

LAURENCE W. CAPRIOTTI,
JACK L. HARGROVE, **MICHAEL W. DOBBINS**
MICHEL D. THYFAULT, **CLERK, U.S. DISTRICT COURT**
JAMES R. WALLWIN and
GEORGE J. STIMAC

No. 03 CR 779

Violations: Title 18, United
States Code, Sections 371, 1033,
1341, 1343, and 1346; Title 26,
United States Code, Sections
7201 and 7206(1)

**SUPERSEDING INDICTMENT**

**COUNT ONE**

The SPECIAL AUGUST 2003-2 GRAND JURY charges:

1. At times material herein:

**The Individuals**

a. Defendant LAURENCE W. CAPRIOTTI was trained as an attorney. CAPRIOTTI was an owner, president and a director of Intercounty Title Company of Illinois (Intercounty-Illinois) and ITI Enterprises, Inc. ("ITI Enterprises"). He was a director of Independent Trust Corporation ("Intrust").

b. Defendant JACK L. HARGROVE was a real estate developer. HARGROVE was an owner and chairman of the board of directors of Intercounty-Illinois, ITI Enterprises, and Intrust.

c. Defendant MICHEL D. THYFAULT was a Certified Public Accountant. From January 1989 to late 1995, THYFAULT was chief financial officer of Intercounty-Illinois. From late 1995 to November 1996, THYFAULT was chief financial officer of ITI Enterprises. THYFAULT was a director of Intrust from December 1990 to December 1994.

d. JAMES R. WALLWIN was treasurer of Intercounty-Illinois from 1989 to late1995. From late 1995 to October 1996, WALLWIN was treasurer of ITI Enterprises.

e. GEORGE J. STIMAC was a Certified Public Accountant. From 1986 to approximately 1992, STIMAC was assistant controller of Intercounty-Illinois. From approximately

*117*

1992 to late 1995, STIMAC was controller of Intercounty-Illinois. From late 1995 until February 1997, STIMAC was controller of ITI Enterprises.

        f.        Alan Hurwick was a Certified Public Accountant. From January 1997 to 2000, Hurwick was chief financial officer of ITI Enterprises. Hurwick died in March 2002.

        g.        A person referred to herein as Individual A was senior vice president and secretary of the board of directors of Intercounty-Illinois. From 1995 forward, Individual A was an owner, president and a director of Intercounty Title Company, an Indiana corporation ("Intercounty-Indiana") and Intercounty National Title Insurance Company ("INTIC"). Until December 1994, Individual A was a director of Intrust.

### The Title Insurance Entities

        h.        Title insurance insures that a purchaser of real property is acquiring good, clean title to the property, subject to certain explicit exceptions that are set forth in the insurance policy. Lenders whose loans are secured by real property usually require the buyer/borrower to purchase such insurance so that the lender does not have to bear any title risk. Entities in the title insurance business often provide other services to their customers, including escrow services for various real estate transactions. An escrow agent typically receives funds and holds them in an escrow account until the parties to the escrow direct the agent to disburse them. The escrow agent's specific responsibilities are set forth in the agreement establishing the escrow.

        i.        Intercounty Title Company of Illinois ("Intercounty-Illinois") was an Illinois corporation that was a registered title insurance agent for a Texas-based title insurance company named Stewart Title Guaranty Company ("Stewart"). Intercounty-Illinois's agency relationship with Stewart lasted until in or about December 1995, at which time Intercounty-Illinois essentially ceased operations. Intercounty-Illinois's primary office was at 120 West Madison Street in Chicago. From 1984 until April 1991, Intercounty was owned approximately 40 percent by CAPRIOTTI, 40 percent by HARGROVE, and 20 percent by Stewart. After April 1991, CAPRIOTTI and HARGROVE each owned approximately 50 percent.

2

j.      As a registered title insurance agent for Stewart, Intercounty-Illinois sold to customers in the Chicagoland area title insurance policies that were issued by Stewart. Intercounty-Illinois also acted as an escrow agent for the collection and disbursement of funds relating to the purchase, sale and construction of real estate. All of the funds that Intercounty-Illinois received as escrow agent were deposited and commingled in a few escrow accounts that it controlled. On a monthly basis, at the direction of its customers, Intercounty-Illinois, through the escrow accounts, engaged in thousands of transactions involving the receipt and disbursement of millions of dollars. The money in the escrow accounts belonged to Intercounty-Illinois's customers. Ordinarily, funds could be disbursed from an escrow account only if there were supporting deposits, meaning that the customer had previously deposited funds into the escrow account in an amount equal to or greater than the disbursement, and the customer directed the disbursement. Due to the volume of business, there was a substantial float in the escrow accounts, meaning that on any particular day, the total amount of title insurance customer funds that had been deposited into the escrow accounts substantially exceeded the total amount of funds paid out that day in escrow transactions. In the agreement governing the relationship between Stewart and Intercounty-Illinois, Intercounty-Illinois agreed to "keep safely in its escrow account separate from [its] individual account all funds received by [it] in connection with transactions in which [Stewart's] title policies will be issued and to disburse said funds only for the purpose for which they were intrusted."

k.      In late 1995, as Intercounty-Illinois moved toward inactive status, Intercounty-Illinois and Stewart were replaced by a set of new companies that provided essentially the same services through a different corporate organization.

■       From November 1995 until 2000, Fidelity National Title Insurance Company of New York ("Fidelity"), a New York corporation, acted as reinsurer for Intercounty National Title Insurance Company ("INTIC"). INTIC, an Illinois corporation, was a title insurance company doing business in the Chicagoland area. Due to regulatory restraints, INTIC's title insurance policy limits were very low. Therefore, Fidelity,

3

as INTIC's reinsurer, was responsible for the vast majority of the insurance that was issued.

- From November 1995 until 2000, INTIC was the exclusive title insurance underwriter for Intercounty Title Company, an Indiana corporation ("Intercounty-Indiana"). Intercounty-Indiana was the exclusive agent of INTIC in issuing title insurance policies in the Chicagoland area. Intercounty-Indiana also acted as an escrow agent, holding funds for real estate transactions in several escrow accounts and distributing those funds as directed by its customers. The funds in the escrow accounts belonged to Intercounty-Indiana's customers.

- INTIC Holding Company was an Illinois corporation that, from its formation in 1995 until 2000, owned all the stock of INTIC and Intercounty-Indiana. Individual A was the majority owner of INTIC Holding Company, and the president of INTIC and Intercounty-Indiana CHECK.

- ITI Enterprises, Inc. ("ITI Enterprises"), an Illinois corporation, provided staffing and various services for INTIC and Intercounty-Indiana, and controlled Intercounty-Indiana's escrow accounts. At the end of 1995, all of the employees on the payroll of Intercounty-Illinois were switched over to the payroll of ITI Enterprises. ITI Enterprises, INTIC and Intercounty-Indiana each had its primary office at 120 West Madison in Chicago. ITI Enterprises was owned approximately 50 percent by CAPRIOTTI and 50 percent by HARGROVE.

1. Until approximately September 1999, the principal escrow accounts for Intercounty-Illinois and Intercounty-Indiana were at LaSalle National Bank of Chicago or its predecessors ("LaSalle Bank"). At that time, Intercounty-Indiana, through ITI Enterprises, moved the primary escrow accounts to Harris Bank and Trust in Chicago ("Harris Bank"). The deposits of LaSalle Bank and Harris Bank were insured by the Federal Deposit Insurance Corporation ("FDIC"). As escrow agents, Intercounty-Illinois and Intercounty-Indiana acted as fiduciaries of all parties to

4

the escrow, were required to hold escrowed funds in trust, and were legally bound to strictly comply with all escrow instructions. As was common in the industry, Stewart and Fidelity issued "closing protection letters" under which they indemnified parties to the escrow against any defalcation or failure to follow closing instructions on the part of Intercounty-Illinois and Intercounty-Indiana, respectively. Stewart and Fidelity thereby guaranteed the escrow accounts and became liable for any shortfall.

### The Non-Title Insurance Entities

   m. Capjac Investments Group, Inc. and Capjac Investments Ltd. (together referred to as "Capjac") were shell companies controlled by CAPRIOTTI and HARGROVE. CAPRIOTTI and HARGROVE used Capjac's bank accounts to receive funds from various ventures, both legal and illegal, and then spent those funds as they saw fit. Individual A, who was vice president of Capjac, signed most of the checks by which funds were disbursed from Capjac's checking accounts.

   n. In the 1980's, Intercounty-Illinois initiated what was known as a "mortgage defeasance program." This program was implemented through several wholly-owned subsidiaries, the last of which was called ITC Defeasance Company. At this time, many real estate properties were encumbered by mortgage loans that carried substantial prepayment penalties. The existence of these penalties deterred the sale and refinancing of such properties. The mortgage defeasance program facilitated such transactions by eliminating these penalties as a deterrent. In a defeasance transaction, the buyer's funds that normally went to pay off the existing mortgage were instead placed in escrow with an Intercounty-Illinois defeasance subsidiary. Although the existing mortgage continued to exist, Intercounty-Illinois issued title insurance to the buyer and its lender as if the existing mortgage had been paid off. The defeasance subsidiary took on the responsibility of paying off the existing mortgage. The plan was for the defeasance subsidiary to invest the funds provided by the buyer, and to make enough money to service the existing mortgage and make a profit. The plan failed because Intercounty-Illinois chose to invest the funds in the junk bond market. By 1990, the junk bond market had collapsed, and the defeasance subsidiaries suffered investment losses in

5

excess of $10 million. These investment losses made it impossible for the defeasance subsidiaries to honor their obligations to pay off the pre-existing mortgages in the defeasance transactions, and created a huge financial problem for Intercounty-Illinois.

### Independent Trust Corporation

o.      Independent Trust Corporation ("Intrust") was a trust company located in in Lombard, Illinois from 1989 until 1992, and thereafter in Orland Park, Illinois. Intrust served as a trustee for various types of trust accounts, including individual retirement accounts and employee benefit plans subject to Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"). In approximately November 1989, Madison Avenue Investments, Inc., which was wholly owned by HARGROVE, purchased a controlling interest in the stock of Intrust, and Intercounty-Illinois purchased a minority interest. In approximately December 1990, Madison Avenue Investments, Inc. purchased the stock owned by Intercounty-Illinois and became the sole shareholder of Intrust. HARGROVE was the chairman of the board of directors of Intrust and CAPRIOTTI was a director of Intrust throughout the relevant time period. Individual A was a director of Intrust from the 1980's until December 1994. THYFAULT was a director of Intrust from December 1990 to December 1994.

p.      On or about December 4, 1990, Intrust entered into an Escrow Agreement with Intercounty-Illinois. The stated purpose of the Escrow Agreement was to serve as an investment vehicle for the daily investment of the cash in Intrust's trust accounts. The Escrow Agreement called for Intrust to tender trust funds to Intercounty-Illinois, and for Intercounty-Illinois to deposit the funds in a specific account at LaSalle National Bank of Chicago, which in fact was one of the escrow accounts managed by Intercounty-Illinois in connection with its title insurance business. The Escrow Agreement obligated Intercounty-Illinois to pay Intrust interest on the funds deposited and sweep fees based on the overnight investment of the funds in the account, which were to be used to purchase and sell short term U.S. Government Obligations each evening.

q.      Under the stated terms of the Escrow Agreement, Intrust was the principal and Intercounty-Illinois was the escrow agent, and only Intrust was able to authorize withdrawals of Intrust funds from the account.  In reality, Intercounty-Illinois controlled the funds in the account because the signators on the account were only Intercounty-Illinois employees; no Intrust employee was ever a signator.  Thus, Intrust lacked the ability to remove money from the account directly, and could do so only if Intercounty-Illinois complied with its directive.  In addition, LaSalle Bank would not disclose to Intrust the status of the escrow account because no Intrust employee was a signator.  Thus, Intrust relied on Intercounty-Illinois and its successors for truthful information about the status of Intrust's funds in the escrow account.

r.      Intrust was regulated by the Office of Banks and Real Estate of the State of Illinois and its predecessor ("OBRE").  In 1994, OBRE began to criticize the Escrow Agreement, the intermingling of Intrust and Intercounty-Illinois funds, and Intrust's lack of control over the funds in Intercounty-Illinois' escrow account.  In response, in approximately January 1997, Intercounty-Indiana, the successor escrow agent to Intercounty-Illinois, established a separate escrow account at LaSalle Bank, which purported to hold all of the funds that Intrust had tendered to Intercounty-Illinois and Intercounty-Indiana under the Escrow Agreement and which purported to be governed by the terms of the Escrow Agreement ("the Intrust escrow account").  The signators on the Intrust escrow account were solely employees of ITI Enterprises, which managed Intercounty-Indiana's escrow accounts; no Intrust employee was ever a signator on this account.   Thus, ITI Enterprises controlled the flow of funds out of the account, and Intrust relied on ITI Enterprises for truthful information about the status of Intrust's funds in the account.  After this separate escrow account was established, OBRE continued to press HARGROVE and CAPRIOTTI, who were board members of both Intrust and ITI Enterprises, to give Intrust control over its money in the escrow account.

s.      Between December 1990 and April 1999, Intrust tendered more than $50 million to Intercounty-Illinois and Intercounty-Indiana pursuant to the Escrow Agreement.  With interest, the Intrust funds should have grown to more than $68 million.  Although Intrust was

7

regulated by OBRE, none of the funds that trust holders deposited with Intrust and Intrust tendered to Intercounty-Illinois and Intercounty-Indiana were insured. The funds that were tendered pursuant to the Escrow Agreement were described on Intrust trust holder account statements as funds invested in "Cash Account" or "Money Market Account."

### Fiduciary Duties

t.       As escrow agents, Intercounty-Illinois and Intercounty-Indiana owed a fiduciary duty to the persons and entities who deposited money into the escrow accounts – the title insurance customers, Intrust and Intrust trust holders. As a title insurance agent, Intercounty-Illinois owed a fiduciary duty to Stewart. As a trust company, Intrust owed a fiduciary duty to its trust holder customers. As directors of Intrust, CAPRIOTTI, HARGROVE and THYFAULT owed a fiduciary duty to Intrust. When one owes a fiduciary duty to someone, one is required to provide that person or entity with honest services, and to treat that person or entity with undivided loyalty, good faith, fairness and honesty.

### Financial Situation In The Late 1980's

u.       A price war in the Chicago title insurance market, coupled with the defeasance program investment losses and other problems, rendered Intercounty-Illinois insolvent as of 1987. The consolidated balance sheets for Intercounty-Illinois showed a negative net worth from 1987 onward . In 1987, liabilities exceeded assets by more than $6 million. In 1988, the deficit exceeded $11 million. In 1989 and 1990, the deficit approached $20 million, and it exceeded $20 million in the following years. The last year that Intercounty-Illinois had an outside auditing firm perform an audit of the company was 1988, which audit report was issued on or about August 1, 1989. That audit report disclosed that in 1988 Intercounty-Illinois had lost more than $7 million.

v.       In November 1989, CAPRIOTTI, HARGROVE and Individual A attended an Intercounty-Illinois shareholder meeting with representatives of Stewart, which at that time was a minority shareholder. At this meeting, the participants discussed Intercounty-Illinois' dire financial situation and the need for a substantial infusion of cash. CAPRIOTTI and HARGROVE offered to

8

provide funds to Intercounty-Illinois, but only if Stewart agreed to modify certain provisions in the master agreement between Intercounty-Illinois and Stewart that CAPRIOTTI and HARGROVE deemed unfair. Stewart refused to agree to their demands, and the meeting ended at an impasse.

### General Scheme Allegations

2.      Beginning no later than in or about 1988 and continuing thereafter until in or about February 2000,  at Chicago, Lombard and Orland Park in the Northern District of Illinois, Eastern Division and elsewhere,

LAURENCE W. CAPRIOTTI,<br>
JACK L. HARGROVE and<br>
MICHEL D. THYFAULT,

defendants herein, along with Alan L. Hurwick, James R. Wallwin, George J. Stimac and others known and unknown to the grand jury, devised, intended to devise, and participated in a scheme to defraud title insurance customers, Intrust,  Intrust trust holders, Stewart, Fidelity, federally-insured financial institutions, and others of money, property and after November 18, 1988, their intangible right of honest services, and to obtain money and property from these victims by means of materially false and fraudulent pretenses, representations, promises and omissions.  This scheme, which affected financial institutions, is further described below.

3.      It was part of the scheme that CAPRIOTTI and HARGROVE, with the assistance of THYFAULT and others, stole and converted to their own use in excess of $80 million that was owned by title insurance customers and Intrust trust holders.  Defendants stole this money from the escrow accounts that Intercounty-Illinois and ITI Enterprises purported to manage for the benefit of these victims.  The defendants plowed more than $70 million of the stolen funds back into their title insurance businesses.  This enabled otherwise insolvent defendant-controlled entities to continue in business, which benefitted defendants in various ways, including millions of dollars in salaries and other employment related agreements, hundreds of thousands of dollars in personal credit card expenses being paid, and the ability to hire family, friends and personal employees, who received salaries and benefits substantially greater than the services they provided to the companies.  In

addition to the money that was plowed back into the title insurance businesses, CAPRIOTTI and HARGROVE stole approximately $10 million from the escrow accounts and converted it to their own use, including the purchase, construction and renovation of real estate properties, such as Ruffled Feathers in Lemont, and the disbursement of millions of dollars for the benefit of CAPRIOTTI and HARGROVE.

4.      It was further part of the scheme that CAPRIOTTI, HARGROVE, THYFAULT and Hurwick fraudulently caused Intrust to tender more than $50 million in trust holder funds to Intercounty-Illinois and ITI Enterprises pursuant to the Escrow Agreement. Rather than keeping the Intrust funds in the escrow account as required by the Escrow Agreement, defendants caused the Intrust funds to be spent as part of their ongoing scheme to deplete the escrow accounts. By infusing the Intrust funds into the escrow accounts and taking advantage of the natural float in the escrow accounts, defendants were able to steal millions of dollars, use Intrust money and new title customer money to pay off old title customers, and continue the scheme for more than a decade. In the end, Intrust and its trust holders lost all of the more than $50 million that had been tendered pursuant to the Escrow Agreement, plus the more than $18 million in interest that they thought was accruing. Fidelity, which was the entity that was insuring the escrow accounts when the scheme came to a close, ultimately suffered the remainder of the loss by paying tens of millions of dollars to the title insurance customers who had deposited funds into the escrow account but had not yet withdrawn them.

5.      It was further part of the scheme that, of the more than $80 million stolen by defendants from the escrow accounts, more than $50 million was stolen from Intrust and the Intrust trust holders, and more than $30 million was stolen from title insurance customers, whose losses were insured by Stewart and Fidelity. The title insurance customers, Stewart, Intrust, and the Intrust trust holders relied on their agents to honor their fiduciary duties in connection with the management of the escrow accounts. By stealing these funds, concealing their thefts and causing their entities to breach their fiduciary duties, CAPRIOTTI, HARGROVE, THYFAULT and others fraudulently

10

deprived these victims of both their money and their right to receive honest services from their agents. CAPRIOTTI, HARGROVE and THYFAULT also breached their fiduciary duties as directors of Intrust, and thus fraudulently deprived Intrust of its right to receive honest services from its directors.

6.     It was further part of the scheme that CAPRIOTTI, HARGROVE, THYFAULT, Wallwin, Stimac, Hurwick and others engaged in various acts for the purpose of concealing the scheme from Stewart, certain Intercounty-Illinois employees, Intrust's president, Intrust's auditors, OBRE and others.

7.     It was further part of the scheme that CAPRIOTTI sometimes concealed from his fellow co-schemers the full extent of his own thefts from the escrow accounts in order to obtain their continued participation in the scheme.

8.     It was further part of the scheme that CAPRIOTTI, HARGROVE, THYFAULT and others caused both the United States mail and interstate wire transmissions to be used in furtherance of the scheme. Among other things, defendants caused Intrust to mail to trust holders and their representatives fraudulent account statements that concealed the fact that defendants had stolen millions of dollars of trust holder cash. Defendants also caused LaSalle Bank and Harris Bank to mail monthly account statements for the Intrust escrow account to ITI Enterprises, as opposed to Intrust, which facilitated the concealment of the scheme from the honest employees of Intrust. Defendants also caused wire transfers of funds that involved interstate wire transmissions. Since the early 1990's, each wire transfer of funds, even if the sending bank and the receiving bank were both in Chicago, involved interstate wire transmissions of data to and from a Federal Reserve facility in East Rutherford, New Jersey.

## Transfers of Funds from Escrow Accounts to the Title Insurance Entities

9.     It was further part of the scheme that CAPRIOTTI and HARGROVE, with the assistance of THYFAULT, Wallwin, Stimac, Hurwick and others, fraudulently withdrew more than $70 million from the escrow accounts, and used that money to bolster their title insurance and other

businesses. These withdrawals were fraudulent because the money belonged to others and could not be used without their consent, which defendants never obtained. This was accomplished in various ways, including the following:

a. In or about the late 1980's, CAPRIOTTI and HARGROVE fraudulently withdrew more than $1 million in escrow funds, and used the funds to make loans that benefitted Intercounty-Illinois and to finance the acquisition by an Intercounty-Illinois subsidiary of a commercial office building in Chicago.

b. Starting in or about 1989, CAPRIOTTI, HARGROVE, THYFAULT and others fraudulently withdrew more than $15 million dollars from the escrow accounts, and used some of those funds to purchase certificates of deposit in the name of Intercounty-Illinois at various financial institutions in the Chicago area, the deposits of which were insured by the FDIC. CAPRIOTTI and HARGROVE, with the assistance of THYFAULT and others, converted many of these certificates of deposit to their own use. In some instances, CAPRIOTTI and HARGROVE pledged the certificates of deposit as collateral for personal loans from the banks that had issued the certificates of deposit. CAPRIOTTI, HARGROVE and others defrauded the financial institutions by fraudulently representing that Intercounty-Illinois was the sole owner of the certificates of deposit and that no person, other than Intercounty-Illinois, had any claim to the certificates of deposit, when in fact the funds used to purchase the certificates of deposit were owned by the title insurance customers and Intrust, and falsely representing that the board of directors of Intercounty-Illinois had approved the use of the certificates of deposit as collateral for the loans, when in fact it had not. CAPRIOTTI and HARGROVE caused some of the loan proceeds obtained from the financial institutions to be deposited into the operating accounts of Intercounty-Illinois, often through Capjac's checking accounts. These deposits into Intercounty-Illinois's operating accounts were booked as loans from Capjac to Intercounty-Illinois. Later on, CAPRIOTTI and HARGROVE paid off some of the loans by causing the financial institutions to foreclose on the certificates of deposit that had been fraudulently pledged as collateral. The net result was that millions of dollars were transferred

12

from the escrow accounts to the operating accounts of Intercounty-Illinois, and the transactions were booked as loans from Capjac, which was owned by CAPRIOTTI and HARGROVE, to Intercounty-Illinois.

c.     Starting in or about 1991 and continuing throughout the 1990's, CAPRIOTTI, HARGROVE and others fraudulently caused millions dollars to be withdrawn from the escrow accounts and disbursed to Capjac, which CAPRIOTTI and HARGROVE converted to their own use. Between 1991 and 1994, defendants caused more than $3 million to be disbursed to Capjac, a substantial portion of which they then caused to be transferred to Intercounty-Illinois's operating accounts. The deposits into the operating accounts were booked as loans from Capjac to Intercounty-Illinois. The net result of these transactions was that millions of dollars were transferred from the escrow accounts to the operating accounts of Intercounty-Illinois, and the transactions were booked as loans from Capjac, which was owned by CAPRIOTTI and HARGROVE, to Intercounty-Illinois.

d.     Starting in or about 1994, CAPRIOTTI, HARGROVE, THYFAULT, Wallwin, Stimac, Hurwick and others fraudulently transferred substantial amounts of funds on a regular basis directly from the escrow accounts to the operating accounts of Intercounty-Illinois and ITI Enterprises. These transfers occurred almost every month for approximately six years. In total, more than $45 million was transferred from the escrow accounts to the operating accounts in this fashion. In addition, defendants and their co-schemers caused escrow funds to be disbursed for the purpose of paying the debts of their title insurance entities, including debts relating to the defeasance transactions.

## Transfers of Funds from Escrow Accounts to Defendants and Their Businesses

10.     It was further part of the scheme that CAPRIOTTI and HARGROVE caused money to be disbursed directly from the escrow accounts to bank accounts and businesses that they controlled. These disbursements were fraudulent because the funds belonged to others and could not be disbursed without their consent, which defendants never obtained. As examples,

13

CAPRIOTTI, HARGROVE and others caused more than $5 million to be disbursed from the escrow accounts to pay for construction of a housing and golf course project that CAPRIOTTI and HARGROVE owned called Ruffled Feathers. In addition, CAPRIOTTI and HARGROVE caused millions of dollars in escrow funds to be disbursed and spent for their benefit.

### Transfers of Funds from Intrust to the Escrow Accounts

11.     It was further part of the scheme that CAPRIOTTI, HARGROVE, THYFAULT and others fraudulently caused Intrust to transfer millions of dollars of Intrust trust holder funds to escrow accounts controlled by the defendants. The Escrow Agreement between Intrust and Intercounty-Illinois was signed by THYFAULT on behalf of Intercounty-Illinois on December 5, 1990. On that same date, CAPRIOTTI, HARGROVE and Individual A, as directors of Intrust, directed Intrust's bank to wire transfer approximately $16,500,000 from Intrust's account to Intercounty-Illinois's escrow account at LaSalle Bank. In January 1991, CAPRIOTTI, HARGROVE and THYFAULT, as directors of Intrust, voted at a board of directors meeting to approve the Escrow Agreement and the transfers of money thereunder.

12.     It was further part of the scheme that, between December 1990 and April 1999, CAPRIOTTI, HARGROVE, THYFAULT and others fraudulently caused Intrust to transfer a net total of more than $50 million in Intrust trust holder funds to escrow accounts controlled by the defendants. Intrust and its trust holders understood and believed that, with interest, this $50 million grew to more than $68 million. Sometimes funds were transferred back to Intrust, but the net amount of funds transferred from Intrust to the escrow accounts grew over time. At the same time, defendants were fraudulently transferring funds out of the escrow accounts and converting them to their own use. By January 1994 and continuing thereafter, the net amount transferred by Intrust to the escrow accounts  generally exceeded the total amount of money in the escrow accounts. By January 1995 and continuing thereafter, the net amount transferred by Intrust to the escrow accounts generally exceeded the sum of the escrow account balances plus the amount of escrow funds that had been used to purchase certificates of deposit, as reflected on the escrow account reconciliation.

14

Below is a chart that illustrates the growing disparity between the funds transferred by Intrust to the escrow accounts and the funds available to honor those obligations:

| Period Ending | Balance in Escrow Accounts | Balance of Escrow Accounts Plus CDs | Balance of Intrust Deposits | Total Intrust $ Supposedly in Escrow Accts |
|---|---|---|---|---|
| 1/94 | $20,472,168 | $44,094,703 | $29,814,751 | $32,837,502 |
| 1/95 | 7,091,279 | 30,713,814 | 30,814,751 | 35,114,974 |
| 1/96 | 10,330,270 | 32,934,261 | 46,314,751 | 52,901,721 |
| 1/97 | 7,691,002 | 29,821,143 | 44,814,751 | 53,995,536 |
| 1/98 | 11,401,380 | 32,131,521 | 41,314,751 | 53,225,878 |

The disparity between the total amount of Intrust funds supposedly in the escrow accounts and the actual amount of funds available to honor those obligations was even greater than depicted above because: (1) throughout this time period, the escrow accounts also received from and owed millions of dollars to title insurance customers; and (2) many of the certificates of deposit referred to in the chart were cashed in but were kept on the escrow account reconciliation. In essence, almost from the very beginning, defendants and their co-schemers caused Intrust funds to be fraudulently transferred out of the escrow accounts in violation of the Escrow Agreement.

13. It was further part of the scheme that, in December 1990, THYFAULT created an Excel spreadsheet entitled "INTRUST - Interest and Fees Earned." This spreadsheet kept track of, among other things, the "book balance" and "invested balance" of the funds transferred from Intrust to the escrow accounts, plus the "interest credited" each day on these balances pursuant to the terms of the Escrow Agreement. Starting in December 1990 and continuing thereafter until November 1996, THYFAULT caused this spreadsheet to be created and faxed to Intrust each month. After THYFAULT left ITI Enterprises in November 1996, Hurwick took over responsibility for creating and faxing this spreadsheet each month. Intrust used these spreadsheets to calculate the total amount of trust holder funds in the escrow accounts controlled by defendants. In the context of the Escrow Agreement, these spreadsheets were false and fraudulent. As THYFAULT, Hurwick and the other

15

defendants well knew, the Intrust funds had been transferred out of the escrow accounts without Intrust's consent, in violation of the Escrow Agreement, and Intercounty-Illinois and ITI Enterprises were unable to pay Intrust what it was due, both of which facts were not disclosed to Intrust.

14.    It was further part of the scheme that, from 1994 onward, CAPRIOTTI and HARGROVE stalled, obstructed and made false statements and promises to OBRE and Intrust's president in connection with OBRE's efforts to protect the Intrust trust holder funds that were in the escrow account managed by Intercounty-Illinois and ITI Enterprises.  In or about March 1994, May 1995 and March 1996, OBRE issued Reports of Examination for Intrust that noted the amount of money that Intrust had sent to the escrow account, and observed that the commingling of trust holder funds and title customer funds was a breach of Intrust's fiduciary duty to its trust holders, and that Intrust, rather than receiving bank account statements, was forced to rely on spreadsheets provided by Intercounty for information about the status of the Intrust money.  The reports recommended that the Intrust funds be separated from the Intercounty-Illinois customer funds.   Intrust's board of directors, which included CAPRIOTTI and HARGROVE, initially promised only to examine the issue and then, in response to the 1996 report, promised "to appropriately have this situation resolved to the satisfaction of the state auditors prior to the next annual audit by having the funds segregated in a separate account at LaSalle National Bank in the name of Independent Trust Corporation."  In January 1997, defendants purported to honor this promise by establishing a new, non-interest bearing escrow account at LaSalle Bank entitled "Intercounty Title Co. as escrowee for Independent Trust Corporation Trust Funds" (the "Intrust escrow account") and claiming to move all of the money owed to Intrust into the account, which should have been more than $53 million.  Instead, the Intrust escrow account, for which the signatories were only ITI Enterprises employees, was funded with only $45,949.  The remainder of the Intrust money either was already stolen or was kept in the title insurance escrow account to fund future thefts.

15.    It was further part of the scheme that, in connection with OBRE's 1997 examination of Intrust, defendants and their co-schemers caused the examiners to receive what purported to be

16

an account statement that stated that, as of May 31, 1997, the Intrust escrow account at LaSalle Bank contained $54,894,943. In fact, the Intrust escrow account still contained only $45,949. In a Report of Examination issued in September 1997, OBRE criticized Intrust's inability to control the funds in this account and the fact that it did not receive account statements, and stated that "this situation continues to present a serious lapse in internal control and appears to violate the basic trust rule that the trustee take possession of and hold all trust property for the benefit of the beneficiaries." CAPRIOTTI and HARGROVE, who constituted two of Intrust's three-person board of directors, did nothing to correct the situation.

16.     It was further part of the scheme that, in connection with OBRE's 1998 examination of Intrust, defendants and their co-schemers caused the examiners to receive what purported to be an account statement that stated that, as of August 31, 1998, the Intrust escrow account contained $54,840,446. In fact, the Intrust escrow account still contained only $45,949. In a Report of Examination issued in October 1998, OBRE criticized Intrust's inability to control the funds in this account and the fact that it did not receive account statements, and stated that "[m]anagement should ensure that only Trust Company personnel can direct and control the funds in this account and all statements relating to this account be sent to the Trust Company." Intrust's board of directors, which was controlled by CAPRIOTTI and HARGROVE, responded by falsely promising that CAPRIOTTI "would take the necessary steps to appropriately have this situation resolved to the satisfaction of the state auditors prior to the next annual audit." In fact, nothing was done to correct the situation.

17.     It was further part of the scheme that, in April 1999, CAPRIOTTI, HARGROVE and Hurwick fraudulently caused the last of the transfers from Intrust to the escrow accounts that they controlled. In early April 1999, LaSalle Bank advised CAPRIOTTI, HARGROVE and Hurwick that the primary title company escrow account was overdrawn by millions of dollars and demanded that they deposit funds to eliminate the overdraft. Although the escrow account at that time was managed by ITI Enterprises, LaSalle Bank, the defendants and others referred to the controlling entity as "Intercounty." CAPRIOTTI told LaSalle Bank that Intercounty had $13 million in certificates of

17

deposit at other financial institutions, and that Intercounty had an account at First National Bank of Chicago ("First Chicago") that contained a substantial amount of money due to a mistaken overfunding of a real estate transaction. CAPRIOTTI promised to send funds from the certificates of deposit and the First Chicago account to LaSalle Bank to correct the overdraft. These representations were false – the certificates of deposit did not exist and the First Chicago account contained less than $2500.

18.     It was further part of the scheme that, on April 21, 1999, CAPRIOTTI asked the president of Intrust to wire transfer Intrust trust holder funds totaling $3.5 million to the Intrust escrow account at LaSalle Bank. At this time, the president of Intrust was reluctant to transfer any more trust holder money because of the pressure from OBRE on the issue. CAPRIOTTI overcame the president's reluctance by promising that the funds would be returned to Intrust by April 30, 1999. This promise was fraudulent because CAPRIOTTI knew that LaSalle Bank was going to keep these funds and that no other funds were available for return to Intrust. CAPRIOTTI told the president of Intrust that the funds were needed to increase CAPRIOTTI's and HARGROVE's account balances at LaSalle Bank so that CAPRIOTTI and HARGROVE would receive a lower interest rate on the renewal of an $18 million loan at LaSalle Bank. This representation was false because CAPRIOTTI knew that no such loan existed and that the funds were to be used to eliminate the overdraft in ITI Enterprise's main escrow account at LaSalle Bank. Based on these false promises and representations, Intrust's president caused $3.5 million to be wire transferred from Intrust's bank account at Cole Taylor Bank to the Intrust escrow account at LaSalle Bank in Chicago.

19.     It was further part of the scheme that, during a joint telephone conversation that occurred on April 23, 1999, CAPRIOTTI and HARGROVE told the president of Intrust to wire an additional $5.7 million in trust holder funds to the Intrust escrow account at LaSalle Bank. The Intrust president was extremely reluctant. CAPRIOTTI repeated the false promise that the funds would be returned by April 30, 1999, and repeated the false representation that the funds were needed to help CAPRIOTTI and HARGROVE obtain a lower interest rate on a loan at LaSalle Bank.

HARGROVE, who was the owner and chairman of Intrust, supported these lies by falsely promising that he would make sure that the money was returned to Intrust by April 30, 1999, and by repeatedly directing the Intrust president to send the money immediately. Based on these false promises and representations, Intrust's president caused $5.7 million to be wire transferred from Intrust's bank account at Cole Taylor Bank to the Intrust escrow account at LaSalle Bank in Chicago.

20.     It was further part of the scheme that CAPRIOTTI and Hurwick caused the $9.2 million that was wire transferred to the Intrust escrow account at LaSalle Bank to be wire transferred to the Intercounty account at First Chicago, and from there the funds were transferred back to Intercounty's main title insurance business escrow account at LaSalle Bank. The money was transferred from LaSalle Bank to First Chicago and then back to LaSalle Bank in an effort to disguise the fact that the funds had come from Intrust. The infusion of $9.2 million into the main escrow account at LaSalle Bank alleviated the overdraft problem, but LaSalle Bank soon thereafter asked CAPRIOTTI and HARGROVE to take their banking business elsewhere. In or about September 1999, ITI Enterprises established a new escrow account for the title insurance business at Harris Bank.

21.     It was further part of the scheme that, when the April 30, 1999 deadline passed and Intrust's president pressed for the return of the $9.2 million to Intrust, CAPRIOTTI and HARGROVE repeatedly promised to take action to return the money. These promises were false – there was no money to be returned. CAPRIOTTI and HARGROVE also promised that all of the funds due to Intrust would be placed in an escrow account that would be controlled by Intrust, as opposed to ITI Enterprises. These promises were false – there essentially was no money left, and defendants never intended to give Intrust control over this account. In September 1999, the OBRE issued a Corrective Action Order that required that Intrust "terminate the escrow arrangement with Intercounty Title Company of Illinois, take control of the trust assets subject to that arrangement, and properly account for those trust assets on its trust accounting system and on its customers' account statements." During a meeting with the OBRE in November 1999, CAPRIOTTI, in HARGROVE's

presence, falsely assured the regulators that the money was safe and that he would comply with the regulators' directives. CAPRIOTTI and HARGROVE caused Intrust to do none of these things.

22.  It was further part of the scheme that, in November 1999, when additional funds were needed for operating expenses, CAPRIOTTI and HARGROVE caused Intrust to loan $1.6 million in corporate funds to ITI Enterprises, knowing that Intrust had debts to its trust holders that it could not pay and that, but for this loan, these corporate funds would have been available for the trust holders. In response to the president of Intrust's statement that the corporate funds might be needed because of the escrow situation, CAPRIOTTI, in HARGROVE's presence, falsely stated to Intrust's president that the escrow accounts were audited every year by the Illinois Department of Financial Institutions and by Fidelity, the re-insurer. The $1.6 million in loan proceeds were wire transferred to Harris Bank and deposited into ITI Enterprises' operating account.

23.  It was further part of the scheme that, on January 5, 2000, CAPRIOTTI asked the president of Intrust to wire transfer another $13 million in trust holder funds to the Intrust escrow account at LaSalle Bank. CAPRIOTTI stated that he and HARGROVE needed the money to increase their account balances at LaSalle Bank, so that the bank would charge them a lower interest rate on a loan renewal. This representation was false – the money was needed to cure an overdraft in the title insurance escrow account at Harris Bank. CAPRIOTTI promised that the money would be returned promptly. The Intrust president was reluctant to comply with this request because of the pressure from OBRE on the issue. CAPRIOTTI stated that he would have HARGROVE, who was the owner of Intrust, speak with the Intrust president.

24.  It was further part of the scheme that, on January 5, 2000, CAPRIOTTI and HARGROVE spoke with the Intrust president in an attempt to get him to transfer $13 million in trust holder funds to the Intrust escrow account at LaSalle Bank. CAPRIOTTI repeated the lie – that the funds were needed to boost account balances at LaSalle Bank so that CAPRIOTTI and HARGROVE could avoid an extra interest charge. CAPRIOTTI promised that the funds would be returned in forty-five to sixty days. HARGROVE promised that he would stay on the situation and make sure

that the money was repaid. The Intrust president was reluctant because of pressure from OBRE on the issue, the fact that April 1999 $9 million had not been returned, and his continuing inability to gain control over the funds that had been transferred over the years. CAPRIOTTI falsely stated that all of the Intrust money was in an account at ABN AMRO International, which CAPRIOTTI said was the parent of LaSalle Bank, that the paperwork for the transfer of control had been submitted to the bank, and that the delay was being caused by the bank's legal department. HARGROVE repeatedly told the Intrust president to wire the money, and that he needed to either wire the money or resign. Notwithstanding all this pressure and these lies, the Intrust president refused to wire any more trust holder money to the Intrust escrow account at LaSalle Bank.

25.     It was further part of the scheme that, on January 24, 2000, CAPRIOTTI and HARGROVE removed the president of Intrust from the position of chief executive officer of Intrust and installed CAPRIOTTI into that position.

26.     It was further part of the scheme that, on February 4, 2000, in response to a request by OBRE, Hurwick wrote and sent a letter to the president of Intrust stating that "Intercounty Title Company is holding $67,817,367.99 in funds belonging to Independent Trust Corporation as of December 31, 1999." In fact, at that time, there was still only $45,949 in the Intrust escrow account.

**Concealment**

27.     It was further part of the scheme that defendants did misrepresent, conceal and hide, and cause to be misrepresented, concealed and hidden, acts done in furtherance of the scheme and the purpose of those acts, including but not limited to the acts described in paragraphs 28-32.

28.     It was further part of the scheme that, when Stewart reviewed the escrow accounts in 1990, CAPRIOTTI, HARGROVE, Wallwin and others deleted certain entries from the escrow account records, which entries showed that Individual A and others had caused escrow funds to be distributed for the benefit of CAPRIOTTI and HARGROVE without them having deposited any funds into the escrow.

29.     It was further part of the scheme that in early 1992, to conceal the fact that millions of dollars of escrow funds had been disbursed for the Ruffled Feathers project without any supporting deposits into the escrow account, CAPRIOTTI, THYFAULT, Wallwin and others agreed to and did provide to the Intercounty-Illinois employee supervising the Ruffled Feathers file documents that supposedly showed that Capjac had deposited $4.3 million into the escrow account, when in fact Capjac did not deposit this money.

30.     It was further part of the scheme that, in 1995, defendants and their co-schemers provided documents to Stewart that supposedly showed that they and their entities had deposited approximately $5.8 million into the escrow account, when in fact at least part of the funds deposited had been taken out of the escrow account during the same time period.

31.     It was further part of the scheme that, when Stewart reviewed the escrow accounts in 1995, CAPRIOTTI, HARGROVE, Wallwin and Stimac fabricated documents related to the escrow account to conceal the fact that escrow funds had been distributed for the benefit of CAPRIOTTI and HARGROVE without them having deposited any funds into the escrow.

32.     It was further part of the scheme that defendants and their co-schemers made false and misleading statements to Intrust's auditors about the security and availability of the funds that Intrust transferred to the escrow accounts, for the purpose of concealing their thefts from the escrow accounts.

33.     On or about January 14, 1995, at Orland Park, Chicago and Hinsdale, in the Northern District of Illinois, Eastern Division,

LAURENCE W. CAPRIOTTI,
JACK L. HARGROVE and
MICHEL D. THYFAULT,

defendants herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly did cause to be delivered by mail according to the direction thereon, an envelope containing an Intrust account statement for an account that was partially invested in an investment

22

denoted as Cash Account, which envelope was addressed to Victim A at her address in Hinsdale, Illinois;

In violation of Title 18, United States Code, Section 1341.

## COUNT TWO

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraphs 1 through 32 of Count One of this Indictment as though fully set forth herein.

2.     On or about January 14, 1995, at Orland Park, Chicago and Barrington, in the Northern District of Illinois, Eastern Division,

LAURENCE W. CAPRIOTTI,
JACK L. HARGROVE and
MICHEL D. THYFAULT,

defendants herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly did cause to be delivered by mail according to the direction thereon, an envelope containing an Intrust account statement for an account that was partially invested in an investment denoted as Cash Account, which envelope was addressed to Victim B at his address in Barrington, Illinois;

In violation of Title 18, United States Code, Section 1341.

24

## COUNT THREE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraphs 1 through 32 of Count One of this Indictment as though fully set forth herein.

2.     On or about October 14, 1996, at Orland Park and Chicago, in the Northern District of Illinois, Eastern Division,

LAURENCE W. CAPRIOTTI,
JACK L. HARGROVE and
MICHEL D. THYFAULT,

defendants herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly did cause to be placed in an authorized depository for mail matter an envelope to be sent and delivered by the Postal Service, which envelope contained an Intrust account statement for an account that was partially invested in an investment denoted as Money Market Account, which envelope was addressed to Victim C at his address in Marquette, Michigan;

In violation of Title 18, United States Code, Section 1341.

25

## COUNT FOUR

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.    The Grand Jury realleges and incorporates by reference paragraphs 1 through 32 of Count One of this Indictment as though fully set forth herein.

2.    On or about October 14, 1996, at Orland Park, Chicago and Barrington, in the Northern District of Illinois, Eastern Division,

LAURENCE W. CAPRIOTTI,<br>
JACK L. HARGROVE and<br>
MICHEL D. THYFAULT,

defendants herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly did cause to be delivered by mail according to the direction thereon, an envelope containing an Intrust account statement for an account that was partially invested in an investment denoted as Money Market Account, which envelope was addressed to Victim B at his address in Barrington, Illinois;

In violation of Title 18, United States Code, Section 1341.

## COUNT FIVE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraphs 1 through 32 of Count One of this Indictment as though fully set forth herein.

2.     On or about April 23, 1999, at Chicago, in the Northern District of Illinois, Eastern Division,

LAURENCE W. CAPRIOTTI and
JACK L. HARGROVE,

defendants herein, for the purpose of executing the above-described scheme, did cause to be transmitted by means of wire communication in interstate commerce a writing, sign and signal, in that defendants caused $5,700,000 to be wire transferred from Intrust's account at Cole Taylor Bank, through the Federal Reserve's facility in East Rutherford, New Jersey, to an account at LaSalle Bank in Chicago, Illinois, in the name of Intercounty Title Co. as escrowee for Independent Trust Corporation Trust Funds;

In violation of Title 18, United States Code, Section 1343.

27

## COUNT SIX

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 32 of Count One of this Indictment as though fully set forth herein.

2.      On or about May 4, 1999, at Chicago, in the Northern District of Illinois, Eastern Division,

LAURENCE W. CAPRIOTTI and
JACK L. HARGROVE,

defendants herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly did cause to be delivered by mail according to the direction thereon, an envelope containing a monthly account statement for LaSalle Bank account number 5800065178, in the name of Intercounty Title Co. as escrowee for Independent Trust Corporation Trust Funds, which envelope was addressed to the address of ITI Enterprises in Chicago, Illinois;

In violation of Title 18, United States Code, Section 1341.

## COUNT SEVEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraphs 1 through 32 of Count One of this Indictment as though fully set forth herein.

2.      On or about July 14, 1999, at Orland Park and Chicago, in the Northern District of Illinois, Eastern Division,

LAURENCE W. CAPRIOTTI and
JACK L. HARGROVE,

defendants herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly did cause to be delivered by mail according to the direction thereon, an envelope containing an Intrust account statement for an account that was partially invested in an investment denoted as Money Market Account, which envelope was addressed to Victim D at his address in Chicago, Illinois;

In violation of Title 18, United States Code, Section 1341.

## COUNT EIGHT

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

### General Conspiracy Allegations

2.      Beginning no later than in or about 1988, and continuing thereafter until in or about February 2000, in the Northern District of Illinois, Eastern Division, and elsewhere,

LAWRENCE W. CAPRIOTTI,
JACK L. HARGROVE and
MICHEL D. THYFAULT,

defendants herein, did conspire and agree with each other, and with others known and unknown to the Grand Jury, to commit offenses against the United States, namely:

a.      to devise, intend to devise and participate in a scheme to defraud title insurance customers, Stewart, Fidelity, Intrust, Intrust trust holders, federally-insured financial institutions, and others of money, property, and after November 18, 1988, the intangible right of honest services, and to obtain money and property from the above-described victims by means of materially false and fraudulent pretenses, representations and promises, and to cause to be delivered by United States mail any matter for the purpose of executing and attempting to execute such scheme, in violation of Title 18, United States Code, Sections 1341 and 1346;

b.      to devise, intend to devise and participate in a scheme to defraud title insurance customers, Stewart, Intrust, Intrust trust holders, federally-insured financial institutions, and others of money, property, and after November 18, 1988, the intangible right of honest services, and to obtain money and property from the above-described victims by means of materially false and fraudulent pretenses, representations and promises, and to cause to be transmitted by means of wire and radio communication in interstate commerce any signs, signals and sounds for the purpose of executing such scheme, in violation of Title 18, United States Code, Sections 1343 and 1346.

30

3.     It was the object of the defendants' conspiracy to commit the fraud described in paragraphs 2 through 32 of Count One, which paragraphs are realleged and incorporated as though set forth herein.

## OVERT ACTS

4.     In furtherance of and to effect the objects of the conspiracy, one or more of the following acts were committed:

a.     On or about November 1, 1993, CAPRIOTTI and HARGROVE caused Capitol Bank of Westmont to renew a $800,000 loan to CAPRIOTTI and HARGROVE, which loan was secured by certificates of deposit totaling approximately $800,000 that had been purchased with escrow funds.

b.     On or about May 2, 1995, CAPRIOTTI and HARGROVE directed Capitol Bank of Westmont to pay off the $800,000 loan to CAPRIOTTI and HARGROVE by liquidating the certificates of deposit that had secured the loan.

c.     On or about July 15, 1994, CAPRIOTTI and HARGROVE caused Capitol Bank of Westmont to renew a $500,000 loan to CAPRIOTTI and HARGROVE, which loan was secured by a certificate of deposit in the amount of $500,000 that had been purchased with escrow funds.

d.     On or about June 9, 1995, CAPRIOTTI and HARGROVE directed Capitol Bank of Westmont to pay off the $500,000 loan to CAPRIOTTI and HARGROVE by liquidating the certificate of deposit that had secured the loan.

e.     Between August 26, 1993 and December 20, 1995, defendants caused approximately 79 checks totaling approximately $2.8 million to be issued to Capjac, which checks were drawn on an Intercounty-Illinois title indemnity bank account, and were charged to a title indemnity file called TI 4659, any one of which constitutes an overt act in furtherance of the conspiracy.

31

      f.      On or about March 14, 1995, HARGROVE caused Intercounty-Illinois to issue a check in the amount of $5,000 for payment on the Ruffled Feathers project.

      g.      On or about March 14, 1995, HARGROVE caused Intercounty-Illinois to issue a check in the amount of $2,000 for payment on the Ruffled Feathers project, which check was funded with money stolen from the escrow account.

      h.      On or about March 14, 1995, HARGROVE caused Intercounty-Illinois to issue a check in the amount of $25,000 for payment on the Ruffled Feathers project.

      i.      On or about March 14, 1995, HARGROVE caused Intercounty-Illinois to issue a check in the amount of $52,535 for payment on the Ruffled Feathers project.

      j.      On or about March 14, 1995, HARGROVE caused Intercounty-Illinois to issue a check in the amount of $30,000 for payment on the Ruffled Feathers project.

      k.      In or about November 1995, CAPRIOTTI, HARGROVE, Wallwin and Stimac fabricated documents to deceive Stewart about the thefts from the escrow accounts.

      l.      Between March 10, 1994 and October 9, 1996, CAPRIOTTI, HARGROVE, THYFAULT and their co-conspirators caused funds to be transferred from the escrow accounts to the title companies' operating accounts on approximately 46 occasions, which funds totaled approximately $15 million, including a transfer of $700,000 on or about October 9, 1996, any one of which constitutes an overt act in furtherance of the conspiracy.

      m.      On or about October 7, 1996, MICHEL THYFAULT faxed to the president of Intrust a spreadsheet regarding the funds that Intrust had transferred to the escrow accounts pursuant to the Escrow Agreement.

      n.      On or about November 4, 1996, MICHEL THYFAULT faxed to the president of Intrust a spreadsheet regarding the funds that Intrust had transferred to the escrow accounts pursuant to the Escrow Agreement.

      o.      In or about January 1997, CAPRIOTTI caused the Intrust escrow account to be established at LaSalle Bank.

p.      On or about April 21, 1999, CAPRIOTTI had a telephone conversation with Intrust's president about the need for additional funds to be transferred to the Intrust escrow account.

q.      On or about April 21, 1999, CAPRIOTTI caused Intrust to wire transfer approximately $3.5 million to the Intrust escrow account.

r.      On or about April 23, 1999, CAPRIOTTI and HARGROVE had a telephone conversation with Intrust's president about the need for additional funds to be transferred to the Intrust escrow account.

s.      On or about April 23, 1999, CAPRIOTTI and HARGROVE caused Intrust to wire transfer approximately $5.7 million to the Intrust escrow account.

t.      On or about January 5, 2000, CAPRIOTTI and HARGROVE had a telephone conversation with Intrust's president about the need for additional funds to be transferred to the Intrust escrow account.

All in violation of Title 18, United States Code, Section 371.

## COUNT NINE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.     At times material to this indictment:

a.     LAURENCE W. CAPRIOTTI and JACK L. HARGROVE, as the owners of Intercounty-Illinois and ITI Enterprises, controlled certain escrow accounts.   CAPRIOTTI, HARGROVE and Individual A caused escrow funds to be transferred to the checking account of Capjac without supporting deposits.  In 1996, Individual A signed checks drawn on the Capjac checking account, which checks were tendered as payment for HARGROVE's personal debts and the debts of HARGROVE's business.  These checks, which totaled approximately $147,610, were taxable income to HARGROVE.  HARGROVE failed to report any of these payments as income on his 1996 individual income tax return.

b.     In 1990, CAPRIOTTI and HARGROVE caused Intercounty-Illinois to purchase certificates of deposit in the amounts of $1,000,000 at Charter Bank and $750,000 at Bank of Homewood.  These certificates of deposit were purchased with escrow funds.  CAPRIOTTI and HARGROVE caused these certificates of deposit to be pledged as collateral for personal loans issued to them by the banks in the same amounts as the certificates of deposit.  In 1996, CAPRIOTTI and HARGROVE paid off these personal loans by causing the banks to close out the certificates of deposit and to apply the proceeds against the outstanding personal loans.   The use of the certificates of deposit to pay off personal loans generated taxable income to HARGROVE in the amount of approximately $875,000.   HARGROVE failed to report the use of these certificates of deposit to pay off his personal loans as income on his 1996 individual income tax return.

c.     In 1996, HARGROVE caused escrow funds totaling approximately $1,266,975 to be transferred to the checking account of First Mortgage Corp.  HARGROVE then signed checks drawn on the First Mortgage Corp. account made payable to himself, caused them to

34

be deposited into his personal checking account, and converted the funds to his own use. These checks, which totaled approximately $1,265,000, were taxable income to HARGROVE. HARGROVE failed to report any of these funds as income on his 1996 individual income tax return.

     3.     On or about October 15, 1997, in the Northern District of Illinois, Eastern Division, and elsewhere,

JACK L. HARGROVE,

defendant herein, who during the calendar year 1996 was a resident of Chicago, Illinois and whose tax return preparer was located in Deerfield, Illinois, willfully did make and subscribe, and cause to be made and subscribed, a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 1996, on behalf of himself, which return was verified by a written declaration that it was reviewed and made under penalties of perjury and was filed with the Internal Revenue Service at the Kansas City Service Center, Kansas City, Missouri, which return he did not believe to be true and correct as to every material matter contained therein, in that:

     a.     The return stated at Line 22 that HARGROVE had total income of $423,127, whereas in truth and fact, as defendant well knew and believed, his total income was greater than $423,127 in calendar year 1996;

     In violation of Title 26, United States Code, Section 7206(1).

35

## COUNT TEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.     At times material to this indictment:

a.     LAURENCE W. CAPRIOTTI and JACK L. HARGROVE, as the owners of Intercounty-Illinois and ITI Enterprises, controlled certain escrow accounts. CAPRIOTTI, HARGROVE and Individual A caused escrow funds to be transferred to the checking account of Capjac without supporting deposits. In 1997, Individual A signed checks drawn on the Capjac checking account, which checks were tendered as payment for HARGROVE's personal debts and the debts of HARGROVE's business. These checks, which totaled approximately $63,433, were taxable income to HARGROVE. HARGROVE failed to report any of these payments as income on his 1997 individual income tax return.

3.     On or about April 15, 1998, in the Northern District of Illinois, Eastern Division, and elsewhere,

### JACK L. HARGROVE,

defendant herein, whose tax return preparer for the calendar year 1997 was located in Deerfield, Illinois, willfully did make and subscribe, and cause to be made and subscribed, a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 1997, on behalf of himself, which return was verified by a written declaration that it was reviewed and made under penalties of perjury and was filed with the Internal Revenue Service at the Atlanta Service Center, Atlanta, Georgia, which return he did not believe to be true and correct as to every material matter contained therein, in that:

a.    The return stated at Line 22 that HARGROVE had total income of $1,580,106, whereas in truth and fact, as defendant well knew and believed, his total income was greater than $1,580,106 in calendar year 1997;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT ELEVEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.     At times material to this indictment:

a.     LAURENCE W. CAPRIOTTI and JACK L. HARGROVE, as the owners of Intercounty-Illinois and ITI Enterprises, controlled certain escrow accounts.   CAPRIOTTI, HARGROVE and Individual A caused escrow funds to be transferred to the checking account of Capjac without supporting deposits.  In 1998, Individual A signed checks drawn on the Capjac checking account, which checks were tendered as payment for HARGROVE's personal debts and the debts of HARGROVE's business.  These checks, which totaled approximately $23,206, were taxable income to HARGROVE.  HARGROVE failed to report any of these payments as income on his 1998 individual income tax return.

b.     In 1996, HARGROVE, as president of Beacon Cove Condominium Corporation ("the corporation"), caused the corporation to purchase the Beacon Cove Apartments in Palatine, Illinois.  The corporation thereafter converted the apartments to condominiums and sold them, thereby generating profits.  On or about October 20, 1998, HARGROVE caused the corporation to wire transfer $1,000,000 to an escrow account that HARGROVE controlled through his ownership of ITI Enterprises.  On or about the following day, HARGROVE caused $1,000,000 to be wire transferred from the escrow account to his personal checking account, which he then converted to his own use.  These funds were taxable income to HARGROVE.  HARGROVE failed to report any of this money as income on his 1998 individual income tax return.

3.     On or about April 13, 1999, in the Northern District of Illinois, Eastern Division, and elsewhere,

JACK L. HARGROVE,

38

defendant herein, whose tax return preparer for the calendar year 1998 was located in Deerfield, Illinois, willfully did make and subscribe, and cause to be made and subscribed, a United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 1998, on behalf of himself, which return was verified by a written declaration that it was reviewed and made under penalties of perjury and was filed with the Internal Revenue Service at the Atlanta Service Center, Atlanta, Georgia, which return he did not believe to be true and correct as to every material matter contained therein, in that:

   a.      The return stated at Line 22 that HARGROVE had total income of $467,025, whereas in truth and fact, as defendant well knew and believed, his total income was greater than $467,025 in calendar year 1998;

   In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWELVE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One as though fully set forth herein.

2.      During the calendar year 1999, defendant JACK L. HARGROVE, whose tax return preparer and primary business activity were located in the Northern District of Illinois, had and received a total gross income of approximately $573,774 and a total taxable income of approximately $534,600.

3.      Upon this taxable income, HARGROVE owed the United States of America income tax totaling approximately $189,775.

4.      HARGROVE was required by law on or before October 15, 2000 to make an income tax return to the Internal Revenue Service and to pay such income tax. HARGROVE did not file an individual income tax return for 1999, nor did he pay any income tax for that year.

5.      Well knowing the foregoing facts, beginning in or about 1996, and continuing thereafter until in or about October 2000, in the Northern District of Illinois, Eastern Division,

JACK L. HARGROVE,

defendant herein, did willfully and knowingly attempt to evade and defeat said income tax due and owing by him to the United States of America for calendar year 1999, by committing various acts which included the following:

a.      JACK L. HARGROVE, as an owner of Intercounty-Illinois and ITI Enterprises, controlled certain escrow accounts. Throughout the 1990's, HARGROVE caused escrow funds to be transferred to the checking account of Capjac at LaSalle Bank in Chicago without supporting deposits. In 1999, HARGROVE caused Individual A to sign checks drawn on the Capjac checking account, which checks were tendered as payment for HARGROVE's personal debts and the debts of HARGROVE's business. These checks totaled approximately $13,640. By paying his personal obligations with funds stolen from the escrow account, passing the money through the

40

Capjac account, and having Individual A sign the Capjac checks, HARGROVE concealed the fact that he had received income totaling $13,640 in 1999.

   b. In 1996, HARGROVE, as president of Beacon Cove Condominium Corporation ("the corporation"), caused the corporation to purchase the Beacon Cove Apartments in Palatine, Illinois. The corporation thereafter converted the apartments to condominiums and sold them, thereby generating profits. On or about August 20, 1999, HARGROVE caused the corporation to wire transfer $438,000 to an escrow account at LaSalle Bank in Chicago that HARGROVE controlled through his ownership of ITI Enterprises. On or about August 23, 1999, HARGROVE caused $438,000 to be wire transferred from the escrow account to his personal checking account, which he then converted to his own use. By passing this money through the escrow account, HARGROVE concealed the fact that he had received income totaling $438,000 in 1999.

   c. In 2000, HARGROVE failed to file a 1999 corporate income tax return for Beacon Cove Condominium Corporation, thereby concealing the fact that the corporation had distributed $438,000 in income to him.

   d. In 2000, HARGROVE directed his tax return preparer not to prepare a 1999 individual income tax return for HARGROVE.

  In violation of Title 26, United States Code, Section 7201.

## **COUNT THIRTEEN**

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.      At times material to this indictment:

a.      LAURENCE W. CAPRIOTTI and JACK L. HARGROVE, as the owners of Intercounty-Illinois and ITI Enterprises, controlled certain escrow accounts. CAPRIOTTI, HARGROVE and Individual A caused escrow funds to be transferred to the checking account of Capjac without any supporting deposits. In 1996, Individual A signed checks drawn on the Capjac checking account, which checks were either tendered as payment for CAPRIOTTI's personal debts or deposited into CAPRIOTTI's personal checking account and then converted to his own use. These checks, which totaled approximately $44,189, were taxable income to CAPRIOTTI. CAPRIOTTI failed to report any of these payments as income on his 1996 individual income tax return.

b.      In 1990, CAPRIOTTI and HARGROVE caused Intercounty-Illinois to purchase certificates of deposit in the amounts of $1,000,000 at Charter Bank and $750,000 at Bank of Homewood. These certificates of deposit were purchased with escrow funds. CAPRIOTTI and HARGROVE caused these certificates of deposit to be pledged as collateral for personal loans issued to them by the banks in the same amounts as the certificates of deposit. In 1996, CAPRIOTTI and HARGROVE paid off these personal loans by causing the banks to close out the certificates of deposit and to apply the proceeds against the outstanding personal loans. The use of the certificates of deposit to pay off personal loans generated taxable income to CAPRIOTTI in the amount of approximately $875,000. CAPRIOTTI failed to report the use of these certificates of deposit to pay off his personal loans as income on his 1996 individual income tax return.

3.      On or about October 6, 1997, in the Northern District of Illinois, Eastern Division, and elsewhere,

42

LAURENCE W. CAPRIOTTI.,

defendant herein, who during the calendar year 1996 was married and was a resident of Frankfort,
Illinois, willfully did make and subscribe, and cause to be made and subscribed, a joint United States
Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year
1996, on behalf of himself and his wife, which return was verified by a written declaration that it was
reviewed and made under penalties of perjury and was filed with the Internal Revenue Service at the
Kansas City Service Center, Kansas City, Missouri, which return he did not believe to be true and
correct as to every material matter contained therein, in that:

      a.      The return stated at Line 22 that CAPRIOTTI and his wife had total income
of $381,260, whereas in truth and fact, as defendant well knew and believed, their total income was
greater than $381,260 in calendar year 1996;

In violation of Title 26, United States Code, Section 7206(1).

## COUNT FOURTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference paragraph 1 of Count One as though fully set forth herein.

2.     During the calendar year 1998, defendant LAURENCE W. CAPRIOTTI, who was then married and a resident of Frankfort, Illinois, had and received total gross income of approximately $271,163 and total taxable income of approximately $177,462.

3.     Upon this taxable income, CAPRIOTTI and his wife owed the United States of America income tax  totaling  approximately $33,469 --  approximately $2,212 that was paid in connection with the filing of their income tax return for 1998, plus an additional amount of approximately $31,257 that was not paid.

4.     CAPRIOTTI and his wife were required by law on or before October 15, 1999 to make an income tax return to the Internal Revenue Service and to pay such income tax.

5.     Well knowing the foregoing facts, beginning in or about 1993, and continuing thereafter until in or about September 1999, in the Northern District of Illinois, Eastern Division,

LAURENCE W. CAPRIOTTI,

defendant herein, did willfully and knowingly attempt to evade and defeat said additional income tax due and owing by him and his wife to the United States of America for calendar year 1998, by committing various acts which included the following:

a.     CAPRIOTTI, as an owner of Intercounty-Illinois and ITI Enterprises, controlled escrow accounts at LaSalle Bank.  Checks drawn on these escrow accounts ordinarily were supported by deposits.  During 1998, CAPRIOTTI caused checks drawn on the escrow accounts totaling approximately $454,195 to be issued payable to him.  None of these checks was supported by any deposit, a fact that was not disclosed outside his companies.  CAPRIOTTI caused these checks to be deposited into his personal checking account, and then converted the funds to his

44

own use. As a result, CAPRIOTTI received concealed income in 1998 that totaled approximately $454,195.

b. In 1993, CAPRIOTTI caused a certificate of deposit to be purchased with escrow account funds in the amount of $37,000 at New Lenox Bank. On or about May 15, 1998, CAPRIOTTI cashed in the certificate of deposit and caused New Lenox Bank to issue a check payable to Intercounty Title Company in the amount of $47,938.24. CAPRIOTTI endorsed this check and caused it to be deposited into the checking account of his wife's business, where it was converted to their own use. As a result, CAPRIOTTI and his wife received concealed income in 1998 that totaled approximately $47,938.24.

c. In 1993, CAPRIOTTI caused a certificate of deposit to be purchased with escrow account funds in the amount of $230,000 at Chicago Heights National Bank. On or about September 3, 1998, CAPRIOTTI cashed in the certificate of deposit and caused Chicago Heights National Bank to issue a check payable to Intercounty Title Company in the amount of $230,000. CAPRIOTTI endorsed this check and caused it to be deposited into the checking account of his wife's business, where it was converted to their own use. As a result, CAPRIOTTI and his wife received concealed income in 1998 that totaled approximately $230,000.

d. In 1999, CAPRIOTTI willfully failed to disclose the above-mentioned items of income to his tax return preparer at the time that his 1998 individual income tax return was prepared.

e. On or about July 15, 1999, CAPRIOTTI filed with the IRS an individual income tax return for 1998 on behalf of himself and his wife, wherein it was stated that their joint total income was a loss of ($460,970), that their joint adjusted gross income was a loss of ($462,641), that the tax due and owing was an alternative minimum tax of $2,212. In fact, as the defendant then and there well knew, their joint total income for 1998, and the amount of tax owed thereon to the United States of America, were both substantially greater. In fact, their joint total

45

income was approximately $732,133 greater, and that, rather than a tax due of $2,212, the tax due was approximately $33,469.

        f.     On or about September 22, 1999, CAPRIOTTI filed with the IRS an application for a tentative refund based on the false individual income tax return for 1998 described above.

In violation of Title 26, United States Code, Section 7201.

## COUNT FIFTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.      At times material to this indictment:

a.      LAURENCE W. CAPRIOTTI and JACK L. HARGROVE, as the owners of Intercounty-Illinois and ITI Enterprises, controlled certain escrow accounts. In 1999, CAPRIOTTI caused escrow funds to paid into his personal checking account totaling approximately $1,161,535, which he then converted to his own use. These transfers from the escrow account, which were unsupported by any deposits, were taxable income to CAPRIOTTI. CAPRIOTTI did not report these payments as income on his 1999 individual income tax return.

3.      On or about August 17, 2000, in the Northern District of Illinois, Eastern Division, and elsewhere,

LAURENCE W. CAPRIOTTI.,

defendant herein, who during the calendar year 1999 was married and was a resident of Frankfort, Illinois, willfully did make and subscribe, and cause to be made and subscribed, a joint United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 1999, on behalf of himself and his wife, which return was verified by a written declaration that it was reviewed and made under penalties of perjury and was filed with the Internal Revenue Service at the Kansas City Service Center, Kansas City, Missouri, which return he did not believe to be true and correct as to every material matter contained therein, in that:

a.      The return stated at Line 22 that CAPRIOTTI and his wife had total income of $57,507, whereas in truth and fact, as defendant well knew and believed, their total income was greater than $57,507 in calendar year 1999;

In violation of Title 26, United States Code, Section 7206(1).

47

## COUNT SIXTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.      The Grand Jury realleges and incorporates by reference paragraph 1 of Count One of this Indictment as though fully set forth herein.

2.      At times material to this indictment:

a.      LAURENCE W. CAPRIOTTI and JACK L. HARGROVE, as the owners of Intercounty-Illinois and ITI Enterprises, controlled certain escrow accounts.  In 2000, CAPRIOTTI caused escrow funds to be paid into his personal checking account totaling approximately $36,930, which he then converted to his own use.  These transfers from the escrow account, which were unsupported by any deposits, were taxable income to CAPRIOTTI.  CAPRIOTTI did not report these payments as income on his 2000 individual income tax return.

3.      On or about October 15, 2001, in the Northern District of Illinois, Eastern Division, and elsewhere,

LAURENCE W. CAPRIOTTI.,

defendant herein, who during the calendar year 2000 was married and was a resident of Frankfort, Illinois, willfully did make and subscribe, and cause to be made and subscribed, a joint United States Individual Income Tax Return (Form 1040 with schedules and attachments) for the calendar year 2000, on behalf of himself and his wife, which return was verified by a written declaration that it was reviewed and made under penalties of perjury and was filed with the Internal Revenue Service at the Kansas City Service Center, Kansas City, Missouri, which return he did not believe to be true and correct as to every material matter contained therein, in that:

a.      The return stated at Line 22 that CAPRIOTTI and his wife had total income of $381,273, whereas in truth and fact, as defendant well knew and believed, their total income was greater than $381,273 in calendar year 2000;

In violation of Title 26, United States Code, Section 7206(1).

48

## COUNT SEVENTEEN

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.    The Grand Jury realleges and incorporates by reference paragraph 1 of Count One as though fully set forth herein.

2.    Intercounty-Illinois was in the business of insurance, as that term is defined in Title 18, United States Code, Section 1033(f), in that Intercounty-Illinois was an agent of Stewart which wrote and issued title insurance policies. The activities of Intercounty-Illinois affected interstate commerce. Defendants JAMES R. WALLWIN and GEORGE J. STIMAC engaged in transactions relating to the conduct of affairs of Intercounty-Illinois.

3.    In or about November 1995, at Chicago in the Northern District of Illinois, Eastern Division, and elsewhere,

JAMES R. WALLWIN and
GEORGE J. STIMAC,

defendants herein, along with Laurence W. Capriotti, Jack L. Hargrove, and others known and unknown to the grand jury, knowingly made a false entry of material fact in a report of Intercounty-Illinois with intent to deceive a person about the financial condition of Intercounty-Illinois, in that WALLWIN and STIMAC, at the direction of Capriotti and Hargrove, did fabricate an escrow reconciliation report and an Overdraft/Retention Report of Intercounty-Illinois to conceal the fact that Capriotti and Hargrove had stolen millions of dollars from the escrow accounts, with the intent to deceive Stewart, which at that time was conducting a review of Intercounty-Illinois' escrow accounts;

In violation of Title 18, United States Code, Section 1033.

## FORFEITURE ALLEGATION

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     The Grand Jury realleges and incorporates by reference Counts One through Eight of this Indictment as though fully set forth herein.

2.     Beginning no later than in or about 1988, and continuing thereafter until in or about February 2000, in the Northern District of Illinois, Eastern Division, and elsewhere,

LAURENCE W. CAPRIOTTI,
JACK L. HARGROVE and
MICHEL D. THYFAULT,

defendants herein, did engage in violations of Title 18, United States Code, Sections 1341 and 1343, and conspiracy to commit violations of Title 18, United States Code, Sections 1341 and 1343, all of which affected a financial institution, thereby subjecting to forfeiture to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), all property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as the result of such violations, including but not limited to at least $80,000,000.

3.     Pursuant to Title 18, United States Code, Section 982(b)(1)(B), and Title 21, United States Code, Section 853(p), if any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants, either:

- ■     cannot be located upon the exercise of due diligence;
- ■     has been transferred or sold to, or deposited with, a third party;
- ■     has been placed beyond the jurisdiction of the Court;
- ■     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek forfeiture of any other property belonging to the defendants up to the value of the above forfeitable property, including but not limited to the following:

a.     Residence located at 903 South Butternut Circle, Frankfort, IL;

50

b.   Residence located at 1710 South Ocean Lane, Unit # 205, Fort Lauderdale, FL;

c.   Residence located at 516 S. Catherine Avenue, La Grange, IL; and

d.   HARGROVE's interest in Arrowhead Condominium Development Corporation, which owns land in Mokena, Illinois.

## SENTENCING ALLEGATION – LAURENCE W. CAPRIOTTI

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.     In and during the commission of the conduct alleged in Counts One through Eight with which defendant LAURENCE W. CAPRIOTTI is charged, and the relevant conduct to each of those counts:

        a.    The amount of the loss involved was more than $80 million. USSG § 1B1.3 and § 2F1.1(b)(1)(S).

        b.    The offense involved more than minimal planning and a scheme to defraud more than one victim. USSG § 1B1.3 and § 2F1.1(b)(2).

        c.    The offense involved the violation of an administrative order. USSG § 1B1.3 and § 2F1.1(b)(4)(B).

        d.    The offense involved sophisticated means. USSG § 1B1.3 and § 2F1.1(b)(5)(C).

        e.    The offense substantially jeopardized the safety and soundness of a financial institution, and the offense affected a financial institution and defendant derived more than $1 million in gross receipts from the offense. USSG § 1B1.3 and § 2F1.1(b)(7).

        f.    Defendant was an organizer and leader of the charged criminal activity, which involved five or more participants and was otherwise extensive. USSG § 1B1.3 and § 3B1.1(a).

        g.    Defendant abused positions of private trust in a manner that significantly facilitated the commission and concealment of the offense. USSG § 1B1.3 and § 3B1.3.

2.     In and during the commission of the conduct alleged in Counts Thirteen through Sixteen with which defendant LAURENCE W. CAPRIOTTI is charged, and the relevant conduct to each of those counts:

        a.    The amount of the tax loss exceeded $1.5 million and was less than $2.5 million. USSG § 1B1.3, § 2T1.1(a)(1) and § 2T4.1(O).

        b.    Defendant failed to report income exceeding $10,000 from criminal activity in a tax year. USSG § 1B1.3 and § 2T1.1(b)(1).

52

3.      While defendant LAURENCE W. CAPRIOTTI was serving a sentence of 24 months' court supervision arising from his conviction for reckless driving on October 25, 1999 in the Circuit Court of Will County, Illinois, defendant committed an offense charged herein or engaged in relevant conduct to such an offense.  USSG § 1B1.3, § 4A1.1(c) and (d), and § 4A1.2(c)(1).

## SENTENCING ALLEGATION – JACK L. HARGROVE

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1.　　In and during the commission of the conduct alleged in Counts One through Eight with which defendant JACK L. HARGROVE is charged, and the relevant conduct to each of those counts:

　　　　a.　The amount of the loss involved was more than $80 million.  USSG § 1B1.3 and § 2F1.1(b)(1)(S).

　　　　b.　The offense involved more than minimal planning and a scheme to defraud more than one victim.  USSG § 1B1.3 and § 2F1.1(b)(2).

　　　　c.　The offense involved the violation of an administrative order.  USSG § 1B1.3 and § 2F1.1(b)(4)(B).

　　　　d.　The offense involved sophisticated means.  USSG § 1B1.3 and § 2F1.1(b)(5)(C).

　　　　e.　The offense substantially jeopardized the safety and soundness of a financial institution, and the offense affected a financial institution and defendant derived more than $1 million in gross receipts from the offense.  USSG § 1B1.3 and § 2F1.1(b)(7).

　　　　f.　Defendant abused positions of private trust in a manner that significantly facilitated the commission and concealment of the offense.  USSG § 1B1.3 and § 3B1.3.

2.　　In and during the commission of the conduct alleged in Counts Nine through Twelve with which defendant JACK L. HARGROVE is charged, and the relevant conduct to each of those counts:

　　　　a.　The amount of the tax loss exceeded $1.5 million and was less than $2.5 million. USSG § 1B1.3, § 2T1.1(a)(1) and § 2T4.1(O).

　　　　b.　Defendant failed to report income exceeding $10,000 from criminal activity in a tax year.  USSG § 1B1.3 and § 2T1.1(b)(1).

## SENTENCING ALLEGATION – MICHEL D. THYFAULT

The SPECIAL AUGUST 2003-2 GRAND JURY further charges:

1. In and during the commission of the conduct alleged in Counts One through Four and Eight with which defendant MICHEL D. THYFAULT is charged, and the relevant conduct to each of those counts:

    a. The amount of the loss involved was more than $10 million and less than $20 million. USSG § 1B1.3 and § 2F1.1(b)(1)(P).

    b. The offense involved more than minimal planning and a scheme to defraud more than one victim. USSG § 1B1.3 and § 2F1.1(b)(2).

    c. The offense substantially jeopardized the safety and soundness of a financial institution. USSG § 1B1.3 and § 2F1.1(b)(6)(A).

    d. Defendant abused positions of private trust in a manner that significantly facilitated the commission and concealment of the offense. USSG § 1B1.3 and § 3B1.3.

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

No.     03 CR 779

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

vs.

LAURENCE W. CAPRIOTTI,
JACK L. HARGROVE,
MICHEL D. THYFAULT,
JAMES R. WALLWIN, and
GEORGE J. STIMAC

SUPERSEDING INDICTMENT

Violation(s): Title 18, United States Code,
Sections 371, 1033, 1341, 13443, and 1346;
Title 26, United States Code, Sections 7201
and 7206(1)

A true bill,

_____
                              Foreman

Filed in open court this _____ day of NOV 03 2004, 19 ____

_____
MICHAEL W. DOBBINS
_____
                              Clerk

Bail, $ _____