IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

NOV 29 2004

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | Judge James B. Moran |
| | ) | United States District Court |
| v. | ) | No. 03 CR 779-4 |
| | ) | Judge James B. Moran |
| JAMES R. WALLWIN | ) | |

DOCKETED
NOV 3 0 2004

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, JAMES R. WALLWIN, and his attorney, SHELLY B. KULWIN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 03 CR 779.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, JAMES R. WALLWIN, and his attorney, SHELLY B. KULWIN, have agreed upon the following:

126

1. Defendant acknowledges that he has been charged in the superseding indictment in this case with insurance fraud, in violation of Title 18, United States Code, Section 1033.

2. Defendant has read the charges against him contained in the superseding indictment, and those charges have been fully explained to him by his attorney.

3. Defendant fully understands the nature and elements of the crime with which he has been charged.

4. Defendant will enter a voluntary plea of guilty to Count Seventeen of the superseding indictment in this case.

5. Defendant will plead guilty because he is in fact guilty of the charge contained in Count Seventeen of the superseding indictment. In pleading guilty, defendant admits the following facts, as well as the facts in paragraph 6, and that those facts establish his guilt and all relevant sentencing facts beyond a reasonable doubt:

In or about November 1995, at Chicago, Illinois, James R. Wallwin and George J. Stimac, along with Laurence W. Capriotti and Jack L. Hargrove, knowingly made a false entry of material fact in a report of Intercounty-Illinois with intent to deceive a person about the financial condition of Intercounty-Illinois, in that Wallwin and Stimac, at the direction of Capriotti and Hargrove, did fabricate an escrow reconciliation report and an Overdraft/Retention Report of Intercounty-Illinois to conceal the fact that Capriotti and Hargrove had stolen millions of dollars from the escrow accounts, with the intent to deceive Stewart, which at that time was conducting a review of Intercounty-Illinois' escrow accounts; in violation of Title 18, United States Code, Section 1033.

The relevant individuals were as follows:

**Laurence W. Capriotti**, a lawyer, was an owner, president and a director of Intercounty Title Company of Illinois, Inc. (Intercounty-Illinois) and ITI Enterprises, Inc.

**Jack L. Hargrove**, a real estate developer, was an owner and chairman of the board of directors of Intercounty-Illinois and ITI Enterprises, Inc.

**Michel D. Thyfault**, a certified public accountant, was chief financial officer of Intercounty-Illinois from 1989 to late 1995, and chief financial officer of ITI Enterprises from late 1995 to November 1996. Thyfault supervised Wallwin and Stimac and was responsible for all accounting and financial recordkeeping.

**James R. Wallwin** was treasurer of Intercounty-Illinois from 1989 to late 1995, and from late 1995 to October 1996 was treasurer of ITI Enterprises. As treasurer, Wallwin was responsible for, among other things, the management of the escrow accounts.

**George J. Stimac**, a certified public accountant, was assistant controller of Intercounty-Illinois from 1986 to 1992, was controller from 1992 to late 1995, and was controller of ITI Enterprises from late 1995 to February 1997. As controller, Stimac was responsible for, among other things, the preparation of financial statements. He also assisted Wallwin with the management of the escrow accounts.

**Susan A. Peloza** was an officer and director of Intercounty-Illinois, a director of Intrust, and an owner, officer and director of Intercounty Title Company, and Indiana corporation (Intercounty-Indiana) and Intercounty National Title Insurance Company (INTIC).

## The Title Insurance Entities

Intercounty-Illinois, which had its primary office at 120 Madison St. in Chicago, was a title insurance agent for a Texas-based title insurance company named Stewart Title Guaranty Company. Intercounty-Illinois's relationship with Stewart lasted until about December 1995, when Intercounty-Illinois essentially ceased operations. From 1984 until April 1991, Intercounty-Illinois was owned approximately 40 percent by Capriotti, 40 percent by Hargrove, and 20 percent by Stewart. After April 1991, Capriotti and Hargrove each owned approximately 50 percent.

3

As a title insurance agent for Stewart, Intercounty-Illinois sold title insurance policies that were issued by Stewart to customers in the Chicago area and also acted as an escrow agent for the collection and disbursement of funds relating to the purchase, sale and construction of real estate. All of the funds that Intercounty-Illinois received as escrow agent were deposited and commingled in a few escrow accounts that it controlled, first at LaSalle National Bank until about September 1999, and later at Harris Bank and Trust. On a monthly basis, Intercounty-Illinois engaged in thousands of escrow account transactions involving the receipt and disbursement of millions of dollars belonging to its customers, who directed the transactions. Due to the volume of business, there was a substantial float in the escrow accounts, meaning that on any particular day, the total amount of title insurance customer funds that were deposited into the escrow accounts substantially exceeded the total amount of funds paid out. An escrow agreement between Stewart and Intercounty-Illinois provided that Intercounty-Illinois agreed to keep the escrow funds safe and separate and to disburse the funds only for purposes authorized by the title insurance customers.

After late 1995, as Intercounty-Illinois became inactive, Intercounty-Illinois and Stewart were replaced by a set of new companies that provided the same services through a different corporate organization; these included: Intercounty-Indiana, Intercounty National Title Insurance Company (INTIC), and ITI Enterprises, which Capriotti and Hargrove each half-owned. Fidelity National Title Insurance Company of New York acted as reinsurer for most of the insurance underwritten by INTIC. ITI Enterprises controlled the escrow accounts.

Intercounty-Illinois was in the business of insurance, as that term is defined in Title 18, United States Code, Section 1033(f), in that Intercounty-Illinois was an agent of Stewart which wrote and issued title insurance policies. The activities of Intercounty-Illinois affected interstate

commerce. Wallwin and Stimac, who worked at Intercounty-Illinois' offices in Chicago and were supervised by Michel Thyfault, engaged in transactions relating to the conduct of affairs of Intercounty-Illinois.

The agreement between Stewart and Intercounty-Illinois allowed Stewart to audit the escrow accounts to make sure that Intercounty-Illinois was honoring its promise to disburse escrow funds only as directed by the depositors. Stewart conducted an audit in 1995.

In or about November 1995, in connection with Stewart's 1995 audit, Wallwin and Stimac met with Capriotti and Hargrove, who directed them to falsify the escrow accounting records to conceal their thefts from the escrow account and the fact that Intrust was sending millions of dollars over to Intercounty-Illinois' escrow account. Capriotti and Hargrove told Wallwin and Stimac to do whatever was necessary. Wallwin and Stimac agreed and did so.

In order to carry out this directive, the two reports that Wallwin and Stimac had to alter were the Retention/Overdraft Report and the escrow bank account reconciliation. The Retention/Overdraft Report was a record of those escrow files that had either a negative balance, meaning that more money had been disbursed than had been deposited, or a positive balance, which meant the opposite. This report showed several escrow files through which Capriotti and Hargrove had stolen millions of dollars of escrow funds, including a file called TI 4659, for which Hargrove was responsible, and files relating to a real estate development called Ruffled Feathers, which Capriotti and Hargrove owned. The escrow bank account reconciliation was a record that reconciled the amount of money that actually was in the escrow account with Intercounty's books and records, which showed where the escrow money went. It contained entries that referred to many of the ways that Capriotti and

Hargrove had stolen escrow funds, including direct transfers of funds from the escrow account to the operating account.

Stimac altered the Retention/Overdraft Report, and Wallwin and Stimac worked together to alter the escrow bank reconciliation. Wallwin and Stimac altered the escrow reconciliation to correspond to the altered Retention/Overdraft Report, from which Stimac had deleted several files with large negative balances. Wallwin and Stimac also deleted from the escrow reconciliation references to certain escrow-funded certificates of deposit (which Wallwin and Stimac believed had been cashed in, based on the fact that no interest was being paid), as well as any references to any direct transfers from the escrow account to Intercounty-Illinois' operating account, which by that time totaled several million dollars. Wallwin gave the altered reports to Capriotti, who gave them to Stewart for the purpose of deceiving Stewart about Intercounty-Illinois' financial condition.

6. The defendant also acknowledges that for the purpose of computing his sentence under the U.S. Sentencing Guidelines, the following conduct, to which he stipulates, constitutes relevant conduct under Section 1B1.3 of the Guidelines:

In the early 1990's, Thyfault and Wallwin prepared monthly cash flow reports and gave them to Capriotti and Hargrove. These cash flow reports projected the cash flow in Intercounty-Illinois' operating account. Most of the time, these cash flow reports showed a need for cash to be deposited into the operating account.

At first, Thyfault told Wallwin to send these reports to Capriotti and Hargrove only, and to place them in an envelope marked "confidential." Later, Thyfault told him to stop sending the written reports to Capriotti and Hargrove. Thereafter, Wallwin provided the information orally to Capriotti and, on occasion, Hargrove.

6

In the early 1990's, Capriotti and Hargrove responded to this information by promising, and then causing, Capjac to send funds to Intercounty-Illinois. Intercounty-Illinois booked these transfers as loans which Intercounty-Illinois owed to Capjac.

Starting in the mid-1990's, when presented with information showing a need for an infusion of funds into the operating account, Capriotti directed Wallwin to transfer funds directly from the escrow account to the operating account. Wallwin caused these transfers to occur. Sometimes Stimac was present in Wallwin's office when Wallwin initiated the calls. When Wallwin was absent or otherwise engaged, Stimac made the calls and would report back to Wallwin what had occurred.

By the end of October 1996, when Wallwin left ITI Enterprises, approximately $15 million had been transferred from the escrow account to the operating account. By assisting in these transfers, defendant abused a position of private trust, namely treasurer of Intercounty-Illinois and ITI Enterprises. The persons who deposited money in the escrow accounts depended on their escrow agents, and the senior employees of their escrow agents, to safeguard this money and to disburse it only as directed by the depositors.

The summary of facts contained in paragraphs 5 and 6 does not exhaust defendant's knowledge of the relevant facts and is offered solely as a factual basis for his guilty plea.

7.  For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

(a)  The applicable sentencing guidelines are set forth in the November 1, 1995 sentencing guidelines manual.

(b)  The base offense level is level 6, pursuant to § 2F1.1(a).

7

(c) The loss from the offense of conviction and relevant conduct was between $10 million and $20 million. Therefore, pursuant to § 2F1.1(b)(1)(P), the offense level is increased by 15 levels.

(d) The offense of conviction and relevant conduct involved more than minimal planning and a scheme to defraud more than one victim. Therefore, pursuant to § 2F1.1(b)(2), the offense level is increased by 2 levels.

(e) The defendant abused a position of private trust, namely treasurer of Intercounty-Illinois and ITI Enterprises, in a manner that significantly facilitated the commission and concealment of the offense and relevant conduct. Therefore, pursuant to § 3B1.3, the offense level is increased by 2 levels.

(f) The defendant was a minor participant in the offense of conviction and relevant conduct. Therefore, pursuant to § 3B1.2(b), the offense level is decreased by 2 levels.

(g) Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of § 3E1.1, a 2-level reduction in the offense level is appropriate pursuant to § 3E1.1(a).

(h) Defendant has provided timely complete information concerning his own involvement in the offense, and notified the government timely of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently, within the meaning of § 3E1.1(b). Therefore, an additional one-level reduction in the offense level is appropriate, provided that the court determines that the

defendant qualifies for a two-level reduction under § 3E1.1(a), and that the offense level is 16 or greater prior to the operation of § 3E1.1(a).

  (i) Based on the facts known to the government, the defendant's criminal history points equal 0 and the defendant's criminal history category is I; and

  (j) The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

 8. Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

 9. Defendant understands the count to which he will plead guilty carries a maximum penalty of 10 years imprisonment, a maximum fine of $250,000 or twice the gross gain or gross loss, whichever is greater, a term of supervised release of at least two but not more than three years, and any restitution ordered by the Court.

9

10. The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $50 on the count to which he has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $50 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

11. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a) If defendant persisted in a plea of not guilty to the charge against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b) If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately.

(c) If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d) At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e) At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

12. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and only may appeal the validity of this plea of guilty or the sentence, subject to the limitations set forth below.

13. Defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal a sentence. In exchange for the concessions made by the government in this plea agreement, defendant knowingly waives the right to appeal any sentence, or the manner in which the sentence was determined, so long as the sentence was within the maximum provided in the statute of conviction. The defendant also waives his right to challenge the sentence in any

collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel which relates directly to this waiver or its negotiation.

14. Defendant understands that he may be entitled to have any disputed sentencing fact which could increase his sentence alleged in the superseding indictment and determined at a jury trial under a proof beyond a reasonable doubt standard. Defendant further understands that, by pleading guilty, he agrees:

(a) To have his sentence determined under the Sentencing Guidelines; and

(b) To waive having sentencing facts alleged in the superseding indictment and found by the jury beyond a reasonable doubt; and

(c) To have the court determine his sentencing facts by a preponderance of the evidence; and

(d) To allow the court to consider any reliable evidence, including hearsay, in determining his sentence.

If the sentencing guidelines are determined to be unconstitutional, defendant understands that the court may have discretion to set his sentence as it deems appropriate without regard to the sentencing guidelines up to the total statutory maximum penalty as set forth in paragraph 9, and that, if this occurs, defendant will have no right to withdraw his guilty plea.

15. Defendant understands that the superseding indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

16. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's

conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

17. Defendant agrees that he will fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate.

(a) Defendant agrees to provide complete and truthful information in any investigation and pretrial preparation, and complete and truthful testimony, if called upon to testify by a representative of the United States Attorney, before any federal or state grand jury, any United States District Court or state court proceeding, and any related civil administrative our court proceeding. In addition, defendant agrees to cooperate fully in preparation for any testimony.

(b) Defendant agrees to postpone his sentencing until the conclusion of the prosecution of his co-defendants.

18. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation and, assuming the defendant's full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline 5K1.1, to depart from the applicable sentencing guidelines range. The Court shall be free to impose any sentence that it deems appropriate. Defendant shall be free to recommend any sentence that he deems appropriate. The government shall recommend that the Court impose a sentence that includes some term of incarceration.

19. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and is free to impose the maximum penalties as set forth in paragraph 9 above. The defendant further acknowledges that if the court does not accept the sentencing recommendation of the parties, the defendant will have no right to withdraw his guilty plea.

13

20. Regarding restitution, the parties agree that the offense to which the defendant is pleading guilty is a crime against property, and thus an order of restitution is required pursuant to Title 18, United States Code, Section 3663A. The parties further agree that the amount of restitution which defendant should be ordered to pay jointly and severally with all convicted codefendants is $15 million. The defendant agrees to provide full and truthful information to the Court and the United States Probation Officer regarding all details of his economic circumstances, including all tax returns and related information as may be requested, in order to determine the manner in which and the schedule according to which restitution is to be paid. Furthermore, defendant understands that he is required to notify the Court and the United States Attorney's office of any material changes in his economic circumstances that might affect his ability to pay restitution. Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the court.

21. After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the count of the original indictment against defendant.

22. Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the

14

Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

23. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

24. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: *Nov. 29, 2004*

PATRICK J. FITZGERALD
United States Attorney

ROBERT W. KENT, JR.
Assistant United States Attorney

JAMES R. WALLWIN
Defendant

SHELLY B. KULWIN
Attorney for Defendant

16