UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 03 CR 779 |
| | ) | |
| JACK L. HARGROVE, and | ) | |
| MICHEL D. THYFAULT, | ) | Judge James B. Moran |

## NOTICE OF FILING

TO: Edward M. Genson
53 W. Jackson Blvd.
Suite 1420
Chicago, Illinois 60604

Paul A. Wagner
321 S. Plymouth Ct.
Suite 1500
Chicago, Illinois 60604

**PLEASE TAKE NOTICE** that on Monday, July 18, 2005, the undersigned filed with the Clerk of this Court, **GOVERNMENT'S MOTION *IN LIMINE* ONE**, service of which is being made upon you.

_____
BART HUFF
Assistant United States Attorney
219 S. Dearborn Street
Chicago, IL 60604

| | | |
|---|---|---|
| **STATE OF ILLINOIS** | ) | |
| | ) | SS |
| **COUNTY OF COOK** | ) | |

Bart Huff, deposes and says that he is employed in the Office of the United States Attorney for the Northern District of Illinois; and that on the 18th day of July, 2005, he caused a copy of the above-mentioned filings to be served by fax and U.S. Mail.

_____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 03 CR 779 |
| | ) | |
| JACK L. HARGROVE,, et al. | ) | The Honorable James B. Moran |

## GOVERNMENT'S MOTION *IN LIMINE* ONE

The UNITED STATES OF AMERICA, by Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, hereby requests that this Court preclude defendant Jack L. Hargrove from eliciting evidence or making argument about: (1) his attorneys' investigation of the situation at Intercounty in February 2000; (2) the statements by Hargrove and his attorneys regarding disclosure of the scheme to the authorities and victims; and (3) Hargrove's subsequent payment of partial restitution to the victims of the scheme.

### Background

Beginning no later than 1988 and continuing until February 2000, Capriotti and Hargrove, assisted by Thyfault, Wallwin, Stimac, Hurwick and others, stole more than $80 million from the escrow accounts that were managed by Intercounty-Illinois and ITI Enterprises. As part of the scheme, Capriotti, Hargrove, Thyfault and Hurwick fraudulently caused Independent Trust Company (Intrust) to tender more than $50 million in trust holder funds to Intercounty-Illinois and ITI Enterprises. Rather than keeping the Intrust funds in the escrow accounts as required, the defendants caused the Intrust funds to be spent as part of their ongoing scheme to deplete the escrow accounts. By infusing the Intrust funds into the escrow accounts and taking advantage of the natural float in the escrow accounts, the defendants were able to steal millions of dollars, use Intrust money and new

title customer money to pay off old title customers, and continue the scheme for more than a decade. In the end, Intrust and its trust holders lost all of the more than $50 million that had been tendered, plus the more than $18 million in interest that they thought was accruing. Fidelity, which was insuring the escrow accounts when the scheme came to a close in early 2000, ultimately suffered the remainder of the loss by paying more than $30 million to the title insurance customers who had deposited funds into the escrow accounts but had not yet withdrawn them.

Of the more than $80 million that defendants stole, they plowed back approximately $70 million into their title insurance companies and other businesses. This was accomplished by:

- withdrawing more than $1 million in the late 1980s and using the funds to benefit Intercounty-Illinois and finance the acquisition of a commercial office building in Chicago;

- withdrawing more than $15 million starting in 1989 and using the funds to purchase certificates of deposit in the name of Intercounty-Illinois at various Chicago area financial institutions. Capriotti and Hargrove converted many of the CDs to their own use, and in some cases pledged the CDs as collateral for personal loans. Some of the loan proceeds were deposited into Intercounty-Illinois's operating accounts and were booked as loans to Intercounty from Capjac Investments Group, Inc., which was owned by Capriotti and Hargrove;

- withdrawing millions of dollars from the escrow accounts and disbursing the funds to Capjac, which Capriotti and Hargrove converted to their own use. Between 1991 and 1994, they caused more than $3 million to be disbursed to Capjac, and then caused a substantial portion to be transferred to Intercounty-Illinois's operating accounts; and

- starting in 1994, transferring more than $45 million – on an almost monthly basis for six years – from the escrow accounts to the operating accounts of Intercounty-Illinois and ITI Enterprises.

As part of the fraud scheme, from 1994 onward, Capriotti and Hargrove stalled, obstructed and made false statements and promises to the Office of Banks and Real Estate and Intrust's

president. From 1994-96, OBRE issued reports noting the amount of money that Intrust had transferred to the escrow account and criticizing the commingling of funds. In response to critical reports in 1997-98, the defendants provided OBRE with allegedly fraudulent escrow account statements purporting to show that the primary Intrust escrow account at LaSalle Bank contained in the vicinity or more than $53 million or $54 million, when, in fact, the account contained only $45,949.

As the fraud scheme neared its end-stage in early April 1999, LaSalle Bank advised Capriotti and Hargrove that the primary title insurance company escrow account was overdrawn by several million dollars, and that they needed to deposit funds into the account. Capriotti told the bank that Intercounty had $13 million in CDs and substantial funds in another bank account, when in fact, the CDs did not exist and the other account contained less than $2,500. Instead, Capriotti and Hargrove obtained $9.2 million from Intrust by falsely telling Intrust's president that the funds were needed to boost Capriotti and Hargrove's account balances at LaSalle Bank so that the bank would charge them lower interest on a loan and falsely promising that the funds would be returned to Intrust by April 30. Capriotti and Hargrove used this $9.2 million to cure the overdraft problem and did not return any money to Intrust. A short time later, LaSalle Bank asked Capriotti and Hargrove to take their banking business elsewhere.

The defendants established a new primary escrow account at Harris Bank. In September 1999, the OBRE issued a Corrective Action Order that required that Intrust "terminate the escrow arrangement with Intercounty Title Company of Illinois, take control of the trust assets subject to that arrangement, and properly account for those trust assets on its trust accounting system and on its customers' account statements." During a meeting with the OBRE in November 1999, Capriotti,

3

in Hargrove's presence, falsely assured the regulators that the money was safe and that he would comply with the regulators' directives. Capriotti and Hargrove caused Intrust to do none of these things. It was further part of the scheme that, in November 1999, when additional funds were needed for operating expenses, Capriotti and Hargrove caused Intrust to loan $1.6 million in corporate funds to ITI Enterprises, knowing that Intrust had debts to its trust holders that it could not pay and that, but for this loan, these corporate funds would have been available for the trust holders. In response to the president of Intrust's statement that the corporate funds might be needed because of the escrow situation, Capriotti, in Hargrove's presence, falsely stated to Intrust's president that the escrow accounts were audited every year by the Illinois Department of Financial Institutions and by Fidelity, the re-insurer. The $1.6 million in loan proceeds were wire transferred to Harris Bank and deposited into ITI Enterprises' operating account.

By January 2000, that escrow account was substantially overdrawn, and on January 5, Capriotti and Hargrove again attempted to obtain another $13 million from Intrust by again falsely stating to Intrust's president that the money was needed to reduce Capriotti and Hargrove's interest rate on a loan. This time, Intrust's president refused their request, and ITI Enterprises began to bounce closing checks.

On January 24, 2000, Capriotti and Hargrove removed the president of Intrust from the position of chief executive officer of Intrust and installed Capriotti into that position.

In late January or early February 2000, OBRE initiated another examination of Intrust. Intrust's failure to comply with OBRE's Corrective Action Order was a primary focus of OBRE's inquiry. On February 4, 2000, in response to a request by OBRE, Hurwick wrote and sent a letter to the president of Intrust stating that "Intercounty Title Company is holding $67,817,367.99 in funds

4

belonging to Independent Trust Corporation as of December 31, 1999." In fact, at that time, there was still only $45,949 in the Intrust escrow account.

In or about February 2000, Hargrove's attorneys, including his criminal defense attorney, Edward Genson, embarked on an investigation of the situation at Intercounty. In late February 2000, Hargrove's attorneys called Gary Bertacchi, Intrust's president, and instructed him to come downtown to Intercounty's offices for a meeting. Bertacchi did as he was instructed, and met with Hargrove, Genson and other Hargrove attorneys. During this meeting, Hargrove told Bertacchi that Intrust's money – which at that point was more than $50 million plus interest – was missing, and that one of his attorneys would soon be advising OBRE of this fact. Hargrove's attorneys thereafter contacted OBRE, which contacted the U.S. Attorney's Office on or about February 29, 2000. Hargrove's attorneys met with the U.S. Attorney's Office and the FBI on March 3, 2000.

Fidelity started investigating the situation at Intercounty in early March 2000. A preliminary review of the escrow account resulted in the belief that at least $8 million of Intercounty escrow money was missing. Thereafter, on March 17, 2000, Fidelity and Hargrove entered into an agreement in which Hargrove acknowledged that the hole in Intercounty's escrow funds was between $8,000,000 and $10,000,000. In addition, Hargrove deposited approximately $2,000,000 into Intercounty's escrow account and agreed to assign his interests in certain property to Fidelity as collateral for payments Fidelity may have to make due to the missing escrow funds.[1] By June 2000, Fidelity had determined that the hole in the escrow account was larger than it had believed and stopped reinsuring Intercounty on or about June 23, 2000, forcing Intercounty to cease operations.

---

[1] The agreement ultimately was amended on April 23, 2000, to change the collateral provided by Hargrove.

5

## Argument

The government seeks an order barring the defense from eliciting evidence or making argument about: (1) his attorneys' investigation of the situation at Intercounty in February 2000; (2) the statements by Hargrove and his attorneys regarding disclosure of the scheme; and (3) Hargrove's payments and pledges of collateral to Fidelity after January 2000. Such evidence is not relevant to any issue that the jury will need to decide, including defendant Hargrove's intent, and can only lead to confusion and a waste of time.

The only conceivable argument for the relevance of this evidence is that it tends to prove Hargrove's supposedly innocent state of mind. This argument fails because Hargrove's purportedly exculpatory conduct and statements occurred after he knew that his offense was about to be discovered by the OBRE, and after he had a chance to consult with his defense attorney about the best way to proceed given this fact. Under these circumstances, the Court should exclude the evidence as irrelevant, and under the balancing test set forth in Fed. R. Evid. 403.

In this circuit, a defendant may offer his own post-offense exculpatory statements to prove his state of mind at the time of the offense only if he had no opportunity to fabricate a story. *See United States v. Macey*, 8 F.3d 462, 467-68 (7th Cir. 1993) (post-offense exculpatory statement by defendant was inadmissible because defendant had four hours in which to fabricate a story). The opportunity to fabricate similarly negates the relevancy of Hargrove's purportedly exculpatory post offense conduct. Here, Hargrove knew that the scheme was about to be discovered, brought his attorneys in to review the situation, and then structured his statements and conduct in a way to place himself in the best light possible. Under these circumstances, the evidence does not tend to prove his state of mind during the course of the scheme one way or the other, and thus is irrelevant.

Courts uniformly have held that, in a fraud case, the only relevant state of mind is that which the defendant had at the time of the offense because the crime is complete when the misapplication of funds or embezzlement occurs. *See, e.g., United States v. Ross*, 206 F.3d 896, 899 (9th Cir. 2000). Restitution after-the-fact is irrelevant. *See, e.g., United States v. Yoon*, 128 F.3d 515, 524-25 (7th Cir. 1997); *United States v. Angelos*, 763 F.2d 859, 861 (7th Cir. 1985).[2]

In this case, the fraud with which Hargrove is charged began in the late 1980's, well over a decade before he brought his attorneys in to investigate, disclosed the fact that money was missing to the authorities and his victims, and paid back a small amount of the money that he and his coconspirators stole.[3] The government expects that the evidence will show that the bulk of the money was stolen in the mid-to-late 1990's, literally years before the conduct in question. In fact, the last theft from Intrust occurred in April 1999 – about a year before events at issue – when Hargrove and co-defendant Capriotti lied to Intrust President Bertacchi to convince him to wire an additional $9,000,000 to Intercounty. Hargrove's agreement to make some restitution, years after the fact and after the fraud began to unravel,[4] has no bearing on his intent at the time of the thefts. *United States v. Stockton*, 788 F.2d 210, 219 (4th Cir. 1986) ("Embezzlement is not excused by restitution of goods or services of equivalent value.").

---

[2] The only exception to this rule is inapplicable to this case. Some courts have stated that in a check kite case, the fact that checks ultimately did clear based on deposits of the defendant is relevant because it sheds light on whether the defendant intended – at the time he presented the kited check – to defraud the financial institution, ie., whether the defendant knew that there were insufficient funds in his account to cover the checks at issue.

[3] In comparison to the $80 million loss, the $2 million in cash and the property provided by Hargrove is small.

[4] *See United States v. Sindona*, 636 F.2d 792, 800-01 (2nd Cir. 1980) (repayment after investigation had begun "sheds little light" on the relevant state of mind).

Even if there were some minimal probative value to the evidence, it should be precluded under Federal Rule of Evidence 403. Such evidence, if allowed, would only confuse the jury and lead to mini trials over the reasons for Hargrove's conduct and the value of the assets pledged as partial restitution.[5] *See United States v. Sindona*, 636 F.2d 792, 801 (2nd Cir. 1980) (holding that any "scant" probative value of repayments by defendant in bank fraud case, which the court deemed "doubtful at best," was substantially outweighed by the risk of delay and confusion).

## Conclusion

For the reasons set forth above, the government requests that this Court enter an order barring any evidence or argument about any conduct or statements by Hargrove or his attorneys after February 4, 2000, the date of the last charged act of fraud.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____
ROBERT W. KENT, JR.
BART HUFF
SCOTT R. DRURY
Assistant United States Attorneys
219 South Dearborn Street
Room 500
Chicago, Illinois 60604

---

[5] As demonstrated by the evidence in the civil trial in April 2004 between Fidelity, Stewart (the insurer before Fidelity) and Hargrove, the exact value of the collateral provided by Hargrove is open to dispute.

8