# JAMES WALLWIN'S
## VERSION OF THE OFFENSE

After working at Chicago Title & Trust for a short time, I was offered a job at InterCounty Title (IC). After leaving IC for about one year, I returned in 1976 and stayed until 1996. Between 1976 and 1990, I worked under several different management teams and owners, including Larry Capriotti, who first purchased an interest in IC in approximately 1978 and Jack Hargrove, who did so in 1984.

Between 1978 and 1984, I continued to work at IC, learning additional aspects of the business. While I hoped to transfer into the production side of the business, my supervisors urged me to stay in the accounting department, despite the fact that I had no real formal training or education in that area. In 1984, Capriotti along with Hargrove took over IC completely and began to take aggressive steps to expand the size and profits of the company.

Between 1976, when I really began my career at IC and 1990, when things first began to go wrong, my career, in my mind was progressing well. Despite my lack of formal education and training, I was progressing within the company and was well respected for the work I was doing. I took pride in the work that I did and the salary that I earned, which allowed me to purchase my own home in 1983, where I still live, and where my wife and I raised our two children, my son James and daughter Amanda.

During this time, aside from raising my children, I cared for my mother, who had become ill, and lived with us until she died in 2000. I guess the best way to put it is that between 1976 and 1990, I lived the American Dream, a good job with a good salary, a beautiful family and a wonderful home.

1

In approximately 1990, things began to change at IC and for me. Capriotti and Hargrove embarked on a new venture called Ruffled Feathers, a $32,000,000 golf course/housing development, which they were joint venturing in Lemont, Illinois with another investor. Because they were unable to obtain a master loan on the project, they began construction without permanent financing, with the plan being they would obtain it in the immediate future. At that same time, Capriotti was building his own home in Frankfort, Illinois and he and Hargrove both had trust/escrow accounts at IC in their own names which were deficient, *i.e.* overdrawn.

It was at this point that they first came to me and raised the issue of altering company records. Stewart Title had raised issues in prior audits about the deficiencies in their personal accounts and they did not want it to come up again in the next impending audit. They wanted the deficiencies papered over. My understanding at the time was that it was a short term fix to mollify Stewart Title and that they would fund the deficiencies in the immediate future with fresh money. Given the investment I had in my career at the time and the manner in which they made the request – it was more of a direction than a request – I worked with others to alter the documents to cover up the deficiencies from Stewart Title. I was wrong to do so. In retrospect, it is clear to me that I should have told them that I could not be involved in such conduct. But I didn't. I went along as, unfortunately, was my nature. I also went along finally because I did not want to jeopardize my job, my career and my income. I also went along because, while I was not entirely confident of Capriotti and Hargrove's integrity at that point, I did not believe that they would just "steal the money" after the audit, but that they would in fact return it. Obviously, I was wrong and I have regretted that first decision to assist them for many years now.

In 1992, Capriotti, Hargrove and Mike Thyfault first advised me of the problems they were having at Ruffled Feathers. The master loan still had not came through and they had the construction escrow department disburse funds on what were called "Unreceived Deposits" to pay for construction costs. This created a further deficiency in the escrow account. Although file overdrafts were not an uncommon occurrence for IC, dating back as far as 1987 there were "File Overdrafts" listed on the audited financial statements totaling over $6,000,000 from various other Capriotti and Hargrove ventures, these were new overdrafts.

As I testified, I went along with their scheme to conceal these additional deficiencies from other IC employees. Here again, I essentially closed my eyes to their unethical and illegal handling of the escrow account with their assertions that all would be well once Ruffled Feathers was sold and they made at that time a projected $30,000,000 profit.

Things obviously got worse after that. In 1995, as I have testified, I went along with additional conduct to conceal from Stewart Title deficiencies in IC's escrow account caused by Capriotti's and Hargrove's thefts from those accounts. There was no excuse for my going along with Capriotti's and Hargrove's plan to engage in this conduct at that time. By then, I knew that, despite Capriotti Hargrove's assurances that these were only "temporary deficiencies" and everything would be covered once Ruffled Feathers and other real estate projects were profitably sold, the conduct was fraudulent and I should have refused to do it.

3

I have thought many times about why I went along with something so clearly illegal and so fundamentally at odds with who I thought I was and think I am. I have never come up with a satisfactory explanation and have been beating myself up for my failure at this critical juncture of my life for a long time now. I feel I not only let myself down, but far worse, my family, especially my two children, who I always taught to be honest and to do the right thing.

In 1996, when Ruffled Feathers was sold, I searched the records to determine whether any of the missing money had ben returned. I could not find that it had been. At that point, I felt I had to leave. Capriotti tried to talk me out of leaving and again assured me that IC's problems were temporary in nature and that everything would soon work out. When I told him my decision was firm, he offered me a significant severance package in return for me signing a separation agreement. I refused to accept it. He also offered me a consulting position which I refused to accept.

About six months later, I joined another title company. I invested a significant portion of my own money trying to make it successful. After four (4) years I left; the company was failing and I lost most of my investment.

The past eight (8) years have been extremely stressful. I never was able to find work again in the only industry about which I had any knowledge. The collapse of IC left me feeling guilt ridden and deeply remorseful about my own role in its ultimate failure. I have spent the last several years working with civil lawyers, federal prosecutors, federal agents and my own attorneys trying my best to do whatever I could to make amends for what I did and for my failure to refuse to go along with Capriotti and Hargrove's fraud.

4

At this point, the consequences of my conduct have deeply affected my life; my wife and I are in debt, we have been trying to secure full time employment, but due to our ages, the economy and my circumstances being unresolved for the past eight (8) years, it has been very difficult. We had been operating a mortgage document delivery business the past few years, but the current economic conditions in that industry have severely reduced our volume and income. I am very fortunate to have my wife of 35 years, who despite everything, has stayed with me and still loves me and the love of my two children. I am also fortunate to have friends and other family members who have stuck with me through these very trying events.

I recognize that what I did in 1990's was wrong. I realize that people were hurt by my failures. I have tried to do all I could to make up for it. I would only ask to Court to take my conduct both before and after those events occurred, as well as the impact any sentence will have on my wife and children, who still depend on me to help them, in the future. Thank you very much for any consideration you can give me in this regard.